# No. 22-2438

*(Docket Number in District Court: 1:15-cv-06279-ER-SLC)*

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

Jesse Sherman, Arlette Sherman,
*Lead Plaintiffs-Appellants*,

PAMCAH-UA Local 675 Pension Fund,
*Movant-Appellant*,

Michael Francisco, Individually and on Behalf of All Others Similarly Situated,
*Plaintiff*,

[Caption continued on following page.]

_____

Appeal from the United States District Court
for the Southern District of New York

## PLAINTIFFS-APPELLANTS' OPENING BRIEF

ROBBINS GELLER RUDMAN
  & DOWD LLP
ANDREW S. LOVE
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA  94104
Telephone:  415/288-4545
415/288-4534 (fax)

LEVI & KORSINSKY, LLP
NICHOLAS I. PORRITT
ADAM M. APTON
55 Broadway, 10th Floor
New York, NY  10006
Telephone:  212/363-7500
212/363-7171 (fax)

[Additional counsel appear on signature page.]

*Counsel for Lead Plaintiffs-Appellants and Movant-Appellant*

Daniel LaMoureaux, Individually and on Behalf of All Others Similarly Situated,
*Consolidated-Plaintiff*

vs.

Abengoa, S.A., Manuel Sanchez Ortega, Canaccord Genuity Inc., HSBC Securities
(USA) Inc., Merrill Lynch International, Société Générale,
*Defendants-Appellees*,

Santiago Seage, Barbara Zubiria, Ignacio Garcia Alvear, Alicia Velarde Valiente,
Banco Santander, S.A., Carlos Sundheim Losada, Christopher Hansmeyer, Claudi
Santiago Ponsa, Enrique Borrajo Lovera, Felipe Benjumea Llorente, Fernando
Solis Martinez-Campos, Ignacio Solis Guardiola, Javier Benjumea Llorente, Jesus
Garcia-Quilez Gomez, Jose B. Terceiro, Jose Borrell Fontelles, Jose Joaquin
Abaurre Llorente, Jose Luis Aya Abaurre, Maria Teresa Benjumea Llorente, Maria
Teresa Benjumea Llorente, Ricardo Martinez Rico,
*Defendants*.

*Jesse Sherman, Arlette Sherman, et al. v. Abengoa, S.A., et al.*
Second Circuit No. 22-2438

## CORPORATE DISCLOSURE STATEMENT

None of the appellants are corporations or have any parent corporation, and

none have publicly held corporations that own 10% or more of its stock.

4888-4367-9549.v1

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION .........................................................................................1

II.   JURISDICTION ...........................................................................................4

III.  ISSUES PRESENTED .................................................................................5

     A.    Securities Act ....................................................................................5

     B.    Securities Exchange Act....................................................................7

IV.  STATEMENT OF THE CASE ....................................................................8

     A.    Factual Background............................................................................8

           1.    A whistleblower detailed Abengoa's pervasive
                accounting fraud..........................................................................9

           2.    The whistleblower's account was corroborated by first-
                hand accounts of other former employees and was relied
                upon by Spain's criminal courts ...............................................11

           3.    Abengoa's former executive chairman directed senior
                management to falsify expenses in order to artificially
                inflate profit margins on several projects ..................................17

           4.    Abengoa's Registration Statement contained false and
                misleading statements and omissions .......................................18

           5.    Abengoa continued to conceal a deepening liquidity
                crisis by falsifying project expenses, inflating profits, and
                hiding losses.............................................................................19

           6.    Unable to conceal its losses any further, Abengoa
                declared bankruptcy ..................................................................22

           7.    Abengoa, Ortega and other senior management face
                criminal charges in Spain..........................................................22

B. Procedural History ..............................................................26

C. Rulings Presented for Review ...........................................27

V. STANDARD OF REVIEW ...........................................................28

VI. SUMMARY OF ARGUMENT ......................................................29

VII. ARGUMENT .................................................................................32

 A. Securities Act Claims ........................................................32

  1. Claims against the Underwriter Defendants were timely filed ............................................................................32

  2. Plaintiffs plausibly alleged Abengoa committed accounting fraud, which rendered their statements and omissions false and misleading ...................................38

   a. Confidential witnesses provided reliable, non-conclusory, and detailed allegations of accounting fraud ...............................................................39

    (1) Credible witnesses in the Spanish criminal proceedings were erroneously rejected by the district court ...................................39

    (2) Confidential witnesses who provided specific, consistent, and concrete examples of Abengoa's accounting fraud were erroneously rejected by the district court as conclusory and uncorroborated ...........................43

   b. The district court made premature fact findings and improperly drew inferences in defendants' favor ................................................................51

(1)    The Complaint adequately alleges that Abengoa fraudulently maintained two sets of books, falsely inflated profit margins, and improperly and prematurely recorded expenses ..................................................51

(2)    The Complaint adequately alleges that Abengoa violated the percentage-of completion accounting rule by routinely recording future, non-existent, and unrelated expenses on construction projects .......................55

3.    Abengoa's false and misleading statement about enforcing strict financial discipline was material to investors ....................................................................59

B.    Exchange Act Claims ..........................................................62

1.    The Complaint adequately alleged that defendants' statements were false and misleading .......................................62

a.    The misstatements of fact and omissions supporting the Securities Act claims also support the Exchange Act claims ...............................................62

b.    Defendants' post-Offering statements about Abengoa's cash flow and liquidity in the face of a liquidity crisis concealed by fraud were false and misleading ........................................................................62

c.    Abengoa's statement that it did not need to access capital markets immediately before seeking a capital increase was false and misleading .....................63

2.    Scienter is adequately alleged ...................................................65

- iv -

a.     Management-level employees' involvement in company-wide fraud supports a compelling inference of corporate scienter .......................................65

b.     Ortega's resignation shortly before the fraudulent scheme was exposed and followed by criminal charges support a compelling inference of scienter .......69

C.     Control person liability was adequately pled ......................................70

VIII.   CONCLUSION ...............................................................................71

# TABLE OF AUTHORITIES

Page

## CASES

*Abramson v. Newlink Genetics Corp.*,
965 F.3d 165 (2d Cir. 2020) ...............................................................62

*Altimeo Asset Mgmt. v. Qihoo 360 Tech. Co.*,
19 F.4th 145 (2d Cir. 2021) ................................................................58

*Asay v. Pinduoduo Inc.*,
2021 WL 3871269 (2d Cir. Aug. 31, 2021) .................................60, 61

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007).............................................................................54

*Bos. Ret. Sys. v. Alexion Pharms., Inc.*,
556 F. Supp. 3d 100 (D. Conn. 2021)..................................................66

*City of Omaha, Neb. Civilian Emps.' Ret. Sys. v. CBS Corp.*,
679 F.3d 64 (2d Cir. 2012) ..................................................................62

*Constr. Laborers Pension Tr. for S. Cal. v. CBS Corp.*,
433 F. Supp. 3d 515 (S.D.N.Y. 2020) .................................................66

*DoubleLine Cap. LP v. Odebrecht Fin., Ltd.*,
323 F. Supp. 3d 393 (S.D.N.Y. 2018) .................................................37

*Emps.' Ret. Sys. v. Blanford*,
794 F.3d 297 (2d Cir. 2015) .................................................45, 46, 54

*FDIC v. Credit Suisse First Bos. Mortg. Sec. Corp.*,
414 F. Supp. 3d 407 (S.D.N.Y. 2019) ...........................................38, 40

*Fed. Hous. Fin. Agency for Nat'l Mortg. Ass'n v. Nomura Holding Am., Inc.*,
873 F.3d 85 (2d Cir. 2017) .......................................................33, 34, 36

*Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt. LLC*,
376 F. Supp. 2d 385 (S.D.N.Y. 2005) .................................................42

*Fresno Cnty. Emps.' Ret. Ass'n v. comScore, Inc.*,
    268 F. Supp. 3d 526 (S.D.N.Y. 2017) ................................................70

*Ganino v. Citizens Utils. Co.*,
    228 F.3d 154 (2d Cir. 2000) ...............................................................58

*Goldman v. Belden*,
    754 F.2d 1059 (2d Cir. 1985) ............................................................58

*Haw. Structural Ironworkers Pension Tr. Fund v. AMC Ent. Holdings, Inc.*,
    422 F. Supp. 3d 821 (S.D.N.Y. 2019) ................................................61

*Herman & MacLean v. Huddleston*,
    459 U.S. 375 (1983)............................................................................28

*Ho v. Duoyuan Glob. Water, Inc.*,
    887 F. Supp. 2d 547 (S.D.N.Y. 2012) ................................................70

*HSH Nordbank AG v. RBS Holdings USA Inc.*,
    2015 WL 1307189 (S.D.N.Y. Mar. 23, 2015)....................................41

*Hutchinson v. Perez*,
    2013 WL 1775374 (S.D.N.Y. Apr. 25, 2013), *aff'd sub nom. Jones v. Perez*,
    550 F. App'x 24 (2d Cir. 2013) ..........................................................59

*In re Ambac Fin. Grp., Inc. Sec. Litig.*,
    693 F. Supp. 2d 241 (S.D.N.Y. 2010) ................................................37

*In re Bear Stearns Mortg. Pass-Through Certificates Litig.*,
    851 F. Supp. 2d 746 (S.D.N.Y. 2012) ...........................................37, 41

*In re EZCorp, Inc. Sec. Litigs.*,
    181 F. Supp. 3d 197 (S.D.N.Y. 2016) ................................................69

*In re Fannie Mae 2008 Sec. Litig.*,
    891 F. Supp. 2d 458 (S.D.N.Y. 2012), *aff'd*, 525 F. App'x 16
    (2d Cir. 2013)......................................................................................41

*In re Foreign Exch. Benchmark Rates Antitrust Litig.*,
    74 F. Supp. 3d 581 (S.D.N.Y. 2015) ....................................................42

*In re Marsh & Mclennan Cos., Inc. Sec. Litig.*,
    501 F. Supp. 2d 452 (S.D.N.Y. 2006) ...............................................66

*In re Moody's Corp. Sec. Litig.*,
    599 F. Supp. 2d 493 (S.D.N.Y. 2009), *opinion corrected on denial of
    reconsideration*, 612 F. Supp. 2d 397 (S.D.N.Y. 2009) ..............................66, 69

*In re Morgan Stanley Info. Fund Sec. Litig.*,
    592 F.3d 347 (2d Cir. 2010) .............................................................58

*In re Mylan N.V. Sec. Litig.*,
    379 F. Supp. 3d 198 (S.D.N.Y. 2019) ...............................................41

*In re OSG Sec. Litig.*,
    12 F. Supp. 3d 619 (S.D.N.Y. 2014) ..................................................42

*In re Petrobras Sec. Litig.*,
    116 F. Supp. 3d 368 (S.D.N.Y. 2015) ...............................................67

*In re Synchrony Fin. Sec. Litig.*,
    988 F.3d 157 (2d Cir. 2021) ....................................................*passim*

*In re Vivendi, S.A. Sec. Litig.*,
    838 F.3d 223 (2d Cir. 2016) .......................................................63, 64

*Info. Res., Inc. v. Dun & Bradstreet Corp.*,
    1998 WL 851607 (S.D.N.Y. Dec. 8, 1998) ......................................42

*Institutional Invs. Grp. v. Avaya, Inc.*,
    564 F.3d 242 (3d Cir. 2009) .......................................................49, 50

*Jackson v. Abernathy*,
    960 F.3d 94 (2d Cir. 2020) ...................................................65, 66, 69

*Litwin v. Blackstone Grp., L. P.,*
    634 F.3d 706 (2d Cir. 2011) ........................................................28, 51

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC,*
    797 F.3d 160 (2d Cir. 2015) ........................................................65, 66

*Merck & Co. v. Reynolds,*
    559 U.S. 633 (2010)...........................................................................33

*Meyer v. Jinkosolar Holdings Co.,*
    761 F.3d 245 (2d Cir. 2014) ........................................................56, 57

*N.J. Carpenters Health Fund v. Royal Bank of Scot. Grp., PLC,*
    709 F.3d 109 (2d Cir. 2013) ........................................................53, 54

*Newman v. Warnaco Grp. Inc.,*
    335 F.3d 187 (2d Cir. 2003) .............................................................37

*Novak v. Kasaks,*
    216 F.3d 300 (2d Cir. 2000) .....................................................*passim*

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund,*
    575 U.S. 175 (2015)...........................................................................61

*Rombach v. Chang,*
    355 F.3d 164 (2d Cir. 2004) .............................................................28

*S.E.C. v. Lee,*
    720 F. Supp. 2d 305 (S.D.N.Y. 2010) ..............................................42

*Singh v. Cigna Corp.,*
    918 F.3d 57 (2d Cir. 2019) ...............................................................60

*Strougo v. Barclays PLC,*
    105 F. Supp. 3d 330 (S.D.N.Y. 2015) ..............................................42

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.,*
    551 U.S. 308 (2007)...........................................................................29

4888-4367-9549.v1

*Van Dongen v. CNinsure Inc.*,
   951 F. Supp. 2d 457 (S.D.N.Y. 2013) ................................................70

*Youngers v. Virtus Inv. Partners Inc.*,
   195 F. Supp. 3d 499 (S.D.N.Y. 2016) ...............................................41

## STATUTES, RULES AND REGULATIONS

15 U.S.C.
   §77k .......................................................................................*passim*
   §77m ........................................................................32, 33, 34
   §77o ...............................................................................4, 7
   §78aa ..............................................................................5
   §78j(b) .........................................................................4, 5, 29, 62
   §78t(a) ............................................................................5, 8
   §78u-4(b)(1) .........................................................................29

28 U.S.C.
   §1291 ...............................................................................5
   §1331 ...............................................................................5

Federal Rules of Civil Procedure
   Rule 9(b) ......................................................................28, 42, 44

17 C.F.R.
   §240.10b-5 .....................................................................4, 62

## I.    INTRODUCTION

Abengoa, S.A. ("Abengoa"), once a highly respected engineering and construction company headquartered in Spain, filed for bankruptcy in November 2015, just two years after its public offering in the United States on October 17, 2013 ("Offering").   First-hand accounts from former employees detailed Abengoa's fraudulent manipulation of financial records on numerous construction projects to conceal from investors the deepening liquidity crisis that ultimately led to bankruptcy.

One former employee became a confidential whistleblower, whose letter to the Office of the Prosecutor of Spain's National Court revealed that Abengoa kept two sets of books, which allowed it to artificially inflate profit margins for construction projects at a key subsidiary, and explained how Abengoa routinely falsified costs.

The whistleblower's account was corroborated by five other former employees and the partner of another company involved in a joint venture with Abengoa, all independently vetted by plaintiffs' counsel, who provide a consistent picture of the Company's accounting fraud.   They confirm Abengoa's dual bookkeeping and give specific examples of how Abengoa recorded future, non-existent, or unrelated expenses in order to recognize revenue prematurely and falsely portray a sound financial condition.

4888-4367-9549.v1

Further corroboration comes from internal emails to and from Abengoa's former Executive Chairman, Felipe Benjumea Llorente ("Benjumea"), who ordered senior officials at various subsidiaries to artificially inflate the percentages of completion of projects and profit margins by recording expenses incurred on unrelated projects (*i.e.*, "invoice triangulation"). The emails were obtained by the accounting firm KPMG, which conducted a forensic analysis of Abengoa's financial statements and found that accounting fraud at Abengoa was endemic.

Abengoa, its former CEO Manuel Sanchez Ortega ("Ortega"), Benjumea, and others face ongoing criminal charges brought by Spain's Office of the National Prosecutor. Spain's National Court accepted indictments against these defendants, finding the evidence, including allegations pleaded here, sufficient to show criminal conduct and financial misrepresentation.

Abengoa, Ortega, and other top executives misled investors by hiding the Company's liquidity crisis behind this massive accounting fraud while making materially untrue statements about Abengoa's accounting policies and financial integrity. The Registration Statement for the Offering stated that Abengoa had "successfully grown [the] business while seeking to enforce strict financial discipline," and recognized revenue from construction projects by using "the

percentage-of-completion method."[1]  (Joint Appendix ("JA") 905¶61, JA923¶130) These materially false and misleading statements violated the Securities Act of 1933 ("Securities Act").  These same statements, as well as subsequent materially false and misleading statements, violated the Securities Exchange Act of 1934 ("Exchange Act").  In those subsequent statements, Abengoa and its top executives represented that: (1) Abengoa's EBITDA[2] was increasing year-over-year and that it had achieved its "liquidity reinforcement plans" thanks to "strict financial discipline," when senior management was directly involved in the fraud concealing a liquidity crisis; and (2) Abengoa had no plans to raise capital and then announced a massive capital increase on the next business day.

The Complaint provides non-conclusory, specific, corroborated allegations of Abengoa's company-wide fraud, which render statements it made about the Company's accounting policies and financial integrity materially false and misleading. Because these allegations more than adequately plead violations of the federal securities laws, the district court's dismissal should be reversed.

---

[1]  Under International Accounting Standard 11 ("IAS 11"), a company must recognize construction contract profits in proportion to the expenses incurred on the job, *i.e.*, the project's percentage of completion.  (JA905¶60)

[2]  EBITDA (earnings before interest, taxes, depreciation, and amortization) is a key metric to evaluate the financial condition of a business.  (JA905¶59)

4888-4367-9549.v1

## II.    JURISDICTION

This is an appeal from dismissal of a class action alleging violations of federal securities laws against Abengoa, its former CEO Ortega, Abengoa's duly authorized U.S. representative, Christopher Hansmeyer, and the investment banks serving as underwriters for Abengoa's U.S. offering ("Underwriter Defendants").[3] This action was brought by lead plaintiffs Jesse and Arlette Sherman and PAMCAH-UA Local 675 (collectively "plaintiffs"), who bring claims under the Securities Act on behalf of purchasers of Abengoa's American Depositary Shares ("ADSs") traceable to the Registration Statement issued in connection with the Offering; and claims under the Exchange Act and Rule 10b-5 on behalf of purchasers of Abengoa's ADSs between October 17, 2013 and August 3, 2015 ("Class Period").

The Third Amended Class Action Complaint for Violation of the Federal Securities Laws ("Complaint") alleged Securities Act claims under §11 against Abengoa, Ortega, Hansmeyer, and the Underwriter Defendants, and under §15 against Ortega and Hansmeyer; and Exchange Act claims under §10(b) against Abengoa and

---

[3]    The Underwriter Defendants are HSBC Securities (USA) Inc., Canaccord Genuity Inc., Merrill Lynch International, and Société Générale.

Hansmeyer, and under §20(a) against Ortega and Hansmeyer.[4] The district court had federal question jurisdiction. 15 U.SC. §78aa; 28 U.S.C. §1331.

On August 30, 2022, the district court dismissed the Complaint with prejudice (Special Appendix ("SA") 98-153) and entered final judgment on August 31, 2022. (SA154) Plaintiffs, individually and on behalf of all others similarly situated, timely filed their notice of appeal on September 29, 2022. (JA1371-73) The Court has jurisdiction to review a final judgment. 28 U.S.C. §1291.

## III. ISSUES PRESENTED

### A. Securities Act

1. Did the district court err in holding that the §11 claims against the Underwriter Defendants were barred by the Securities Act's one-year statute of limitations when the information the court found triggered plaintiffs' duty to inquire, disclosed more than one year before the claims were filed, was entirely unrelated to the alleged misstatements and was denied by defendants?

---

[4] The district court dismissed with prejudice claims pursuant to §10(b) and §20(a) against Ortega in its order granting in part and denying in part plaintiffs' motion for leave to file a third amended complaint. (SA47-97) That ruling is challenged on appeal herein.

2.     Did the district court err in dismissing plaintiffs' claims by concluding that falsity was not adequately pled, despite detailed allegations that Abengoa fraudulently inflated costs and prematurely recognized revenue, which were in direct contrast to Abengoa's statements, including that it "enforce[d] strict financial discipline" and recognized revenue using the "percentage-of completion method"? Specifically, did the court err when it: (a) rejected allegations of confidential witnesses because their statements were presented to Spanish National Courts, even though they were found sufficiently reliable under the high standard imposed by those courts to proceed to indictment, were confirmed by plaintiffs' counsel, and were corroborated by documentary evidence; and (b) determined that allegations detailing accounting fraud in several of the Company's projects, and other allegations supporting fraud—including dual bookkeeping—failed to "necessarily" show company-wide fraud, and thereby prematurely resolved fact questions and improperly drew inferences in defendants' favor at the pleading stage?

3.     Did the district court err in finding that Abengoa's statement that it has "successfully grown [the] business while seeking to enforce

- 6 -

strict financial discipline" through a "robust project management and control system" was inactionable puffery when that statement was verifiably false and contradicted by then-existing facts supporting widespread, systemic accounting fraud?

4.    Did the district court err in dismissing claims under §15?

**B.    Securities Exchange Act**

1.    Did the district court err in dismissing Exchange Act claims by concluding that falsity was not pled as to the statements in the Offering materials, as well as defendants' subsequent statements during the Class Period, based on the same reasoning it used to dismiss the Securities Act claims?

2.    Did the district court err in rejecting allegations of Abengoa's corporate scienter by discounting corroborated allegations of management's direct participation in a widespread accounting fraud because they were presented in foreign proceedings, by prematurely resolving fact questions, and by failing to accept the facts alleged in the Complaint as true and drawing inferences from those facts?

3.      Did the district court err in failing to find a strong inference of scienter despite allegations of pervasive, company-wide fraud and the CEO's suspiciously-timed resignation?

4.      Did the district court err in dismissing claims under §20(a)?

## IV.  STATEMENT OF THE CASE

### A.    Factual Background

Abengoa, founded in Spain in 1941, was widely regarded as one of the preeminent construction and engineering firms in Europe—at least before its ignominious collapse in November 2015, when it declared bankruptcy and its attempts at concealing a growing liquidity crisis through massive accounting fraud were uncovered.  These events led to criminal charges in Spain, where the Public Prosecutor and Spain's criminal courts, after years-long investigations, found the evidence—much of it alleged here—to be sufficient for indictment.  (JA891¶2, JA896¶¶14-16, JA940¶191)

Abengoa's fraud included artificially inflating profit margins for numerous construction projects and prematurely recognizing revenue by recording non-existent or unrelated expenses.  The fraud pervaded the Company, particularly at Abengoa's "Engineering and Construction" division subsidiaries Abeinsa Ingeniería y Construcción Industrial S.A. ("Abeinsa") and Instalaciones Inabensa S.A.

("Inabensa"), which accounted for approximately 60% of Abengoa's overall revenue. (JA892¶3, JA904-05¶¶54-58)

## 1. A whistleblower detailed Abengoa's pervasive accounting fraud

Former employee ("FE") 7, who worked in Inabensa's Controller Department overseeing the subsidiary's accounting and financial reporting, became a confidential whistleblower and described the fraud in a detailed letter to the Prosecutor of Spain's National Court. (JA902¶45)

FE7 revealed that Abengoa kept two sets of books. With this dual accounting system, Abengoa used SAP software for one set of books—its "official," yet, inaccurate accounting records of constructions projects with inflated profit margins—and kept a second set of books on Excel spreadsheets, which recorded the true costs for particular projects. (JA907¶¶66-67) Abengoa was thus able to falsify the purported financial strength of its operations and prematurely recognize revenue. (JA906¶65, JA907¶68)

As FE7 described, each construction project came with an estimated margin that had been initially prepared for the project bid. This estimated margin, which was entered into SAP, was commonly inflated because it did not account for the project's entire cost. (JA906¶64) Project managers could not revise the project margins in SAP without senior management approval under Abengoa's "Mandatory Compliance

- 9 -

Standards." (JA906¶65) Senior management control ensured that Abengoa maintained the initial inflated margins and profits in its SAP records. (*Id.*, JA907¶68) The second set of books on Excel spreadsheets recorded the same categories of information contained in the SAP records, but without Mandatory Compliance Standards, project managers recorded the projects' true costs. (JA907¶¶66-67)

FE7 provided specific instances where Abengoa inflated margins to accelerate project revenue. For example, in December 2014, Inabensa increased the project margin to 86% for the "DGEN" project, an electrical line project in India. (JA907¶69) This allowed Inabensa to recognize a profit of almost €3 million in 2014, the total estimated profit for the entire project, even though the project had "hardly even started." (*Id.*)

According to FE7, Abengoa prematurely recognized revenue by abusing the "cost provisions" rule. Cost provisions are accounting entries used to denote an expense that has not yet been registered for an account, effectively serving as a placeholder until the underlying paperwork is received, at which point the provision is supposed to be cancelled and the actual costs accounted for. (JA907-08¶70) But instead of using cost provisions as a placeholder, Inabensa entered and did not adjust cost provisions for materials that had not yet been ordered, purchased, or even needed for particular projects. (JA908¶71) As a result Abengoa recognized revenue

4888-4367-9549.v1

prematurely in violation of IAS 11's percentage-of-completion rule, which requires recognizing construction contract profits in proportion to the expenses incurred on the job. (JA905¶60, JA907-08¶70) FE7's whistleblower letter included screenshots of an Excel spreadsheet showing the cost provisions for electric transmission projects in Kenya and Ukraine, demonstrating how the Company recorded fake expenses that routinely increased just before the end of a fiscal year in order to maximize purported profits and, in turn, bonuses for executives. (JA908-09¶¶71-73)

This undisclosed accounting fraud occurred company-wide. As FE7 explained, the fraudulent accounting required coordination from other companies within Abeinsa, as well as Inabensa, and senior levels of management. Thus, FE7 was able to state "with little margin of error" that those practices had been undertaken by all large project companies within Abengoa. (JA909¶74)

> **2.     The whistleblower's account was corroborated by first-hand accounts of other former employees and was relied upon by Spain's criminal courts**

FE7's description of Abengoa's accounting fraud is corroborated by first-hand accounts from five different former employees, all of whom were independently vetted by plaintiffs' counsel. (ECF 154 at 15 n.2) Two of those former employees, FE4 and FE5, together with FE7, were also vetted by independent tribunals in Spain. (JA939-40¶¶189-190)

FE4 was the Chief of Critical Projects Follow-up for Inabensa in 2013-2014, and in the Controller Department until March 2016. (JA900-01¶42) While in charge of resolving critical accounting-related problems, FE4 discovered significant accounting irregularities, including the dual accounting system described by FE7, which showed large disparities, false expenses, and manipulated accounting entries. (*Id.*)

During 2013 and 2014, FE4 discovered Inabensa projects containing inaccurate cost-provisions information used to calculate project profits on a monthly basis. (JA910-11¶84) Consistent with FE7's whistleblower letter, FE4 described the constraints on adjusting initial project margins to reflect actual costs during the execution of the projects. (JA911¶85) FE4 also confirmed that Inabensa routinely recognized project revenues prematurely on new projects. In some cases, as soon as a project was awarded, and especially if it was near the end of the financial year, cost provisions would be entered immediately, even if purchase orders were not issued or suppliers had not been identified. (JA911-12¶89) FE4 confirmed the improper use of cost provisions described by FE7, including in connection with the projects in Ukraine and Kenya. (JA912¶90)

FE5 worked for Inabensa from 2007 to 2017, and was assigned to the Controller Department in April 2015, as a project control engineer for the major AVE Mecca

Medina project in Saudi Arabia.  (JA901¶43)  FE5 oversaw the project's budget, comparing the initial budget to subsequent costs in order to evaluate profit margins. (*Id.*, JA912-13¶92)  FE5 discovered that unrelated expenses from other projects had been charged to the project in 2012, 2013, and 2014, totaling more than €22 million. (JA912-13¶92, JA919¶112, JA923-24¶¶132-135)  FE5 explained that transferring unrelated expenses to new projects was widespread at Abengoa—done to hide undeclared losses from prior projects, increase the percentage-of-completion of new projects, and recognize higher revenues.  (JA913¶93)

FE5 described how a new project, as in a Ponzi scheme, was assigned costs from a previous project (prior project losses) upon commencement, resulting in the new project being unable to allocate its true expenses and having to pull in costs from a newer project, and so on.  (*Id.*)  Once Abengoa stopped obtaining new projects, it was unable to advance costs from newer projects, which ultimately contributed to the Company's bankruptcy.  (*Id.*)

FE5 confirmed that the fraudulent advancing of expenses from unrelated projects was directed by senior management.  (JA913¶94)  FE5 explained that Abengoa executives were motivated to falsely advance costs because they received bonuses based on percentage-of-completion of contracts.  (*Id.*)

4888-4367-9549.v1

In Spain's criminal system, when a well-founded suspicion of criminal conduct exists, the prosecutor proceeds with a criminal action, and the judge assigned to the matter will investigate the alleged crimes in their discretion in order to obtain all necessary facts. If, after investigation, the judge believes the facts constitute a crime, the judge will approve the claims for indictment. (JA932-34¶¶174-178) That is precisely what happened here. Relying in part on the statements of FE4, FE5 and FE7, Abengoa, Ortega, Benjumea, and others were indicted and currently face charges for accounting fraud. (JA937-39¶¶185-186, 189)

Abengoa's company-wide fraud was corroborated by three other former employees, as well as one witness from another company:

FE1 was the Director of Human Resources at Abengoa's U.S. subsidiary, Abeinsa EPC, from August 2010 through March 2013, when she quit, unable to tolerate the stress from knowing about Abengoa's accounting irregularities. (JA900¶39, JA919-20¶114) FE1 corroborated FE7, having been informed repeatedly by employees in Abeinsa's accounting department that Abeinsa, like Inabensa, maintained two sets of books, with one set shown to its external auditor while maintaining separate accounting for internal purposes. (JA909¶76)

FE1, as Director of HR, participated in an exit interview with the internal auditor, who resigned just months before the Offering. The auditor had been directed

to sign off on financial reports that were to be presented to banks for obtaining larger lines of credit that showed false percentages of completion on some projects and failed to show that other projects were over budget. (JA919-20¶114) The auditor told FE1 that when he expressed his concerns directly to Abeinsa's CFO, Santiago Duran, he was told to "shut the f—k up and just sign" the reports. The auditor refused, believing that would be illegal, and resigned. (JA920¶115)

Likewise, FE2, a former employee with broad oversight for accounting and financial reporting at several of Abengoa's U.S. subsidiaries, confirmed that those subsidiaries maintained two sets of books, one with falsified information for external use. (JA900¶40, JA909¶77) FE2 also quit rather than sign off on false financial statements. (JA900¶40)

FE3, a Senior Staff Accountant at Abengoa's corporate office in Missouri from June 2013 through July 2014, also quit over concerns about Abengoa's financial reporting. FE3 was responsible for accounting functions at Abeinsa, including the preparation of financial reports for Abengoa's corporate headquarters in Spain. (JA900¶41) On a monthly basis, FE3 was directed by Abengoa's executives to reconcile discrepancies between the two sets of books—although there was no legitimate reason for such discrepancies. FE3 was ordered to manipulate the costs and

expenses in the SAP system to match the numbers with the other set of records. (JA910¶¶79-83)

FE6 did not work at Abengoa but was a partner at a company called Canalizaciones Ebro S.L. ("Cebro"). (JA901-02¶44) FE6 was responsible for negotiating the terms of construction contracts Cebro entered into with Abengoa's subsidiary, Befesa, for the Cunene Water Pipeline project in Angola from 2011-2012. (*Id.*) FE6 described how Abengoa artificially inflated expenses on that project, and how Abengoa representatives directed FE6 to order equipment and supplies that were not necessary, and to commence construction of the pipeline out of order relative to other work on the project. (*Id.*, JA913-14¶95) According to FE6, throughout the course of the project, Cebro received requests from Befesa project managers asking for letters confirming the purchase of materials and supplies that were not needed for building the pipeline. (JA914¶96) In addition, Cebro sued Abengoa when it failed to pay Cebro for its work, seeking €1,034,915.16 in payment—an amount in project expenses that was prematurely recognized by Abengoa. (JA914¶97)

4888-4367-9549.v1

### 3. Abengoa's former executive chairman directed senior management to falsify expenses in order to artificially inflate profit margins on several projects

These accounts of Abengoa's fraud are further corroborated by internal emails from Benjumea,[5] initially obtained during KPMG's internal audit, showing Benjumea ordered Abengoa's senior management to falsify project expenses at seven projects. (JA909-18¶¶75-108)  Abengoa had retained KPMG to conduct a forensic analysis of its past financial statements after an investigating judge in Spain demanded information from the Company in response to the indictments.  KPMG completed its investigation in October 2019.  Its final report concluded that accounting fraud was endemic at Abengoa and its subsidiaries between 2012 and 2016.

KPMG reported that Abeinsa fraudulently recorded €15 million by artificially inflating project margins and advancing the percentages of completion on projects in a fictitious manner in 2012-13.  And it identified the invoice triangulation scheme described by FE5 at Inabensa, including on the AVE Mecca Medina project, a high-speed railway project in Saudi Arabia valued at more than €7 billion.  (JA894¶9, JA915-16¶¶99-102)

---

[5]   The Benjumea family founded Abengoa.  (JA897-99¶¶24, 33)  Benjumea served as Executive Chairman until September 24, 2015, when he was demoted to "Honorary" Chairman amidst criminal investigations implicating him in the accounting fraud that bankrupted the Company.  (JA899¶¶33-34)

4888-4367-9549.v1

KPMG determined that Abengoa engaged in invoice triangulation through Inabensa Turkey, using this scheme to inflate Inabensa's earnings for 2012 to €50 million, double what Abengoa had initially forecasted. (JA916¶103)

On August 10, 2012, Julio Artillo, Inabensa's former Administration Department Director, suggested the use of several projects to record fake costs, including the AVE Mecca Medina project, power line projects in Peru and Brazil, a solar thermal power plant project in the U.S., and two other solar thermal power plant projects in Spain. (JA916¶104) The following day, Benjumea directed Artillo to book costs against the power line project in Peru, writing: "The [purchase] order of Peru from Hyunsung is going to [be] triangulate[d], it is too big to [not use it], urgently [to start] to negotiate." (JA916¶105) Hyunsung, a Korean supplier of capital goods, was going to acquire supplies for approximately €15 million. (*Id.*) On September 21, 2012, Benjumea provided authorization to proceed with the scheme. (JA917¶107) He emphasized that "Everyone that is copied here must comply with my instructions." (*Id.*)

### 4. Abengoa's Registration Statement contained false and misleading statements and omissions

On October 17, 2013, Abengoa sold 287,500,000 shares that generated proceeds of €517.5 million (approximately $703.8 million) in the Offering. (JA892¶3, JA922¶¶123-127) The Offering's registration statement and prospectus ("Registration

- 18 -

Statement") was signed by defendants Ortega and Hansmeyer. (JA946¶219) The Registration Statement represented that the proceeds from the Offering would be used to repay €347 million in corporate debt and to "reinforce [Abengoa's] liquidity position and strengthen [its] balance sheet." (JA922¶128) It led investors to believe that Abengoa adhered to international accounting standards and accurately disclosed its financial information by stating, for example, that it was "enforc[ing] strict financial discipline to maintain [its] strong liquidity position" and "establish[ing], over the years, a robust project management and control system, with periodic monitoring of each project." (JA922-23¶¶129-130) The Registration Statement also represented that Abengoa recognized revenue pursuant to a percentage-of-completion accounting policy pursuant to IAS 11. (JA942-43¶197)

These statements concealed the accounting fraud that was masking Abengoa's liquidity crisis.

**5. Abengoa continued to conceal a deepening liquidity crisis by falsifying project expenses, inflating profits, and hiding losses**

Following the Offering, Abengoa and its top executives, including Ortega, repeatedly represented that Abengoa's EBITDA was increasing year-over-year, and that it had achieved "liquidity reinforcement plans" thanks to its "strict financial discipline." (JA895¶11, JA950-52¶¶234-236 (Full Year 2013 Financial Results),

JA960¶265 (Strategy Update Breakfasts), JA966-67¶¶285-288 (February 9, 2015 Announcements))  For example, at the Strategy Update Breakfasts on September 3 and 4, 2014, Ortega represented that Abengoa had achieved a "[s]trong liquidity position" thanks to successfully "reinforc[ing] [Abengoa's] financial discipline" and "reduc[ing] … corporate leverage."  (JA960-61¶¶265-266)  These statements, and others like them, collectively concealed Abengoa's true liquidity risk and misled investors to believe that it was able to timely meet its financial obligations and fund its operations.  (JA985-86¶¶351, 356, JA988¶¶365-366)

In fact, Abengoa accrued, but concealed, significant losses during 2014.  This included material losses from two subsidiaries, Abengoa Solar S.A. and Abengoa Bioenergia, S.A.  (JA926¶140)  According to an independent audit report, Abengoa deliberately hid these losses "to give a misrepresentation of the financial status of the company."  (*Id.*; *see also* JA927¶142 (Abengoa artificially inflated profit for A3T project in Mexico instead of reporting loss), JA927¶144 (Abengoa cancelled €500 million loan on December 31, 2014, and renewed it two days later on January 2, 2015.))

As Abengoa's liquidity crisis worsened, it was able to conceal its losses for a time by transferring expenses from old projects to newer projects; however, like any Ponzi scheme, maintaining the fraud required fresh capital.  Abengoa thus engaged in

4888-4367-9549.v1

several highly-engineered financial transactions.  (JA928-30¶¶147-161)  Analysts questioned some of these transactions, but Abengoa repeatedly maintained that its EBITDA was increasing year-over-year and that it had achieved its "liquidity reinforcement plans" as a result of its "strict financial discipline."  (JA929¶152, JA972-73¶305)

Then Ortega resigned as CEO in May 2015, following a highly damaging revelation concerning Abengoa's leverage ratios and amidst tightening internal controls while Abengoa was verging on financial collapse—a collapse that had been concealed and delayed by fraud occurring under his watch.  (JA981-82¶¶334-346)

On Friday, July 31, 2015, Abengoa issued a press release reporting purportedly "[s]trong business performance."  (JA976¶318)  On a conference call later that day, Abengoa asserted it had no plans to access the capital markets for additional financing. (JA976-78¶¶319-321)  But on August 3, 2015, the next business day after announcing it had "no need" and "ha[d] no plans" to raise additional capital, Abengoa did just that by announcing a massive capital increase of €650 million and asset divestitures totaling €500 million.  (JA896¶14, JA979¶325)  The price of Abengoa's ADS plummeted more than 45% over the next two trading days.  (JA988¶365)  Analysts such as *Bloomberg* stated that the unexpected announcement had "eroded

4888-4367-9549.v1

trust in Abengoa's accounting methods and ability to generate sufficient cash to service its debt." (JA896¶14)

### 6.     Unable to conceal its losses any further, Abengoa declared bankruptcy

Following the Class Period, on November 8, 2015, Abengoa announced that Spanish investment firm Gonvarri Corporación Financiera had agreed to invest €350 million in connection with the capital raise announced three months earlier. (JA930-31¶162) But on November 25, 2015, after Gonvarri cancelled the agreement, Abengoa announced it was filing for bankruptcy protection. (JA931¶163) In its bankruptcy filing, Abengoa reported a total indebtedness of €16.9 billion. (JA931¶164)

On April 18, 2016, Abengoa's ADSs ceased trading on the NASDAQ, less than three years from their initial listing. (JA896¶16)

### 7.     Abengoa, Ortega and other senior management face criminal charges in Spain

Meanwhile, Abengoa executives, subsidiaries, and related parties face ongoing criminal charges in Spain over the massive accounting fraud that led to the Company's bankruptcy. (JA932¶173) Many of the above-described allegations have been investigated independently by members of Spain's judiciary, and were found

sufficiently reliable for the cases to proceed towards trial with the support of the Public Prosecutor's Office. (JA935-37¶¶180-184)

On March 22, 2016, investors filed a criminal complaint in Spain against Ortega and Benjumea for corporate crime and for the crime of misrepresentation in capital investment or misrepresentation in investment in stock markets. The matter is pending in the National Court in Madrid, a Central Criminal Investigation Court with jurisdiction over particularly severe crimes. (JA935¶180)

On February 2, 2017, following an evaluation of the evidence in support of the indictments by a three-judge panel before the appellate branch of the National Court, the investigating judge accepted the complaint. The judge held that evidence was sufficient to investigate whether the financial statements disseminated by Abengoa and the positive financial situation disclosed by its managers, prior to its financial collapse in November 2015, were contrary to financial and economic reality. (JA935¶181)

On February 20, 2018, Spain's top financial accounting regulator, the Instituto de Contabilidad y Auditoría de Cuentas ("ICAC"), sanctioned Abengoa's independent auditor, Deloitte S.L., and the lead audit partner for its audit of Abengoa's 2014 financial statements. (JA940-41¶¶192-193) The ICAC resolution cites specific instances in which Deloitte knowingly certified incorrect and materially misleading

financial statements. The resolution faults Deloitte for failing to object or even question Abengoa's inflated profit margins. These breaches of auditing standards led the ICAC to fine Deloitte and its audit partner €1.48 million and €8,700, respectively. (JA894-95¶10, JA941¶194) The ICAC's resolution confirms that Abengoa was rife with fraud, with their independent auditor performing effectively no oversight. (JA941¶195)

On December 26, 2019, after two years of extensive discovery in the "investigatory stage," Abengoa investors filed a motion with the National Court requesting that the criminal complaint against Ortega and Benjumea be "extended" to include as additional defendants: Abengoa; two members of Abengoa's Audit Committee; Deloitte S.L.; and the lead audit partner. (JA935¶182)

On February 2, 2020, the National Court granted the motion and expanded the criminal complaint to include Abengoa, Deloitte S.L., and the additional individuals noted above. In reaching its decision, the National Court concluded that the evidence submitted against these additional parties was sufficient to show that "some type of criminal offense" had been committed. (JA937¶185) The Court stated: "The state of the case … shows that there is evidence that can be inferred from the systematic concealment of substantial losses of its assets, as well as the inclusion of insufficiently

accredited certifications that indicate a visible misrepresentation of the reality of the entity's economic and financial situation."  (JA937-39¶186)

The Court found that the ICAC report "highlights the existence of losses accounted for in 2015 and 2016 that should have been recorded, in significant amounts, at least since 2014, and would have been deliberately hidden to give a misrepresented appearance of the company's equity and financial situation; a situation that would result in obvious damage to those who invested, trusting in the truthfulness of the financial information provided by ABENGOA."  (*Id.*)

Meanwhile, in June 2018, investors had filed a second criminal action alleging accounting fraud and misrepresentation against Abeinsa and Inabensa (as well as against various senior officers of Abengoa), in Seville, where Abengoa was based.  (JA939¶188)

The investigating judge in Seville's Criminal Investigation Court conducted an investigation over the following year.  The judge relied upon FE7's letter, as well as testimony from FE4 and FE5, detailing the same fraudulent transactions alleged here. The judge also reviewed the internal emails and testimony from additional witnesses and the KPMG report.  (JA939¶189)

On June 9, 2020, the investigating judge in Seville elevated the criminal action against Abeinsa and Inabensa to the National Court in Madrid that also has

jurisdiction over the criminal claims against Ortega, Benjumea, and Abengoa. The judge determined that the alleged financial accounting fraud pervaded Abengoa in its entirety and, therefore, fell under the jurisdiction of the National Court. That action remains ongoing. (JA939-40¶190)

## B.    Procedural History

In August and September of 2015, two putative class actions were brought under the federal securities laws against Abengoa and individual Abengoa executives and officers. On May 24, 2016, the court consolidated the actions, and appointed lead plaintiffs and lead counsel. (ECF 19)

Plaintiffs filed a first amended complaint on August 2, 2016, against Abengoa, individual executives and officers, and the Underwriter Defendants. (ECF 31) The case was then effectively stayed for more than three years while Abengoa underwent bankruptcy proceedings in both Spain and the U.S. (JA932¶172)

Plaintiffs filed a second amended complaint ("SAC") on October 28, 2019, against Abengoa, Ortega, Hansmeyer, and the Underwriter Defendants. (JA25-113) The court granted defendants' motions to dismiss the SAC on August 21, 2020 (SA1-46) and granted in part plaintiffs' motion for leave to file a third amended complaint on September 10, 2021. (SA47-97)

4888-4367-9549.v1

On September 17, 2021, plaintiffs filed the operative Complaint. (JA888-1085) The court granted defendants' motions to dismiss the Complaint with prejudice on August 30, 2022. (SA98-153) Plaintiffs timely filed a notice of appeal. (JA1371-73)

## C. Rulings Presented for Review

After the court dismissed the SAC, it granted plaintiffs' motion for leave to amend except regarding Exchange Act claims against Ortega and Banco Santander (one of the Underwriter Defendants), which were dismissed with prejudice.

In dismissing the Complaint, the court rejected the Underwriter Defendants' contention that the Securities Act claims arising out of the Offering were barred by the three-year statute of repose. It did, however, find the claims barred by the one-year statute of limitations.

The court also dismissed Securities Act claims against Abengoa, Ortega, and Hansmeyer for failure to state a claim. It held that the statement that Abengoa has "successfully grown [the] business while seeking to enforce strict financial discipline" through a "robust project management and control system" was inactionable puffery. It also found that statement, as well as the statement about adhering to the "percentage-of-completion" method of revenue recognition, failed to adequately allege falsity, after disregarding the allegations from confidential witnesses as lacking specificity and corroboration.

4888-4367-9549.v1

The court dismissed the Exchange Act claims on falsity grounds for the same reasons it rejected falsity for the Securities Act claims. In addition, it found plaintiffs failed to allege a compelling inference of scienter—as to both corporate scienter and individual scienter.

The court dismissed the related control liability claims.

## V. STANDARD OF REVIEW

This Court reviews "'de novo the dismissal of a complaint under Rule 12(b)(6), accepting all factual allegations as true and drawing all reasonable inferences in favor of the plaintiff.'" *Litwin v. Blackstone Grp., L. P.*, 634 F.3d 706, 715 (2d Cir. 2011).[6] A complaint alleging securities fraud must "state with particularity the circumstances constituting [the] fraud." Fed. R. Civ. P. 9(b).

For claims under §11 of the Securities Act, liability against the issuer of a security is "virtually absolute, even for innocent misstatements." *Herman & MacLean v. Huddleston*, 459 U.S. 375, 382 (1983). "Other defendants bear the burden of demonstrating due diligence." *Id*. Section 11 does not require allegations of scienter, reliance, or loss causation. *Rombach v. Chang*, 355 F.3d 164, 169 n.4 (2d Cir. 2004).

---

[6] Unless otherwise indicated, internal citations and footnotes are omitted and emphasis is added throughout.

4888-4367-9549.v1

Claims under §10(b) of the Exchange Act must meet the heightened pleading requirements of the Private Securities Litigation Reform Act ("PSLRA"). When a plaintiff alleges a false statement or omission, the complaint must specify "the reason or reasons why the statement is misleading" and must "state with particularity all facts on which that belief is formed." 15 U.S.C. §78u-4(b)(1). Additionally, unlike the Securities Act, the Exchange Act requires that the complaint state with particularity facts giving rise to a strong inference of "'conscious misbehavior or recklessness,'" or that show the defendant had the "'motive and opportunity to commit fraud.'" *Novak v. Kasaks*, 216 F.3d 300, 307 (2d Cir. 2000).

Analyzing scienter requires a "comparative assessment of plausible inferences, while constantly assuming the plaintiff's allegations to be true." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 326-27 (2007). "The inquiry ... is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id*. at 322-23 (emphasis in original).

## VI.   SUMMARY OF ARGUMENT

Despite detailed allegations from confidential witnesses that provided clear, consistent, and specific examples of Abengoa's accounting fraud involving premature recognition of revenue and artificial inflation of profit margins, which were

corroborated by KPMG, findings from the ICAC, and indictments by Spain's National Court, the district court found plaintiffs' allegations insufficient.

The court did so by disregarding confidential witnesses from the Spanish proceedings, even though they had been thoroughly vetted by judges and prosecutors, and relied upon by the Spanish National Court to indict Abengoa, Ortega, and others for accounting fraud. And except for the confidential whistleblower, they were all independently vetted by plaintiffs' counsel.

The court also improperly considered the Complaint's allegations from each of the confidential witnesses in isolation and then determined that those allegations were conclusory and lacking in corroboration—even though they provided specific and detailed examples of fraud on several major projects, a consistent description of fraudulent accounting, and were confirmed by other sources.

Rather than accept the allegations as true and give plaintiffs all favorable inferences, the court found that defendants' accounting "irregularities" did "not necessarily" suggest fraud and made premature fact-bound determinations that the alleged false and misleading statements were immaterial, a question that should have been left for a later stage in the proceedings.

The court's wholesale rejection of the confidential witnesses and its overarching determination that plaintiffs failed to sufficiently allege the existence of accounting

fraud led it to erroneously hold that: (1) defendants' statements that Abengoa enforced strict financial discipline and adhered to the percentage-of-completion accounting method were not materially false or misleading in violation of either the Securities Act or Exchange Act; (2) Abengoa's post-Offering statements about liquidity and cash flow and its statement that it did not need access to capital markets were not materially false or misleading in violation of the Exchange Act; and (3) plaintiffs failed to allege a compelling inference of either corporate or individual scienter.

The court also erroneously held that the one-year statute of limitations bars claims against the Underwriter Defendants because disclosures Abengoa made about debt misclassification—not margins or revenue recognition—triggered plaintiffs' duty to inquire, even though the claims alleged against the Underwriter Defendants in the Complaint (which were also alleged in the earlier complaints) have nothing to do with Abengoa's purported debt misclassification.

As this Court has emphasized, while pleading standards for securities cases are demanding, "even securities plaintiffs need not prove their entire case within the confines of the complaint." *In re Synchrony Fin. Sec. Litig.*, 988 F.3d 157, 161 (2d Cir. 2021). "Equally as important as concerns about facilitating overly burdensome and expensive discovery and litigation are concerns about prematurely dismissing cases where plaintiffs have plausibly alleged with particularity the existence of

- 31 -

securities fraud." *Id.* This Court has cautioned against mistaking "heightened pleading standards for impossible ones." *Id.* That is precisely the mistake made by the district court in dismissing the Complaint and is cause for reversal.

## VII. ARGUMENT

### A. Securities Act Claims

#### 1. Claims against the Underwriter Defendants were timely filed

On August 2, 2016, plaintiffs filed the first amended complaint, alleging that the Underwriter Defendants violated §11 of the Securities Act. (ECF 31) This was within the one-year statute of limitations, *i.e.*, one year "after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence." 15 U.S.C. §77m.

The claims against the Underwriter Defendants were filed less than one year from Abengoa's announcement, on August 3, 2015, of a massive capital increase of €650 million and asset divestitures totaling €500 million. (JA930¶160) This capital increase represented 34% of Abengoa's market capitalization at that time. (JA930¶161) Abengoa had been concealing its deepening liquidity crisis, and just days earlier represented to investors that it had "no need" and "ha[d] no plans" to raise additional capital. (JA896¶14)

4888-4367-9549.v1

This announcement surprised analysts and investors. *Bloomberg*, for example, said the unexpected announcement had "eroded trust in Abengoa's accounting methods and ability to generate sufficient cash to service its debt." (*Id.*) It was these developments that informed investors that Abengoa's previous statements, such as those about its maintenance of "strict financial discipline," were false, thereby giving investors enough information to adequately plead a §11 claim.

A securities law violation is discovered when the plaintiff learns "'sufficient information about [the violation] to ... plead it in a complaint'" "adequately"—*i.e.*, with enough "'detail and particularity to survive a [Rule] 12(b)(6) motion to dismiss.'" *Fed. Hous. Fin. Agency for Nat'l Mortg. Ass'n v. Nomura Holding Am., Inc.*, 873 F.3d 85, 119 (2d Cir. 2017) (some alterations in original) (citing *Merck & Co. v. Reynolds*, 559 U.S. 633, 650-53 (2010) (limitations period begins not when a reasonable investor would have begun investigating, but when such investor conducting an investigation would have uncovered sufficient facts constituting the violation to adequately plead such facts and survive a motion to dismiss)). It is defendants' "burden to prove that a reasonable investor … would have conducted a fulsome investigation and uncovered information sufficient to make out a plausible claim for relief by" the date on which the statute of limitations expired. *Nomura*, 873 F.3d at 122.

4888-4367-9549.v1

The district court held that it was not the August 3, 2015 announcement, but "the November 2014 disclosures [that] were sufficient to put the plaintiffs on notice that the Registration Statement was false." (SA129) But the November 2014 disclosures involved debt mischaracterization that, while perhaps improper, had nothing to do with the accounting fraud that plaintiffs allege rendered the statements at issue in the Registration Statement misleading.

The district court's error may have stemmed from its mistaken assumption that plaintiffs must allege, as it held, "that the Registration Statement was false." (*Id.*) But §11 claims must allege not that the Registration Statement is false, generally, but that specific statements in the Registration Statement were untrue. 15 U.S.C. §77k; *see also* 15 U.S.C. §77m ("[n]o action shall be maintained to enforce any liability created under section 77k or 77l(a)(2) of this title unless brought within one year after the discovery of the *untrue statement* or the omission, or after such discovery should have been made by the exercise of reasonable diligence").

And the specific statements and omissions alleged to be false or misleading in the Complaint are unrelated to the November 2014 bond issuance by one of Abengoa's subsidiaries, which caused analysts to inquire why Abengoa had failed to include the bond in its recourse debt leverage ratio. (JA895¶12) Abengoa's explanation regarding its classification of this debt was, indeed, received with

- 34 -

skepticism, with the market largely believing that it had attempted an accounting slight-of-hand in hopes of showing lower leverage ratios. As *Reuters* reported, this disclosure raised "myriad further questions about how various liabilities are treated on its balance sheet." (*Id.*)

But, as the district court held in dismissing the SAC, "[t]hough Plaintiffs' First Amended Complaint included a Securities Act claim based on allegations of debt mischaracterization, *see* [ECF 31¶¶47-49], plaintiffs have now opted to pursue other theories, omitting any mention of Abengoa's debt practices from their Securities Act claims and allegations." (SA21) Thus, "the November 2014 disclosures about these [same] debt practices did *not* trigger the beginning of the statute of limitations for Plaintiffs' current Securities Act claims," alleging "that Abengoa used erroneous financial statements to improperly secure funding and that it failed to abide by its stated accounting policy." (SA21 & n.5)

In dismissing the Complaint, however, the court inexplicably reversed itself, holding that while the November 2014 disclosures "alone could have alerted plaintiffs to the alleged misstatements, at the very least, they triggered a duty to inquire." (SA129) The court was right the first time. The claims alleged in the Complaint— that defendants fraudulently used accounting entries to inflate project expenses in

order to prematurely recognize revenue—have nothing to do with Abengoa's purported debt classification.

Nevertheless, the court noted the *Reuters*' article's reference to a hedge fund analyst who stated, "'[t]he more they open the door on their financials, the more questions there are.'" (SA129 (quoting JA895¶12) (alteration in original)) But nothing regarding the November 2014 debt misclassification debacle or the *Reuters*' article published in its wake calling into doubt Abengoa's debt treatment gave any indication that Abengoa kept two sets of books or artificially inflated profit margins for numerous construction projects while recording fake expenses in order to prematurely recognize revenue—the actual substantive grounds for plaintiffs' §11 claims.

As this Court has stated, the duty to inquire is triggered if the information """relates directly to the misrepresentations and omissions the [p]laintiff[] ... allege[s] in [its] action against the defendants,""" and is, "in the totality of the circumstances, 'specific enough to provide an ordinary investor with indications of the *probability* (not just the *possibility*) of' a violation." *Nomura*, 873 F.3d at 120-21 (alterations and emphases in original) (notice of certain facts does not equate to notice that other specific representations in prospectus were false and misleading). Defendants' burden can be met only be adducing """uncontroverted evidence'" that "'irrefutably

- 36 -

demonstrates'" when a reasonable plaintiff would have been on inquiry notice of the false statements in the Offering Materials in the first instance. *In re Bear Stearns Mortg. Pass-Through Certificates Litig*., 851 F. Supp. 2d 746, 763 (S.D.N.Y. 2012).

Moreover, even if the November 2014 announcement could somehow trigger a duty to inquire, there is no inquiry notice here because the purported warning signs were accompanied by reliable words of comfort or "benign" explanation from management. *See Newman v. Warnaco Grp. Inc*., 335 F.3d 187, 194 (2d Cir. 2003). When analysts questioned why Abengoa had failed to include the bonds in Abengoa's reported corporate leverage ratio, Abengoa denied it had misclassified the debt, stating it had properly reclassified the bonds as non-recourse-debt, thereby excluding them from Abengoa's debt and leverage ratios. (JA963¶275; *see also* JA964¶276 ("It is, for accounting purposes, classified in a different bucket.")) In light of Abengoa's denials, a reasonable investor would not have been on notice of such wrongdoing. *See DoubleLine Cap. LP v. Odebrecht Fin., Ltd*., 323 F. Supp. 3d 393, 438 (S.D.N.Y. 2018) (citing cases) (denials of wrongdoing not sufficient to trigger inquiry notice); *see also In re Ambac Fin. Grp., Inc. Sec. Litig*., 693 F. Supp. 2d 241, 276-77 (S.D.N.Y. 2010).

Finally, "'[w]hether sufficient facts existed at [a particular] time is, by definition, a fact-intensive inquiry and, thus, generally ill-suited for resolution at the

motion to dismiss stage.'" *FDIC v. Credit Suisse First Bos. Mortg. Sec. Corp.*, 414 F. Supp. 3d 407, 411 (S.D.N.Y. 2019) (second alteration in original). Thus, at a minimum, resolution of this issue at the pleading stage is premature.

> **2. Plaintiffs plausibly alleged Abengoa committed accounting fraud, which rendered their statements and omissions false and misleading**

The Registration Statement represented that Abengoa adhered to international accounting standards, notably the percentage-of-completion policy of IAS 11, accurately disclosed its financial information, and maintained a "strong liquidity position" by "enforc[ing] strict financial discipline." (JA922-23¶¶129-130, JA942-43¶197)

These statements were materially false and misleading. Not only did the Registration Statement fail to disclose that Abengoa kept two sets of books, inflated profit margins, and prematurely recognized revenue on construction projects; it misled investors about Abengoa's precarious financial position that was masked by accounting fraud.

- 38 -

### a. Confidential witnesses provided reliable, non-conclusory, and detailed allegations of accounting fraud

#### (1) Credible witnesses in the Spanish criminal proceedings were erroneously rejected by the district court

Abengoa's massive accounting fraud—which put the lie to the Company's statements about strict financial discipline and adherence to percentage-of-completion revenue recognition—was described by FE7 in a letter to the Prosecutor of Spain's National Court. (JA905-09¶¶59-74) FE7 worked in Inabensa's Controller Department overseeing the subsidiary's accounting and financial reporting, and thus had first-hand knowledge of how Abengoa kept two sets of books and fraudulently inflated project costs in order to prematurely recognize revenue. FE7 described a policy that prevented project managers from revising initial project margins to accurately reflect costs in the books provided to external parties. (JA906¶¶64-65) FE7 provided screen shots of Abengoa's internal accounting records showing it recorded fake expenses through cost provisions entries for specific projects. (JA908-09¶¶71-73)

FE7's account was corroborated by two other employees who also provided testimony to Spanish authorities (and were vetted by plaintiffs' counsel) and, like FE7, were deemed sufficiently reliable by Spanish criminal courts that the investigating

judge elevated the charges to the National Court. (JA939-40¶188-190) FE4 was in charge of resolving critical accounting problems at Inabensa, and, consistent with FE7, described the double accounting system, which showed large disparities, false expenses, and manipulated accounting entries. (*Id.*)

FE4 echoed FE7's observation about the constraints that made adjusting initial project margins to reflect actual costs unduly difficult. (JA911¶85) FE4 also confirmed that Inabensa routinely recognized expenses prematurely in new projects in order to record inflated project revenues. (JA911-12¶89) FE4, again corroborating FE7, identified specific projects that used false cost provisions. (JA912¶90)

FE5 also worked at Inabensa and oversaw the budget for the AVE Mecca Medina project. (JA901¶43) FE5 was tasked with overseeing the project's budget, and discovered unrelated expenses from other projects. (JA912-13¶92, JA919¶112, JA923-24¶¶132-135) FE5 explained that transferring unrelated expenses to new projects—a practice confirmed by Benjumea's emails in KPMG's report—was widespread. (JA913¶93)

These three witnesses, especially when bolstered by the other confidential witnesses, as well as by the KPMG report and the ICAC resolution, amply provide a plausible basis for pleading systemic accounting fraud at Abengoa's key subsidiaries. But the district court refused to consider the detailed, corroborated allegations from

these confidential witnesses because they were presented and considered in Spanish proceedings (SA138)—despite being vetted and found sufficiently reliable in those proceedings to support the indictment of Abengoa, Ortega, Benjumea, and others.

This was error. "[T]he weight of authority holds that plaintiffs may base factual allegations on complaints from other proceedings because 'neither Circuit precedent nor logic supports ... an absolute rule' against doing so." *In re Mylan N.V. Sec. Litig.*, 379 F. Supp. 3d 198, 214-15 (S.D.N.Y. 2019) (treating allegations taken from the State Attorney General's complaint against the company as a "proper basis for the pleadings" in finding scienter to be adequately pled) (quoting *Youngers v. Virtus Inv. Partners Inc.*, 195 F. Supp. 3d 499, 516 n.10 (S.D.N.Y. 2016) and citing *HSH Nordbank AG v. RBS Holdings USA Inc.*, 2015 WL 1307189, at *3-*4 (S.D.N.Y. Mar. 23, 2015) (denying defendants' motion to strike allegations in complaint that rely on complaints and citations to news articles from another action)); *In re Fannie Mae 2008 Sec. Litig.*, 891 F. Supp. 2d 458, 471 (S.D.N.Y. 2012), *aff'd*, 525 F. App'x 16 (2d Cir. 2013); *Bear Stearns*, 851 F. Supp. 2d at 768 n.24 ("It makes little sense to say that information ... which the [complaint] could unquestionably rely on if it were mentioned in a news clipping ... is immaterial simply because it is conveyed in an unadjudicated complaint.").

4888-4367-9549.v1

Several other courts in this Circuit have held that such allegations from other proceedings may be relied on at the pleading stage. *See In re OSG Sec. Litig*., 12 F. Supp. 3d 619, 622 (S.D.N.Y. 2014) ("While allegations from another lawsuit are not evidence and cannot be 'introduced in a later trial for collateral estoppel purposes,' plaintiffs need not provide admissible proof at this stage."); *Strougo v. Barclays PLC*, 105 F. Supp. 3d 330, 343 (S.D.N.Y. 2015) ("[P]ermitting plaintiffs to borrow allegations from the NYAG's complaint is warranted at this stage in the litigation."); *S.E.C. v. Lee*, 720 F. Supp. 2d 305, 340-41 (S.D.N.Y. 2010) ("There is no absolute rule barring a private plaintiff from relying on government pleadings and proceedings in order to meet the Rule 9(b) and PSLRA thresholds."); *Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt. LLC*, 376 F. Supp. 2d 385, 395 (S.D.N.Y. 2005) (holding that an SEC complaint is an adequate source for a factual allegation).

The fact that the allegations come from proceedings in another country is irrelevant, particularly when the nature of those proceedings attest to their reliability. *In re Foreign Exch. Benchmark Rates Antitrust Litig*., 74 F. Supp. 3d 581, 592 (S.D.N.Y. 2015) (court took "judicial notice of penalties and fines levied by regulators in three countries against six Defendants as a result of some of the investigations detailed in the U.S. Complaint and for the very conduct alleged in the Complaint"); *cf. Info. Res., Inc. v. Dun & Bradstreet Corp*., 1998 WL 851607, at *1 (S.D.N.Y. Dec. 8,

1998) (recognizing the admissibility of factual findings in the "European Commission's Statement of Objections").

FE4 and FE5 were vetted by plaintiffs' counsel and the credibility of all three witnesses was subject to a thorough investigation by prosecuting authorities. As alleged, Seville's Criminal Investigation Court was overseeing the case when the investigating judge conducted a "thorough[]" year-long investigation that relied in part on the witnesses in question, after which the judge elevated the criminal action to the National Court. (JA939-40¶¶189-190) There was also corroboration from internal emails and testimony from additional witnesses, as well as findings of accounting malfeasance from KPMG and the ICAC. (JA939¶189)

The district court had no reason to reject these witnesses, whose credibility was independently vetted by plaintiffs' counsel and accepted by Spanish authorities, simply because they were presented in proceedings in Spain. Nor, as discussed below, should they have been rejected as failing to provide sufficient particularity.

> **(2)** **Confidential witnesses who provided specific, consistent, and concrete examples of Abengoa's accounting fraud were erroneously rejected by the district court as conclusory and uncorroborated**

Despite providing both specific examples of accounting fraud for several projects that were consistent across the accounts of several confidential witnesses, and

allegations of company-wide fraud supported by the findings of KPMG, the ICAC, and the Spanish criminal courts, the district court held that "the allegations from the confidential witnesses as a whole should largely be disregarded absent other corroborating allegations under Rule 9(b)." (SA138) In addition to rejecting the three witnesses discussed above from the Spanish proceedings (*id.*), the court also concluded that: (1) the allegations from the confidential witness were too conclusory and speculative; and (2) the alleged accounting irregularities involved "only a handful of projects" so that the Complaint failed to specify "'what effect the alleged conduct had on the company's statements regarding its financial health.'" (SA138-39)

In so finding, the district court did exactly what this Court cautioned it should not do: mistake the heightened pleading standards of Rule 9(b) and the PSLRA for "impossible ones." *Synchrony*, 988 F.3d at 161.

A complaint may rely on information from confidential witnesses if "they are described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." *Novak*, 216 F.3d at 314. The Complaint did so (*see supra* pp. 9-16), as the district court acknowledged. (SA137 (the Complaint "does sufficiently allege job descriptions for FE2, FE3, FE4, FE5, and FE7" (citing SA91 n.11 (the Complaint "alleges specific actions that each of these witnesses took in their respective roles,

thereby providing sufficient information to infer that these witnesses possess the information they alleged"))) It cannot be disputed, therefore, that "the Complaint details statements from [these confidential witnesses] in management positions with a broader knowledge of the company's ... accounting practices." *Emps.' Ret. Sys. v. Blanford*, 794 F.3d 297, 307 (2d Cir. 2015).

The court acknowledged that FE4 and FE5 "provide first-hand accounts of the allegedly improper accounting, and name specific affected projects" (SA135 (citing JA910-14¶¶84-94)), and that "FE7 provided specific detail[s] as to how the accounting fraud took place, including describing the two sets of accounting systems (SAP and Excel)" (*id.* (citing JA906-07¶¶63-68)), "and the intentionality of the accounting fraud, including its impact on Abengoa's reported profits and liquidity." (*Id.* (citing JA907¶68)) But, as noted above, the court erroneously discounted the allegations of FE4, FE5 and FE7 because they were derived from Spanish proceedings. The wholesale rejection of these allegations undermines the court's determination that the Complaint's allegations lacked particularity.

The court rejected FE1's allegations because they were "second-hand" and because FE1 had resigned months before the start of the Class Period. (SA33-34, SA134) But as the court recognized in its earlier order dismissing the SAC, yet inexplicably overlooked in dismissing the Complaint, "FE1's statements are not so

4888-4367-9549.v1

lacking in specificity as to time-period that they need be discounted, and the Second Circuit has found that "'allegations concerning activity in one period can support an inference of similar circumstances in a subsequent period.'" (SA33 (quoting *Blanford*, 794 F.3d at 307)) Moreover, FE1 was the Director of Human Resources at Abengoa's U.S. subsidiary, and provided details of an exit interview she conducted in that position with an internal auditor, who had resigned shortly before the Offering. As HR Director, FE1 was in a credible position to report on an exit interview with an employee who described resigning after refusing a demand by senior management to sign off on financial reports that falsely inflated the value of certain projects. (JA919-20¶¶114-115) *Novak*, 216 F.3d at 314. FE1 thus corroborates allegations of company-wide fraud involving the inflation of project revenues.

The court acknowledged that FE6 "provides specific fraud allegations regarding the Cunene Water Pipeline project in Angola." (SA135 (citing JA913-14¶¶95-96)) But the court still rejected these allegations because FE6 was not an employee, worked on just one project with an Abengoa subsidiary, and was not alleged to have interacted with management. (SA137) FE6's allegations that the project expenses were falsely inflated, however, are consistent with the allegations from other witnesses. Coming from yet another project and yet another subsidiary, they provide further corroborative allegations of company-wide fraud.

- 46 -

And while the Court did not discount the testimony of FE3, it held that "FE3's statements alone are insufficient to meet the pleading standard for fraud." (SA138 n.15) Of course, the Complaint does not rely on FE3's statements in isolation, but to bolster a consistent, detailed picture of company-wide accounting fraud.

FE3, from Abengoa's corporate office in Missouri (JA900¶41), described how Abengoa routinely used two sets of books, including one that contained false information about project data that was provided to external parties. (JA910¶¶79-83) FE2, who had broad oversight for accounting and financial reporting at several of Abengoa's subsidiaries (JA900¶40), also reported that Abeinsa used two sets of books, one of which contained false information. (JA909¶77) And, as the court noted, FE7 detailed how the accounting fraud took place with "a dual SAP and Excel accounting system" at Inabensa. (SA136) FE7 was corroborated by FE4. (JA910-11¶¶84-86)

Considered together, these consistent allegations regarding the use of two sets of books, with one providing false information to the public—the very essence of fraud—were neither speculative nor conclusory.

The witnesses also provided detailed allegations of Abengoa's systemic practice of falsifying expenses and inflating profit margins regarding several major projects. FE7 described an electrical line project in India, DGEN, where the profit margin was

inflated to accelerate project revenue for the entire project when the project had just begun.  (JA907¶69)

Evidenced by screenshots from an Excel spreadsheet, FE7 detailed how Inabensa prematurely entered cost provisions for materials that had not yet been ordered for two electric transmission projects in the Ukraine and Kenya, logging in expenses that were not actually incurred until the following year.  (JA908-09¶¶71-72) FE4 confirmed the improper use of cost provisions to increase revenue and hide losses for both the Ukraine and Kenya projects (JA912¶¶90-91)—which is consistent with FE6's account that, as the court noted, provided "specific fraud allegations regarding the Cunene Water project in Angola."  (SA135 (citing JA913-14¶¶95-96))

FE5—the project control manager assigned to the €7 billion AVE Mecca Medina project—discovered that substantial expenses on the project were losses from unrelated projects involving Huawei, Vodafone, Nokia, and others.  (JA913¶93, JA919¶112)  FE5 explained that this practice was widespread (JA913¶93), as confirmed by the Benjumea emails in the KPMG report.  (JA915-16¶¶99-102)

It is difficult to reconcile the district court's holding that the confidential witness allegations were insufficient to plead accounting fraud.  Rather than resting on "'speculation and conclusory allegations'" (SA137-38), plaintiffs provided "numerous allegations in its amended complaint that 'explain why the statement[s] [regarding

strict financial discipline and relying on the percentage-of-completion accounting rules were] fraudulent.'" *Synchrony*, 988 F.3d at 169.

Moreover, the witnesses were not only consistent with each other's accounts, but were amply corroborated by other evidence of systemic, company-wide accounting fraud. *See Novak*, 216 F.3d at 314 (in addition to confidential sources, the existence of the fraud was supported by several documentary sources); *Institutional Invs. Grp. v. Avaya, Inc.*, 564 F.3d 242, 263 (3d Cir. 2009) ("'the corroborative nature of other facts alleged'" can strengthen confidential witness allegations).

KPMG's final report confirmed that accounting fraud was endemic at Abengoa and included invoice triangulation identified by FE5. (JA894¶9, JA915¶¶99-100) KPMG cited emails showing that Benjumea ordered Abengoa's senior management to falsify project expenses at seven projects, including the AVE Mecca Medina project, as also described by FE5. (JA915-16¶¶99-102)

The resolution of Spain's top financial accounting regulator, the ICAC, cited specific instances whereby Abengoa's auditor knowingly certified incorrect and materially misleading financial statements, confirming Abengoa's inflated profit margins. (JA894-95¶10) The National Court specifically quoted from the ICAC report, which highlighted losses in 2015 and 2016 that were not recorded, and were "deliberately hidden to give a misrepresented appearance of the company's equity and

financial situation." (JA937-39¶186)  In expanding the criminal complaint to include Abengoa, Deloitte, and others, the Court concluded that the evidence submitted— including "the systematic concealment of substantial losses of [Abengoa's] assets, as well as the inclusion of insufficiently accredited certifications"—was sufficient to show "a visible misrepresentation of the reality of the entity's economic and financial situation." (*Id*.)  And in elevating the criminal action against Abeinsa and Inabensa to the National Court, the investigating judge in Seville agreed that the alleged financial accounting fraud pervaded Abengoa in its entirety. (JA939-40¶190)

The district court held that the allegations from the confidential witnesses should be disregarded in the absence of corroboration and because they were limited to merely a "handful of projects." (SA138)  But that corroboration is overwhelming, and more than sufficient at the pleading stage to infer company-wide accounting fraud.

4888-4367-9549.v1

### b. The district court made premature fact findings and improperly drew inferences in defendants' favor

#### (1) The Complaint adequately alleges that Abengoa fraudulently maintained two sets of books, falsely inflated profit margins, and improperly and prematurely recorded expenses

The district court not only disregarded allegations from the confidential witnesses, but "even in light of" those allegations (SA138) held that the Complaint failed to plausibly plead accounting fraud. In doing so, however, the court neglected to accept the allegations as true and draw all reasonable inferences in plaintiffs' favor. *Litwin*, 634 F.3d at 715. For example, the court found "no credible specific allegations concerning the absence of strict financial discipline" (SA139), stating that although Abengoa kept two sets of accounting books, that "does not necessarily indicate that Abengoa did not have strict financial discipline in place." (SA138) As the court had previously held, "[t]here is nothing to suggest that having two systems was inherently fraudulent, or that the method for correcting discrepancies was inherently improper." (SA35) In fact, the Complaint does not merely suggest, but makes clear that Abengoa utilized dual sets of accounting records for fraudulent purposes.

- 51 -

FE7 described how an accurate set of books was used internally while a second set of books that contained inflated profit margins was provided for external use (JA906-07¶¶63-68), a practice confirmed by FE4. (JA910-11¶¶84-86) The use of two sets of books, with only one containing accurate numbers, was also described by FE2 and FE3. (JA909¶77, JA910¶¶79-83) And the context for inferring that the use of dual books was improper includes the findings of pervasive fraud by KPMG, the ICAC, and the National Court.

Only by making premature fact determinations and drawing inferences in *defendants*' favor could the court conclude that Abengoa's use of two sets of accounting books did not support allegations of accounting fraud. And it did so, for example, by finding exculpatory an allegation suggesting that the dual system was widely known *within* Abengoa (SA139 (citing JA907¶67) (it was so common that project managers, when asked for their margin estimates, replied by asking which margin was actually being requested)), which hardly negates malfeasance. The court further noted that Abengoa purportedly made some effort to rectify accounting errors by creating a Controller Department in May 2015. (SA139 (citing JA982¶337)) That effort, however, was quite belated—just months before the end of the Class Period and, as alleged, in the wake of revelations concerning Abengoa's leverage ratios and the tightening of internal controls. (JA981¶334)

The court also rejected detailed allegations that Abengoa improperly recorded expenses on specific projects because they came from confidential witnesses, whom the court discredited. (SA139) As discussed above, this was error.

And the court held that those "accounting irregularities" were limited to a "handful of projects" (SA138), which not only undercounts the quantity of projects specified, but is a premature fact-bound ruling that discounts the reasonable inference of company-wide fraud.

The Complaint alleges specific examples of accounting fraud at two subsidiaries, Inabensa and Abeinsa, which led the Engineering and Construction division that represented 60% of Abengoa's overall consolidated revenue. (JA892¶3) Moreover, in addition to the specific allegations of improper accounting practices at far more than a handful of projects, findings by the ICAC, KPMG and Spanish authorities provide strong support for an inference of pervasive, company-wide accounting fraud. Plaintiffs are thus entitled to the reasonable inference that defendants' representations about Abengoa's adherence to strict financial discipline and the percentage-of-completion revenue recognition rule were false or misleading in the face of systemic fraud. *See N.J. Carpenters Health Fund v. Royal Bank of Scot. Grp., PLC*, 709 F.3d 109, 123-24 (2d Cir. 2013) (where unnamed employees worked at only a few of the company's many offices and were spread across the country, and

the statements from those employees "provide no basis for believing that factors [are] unique to the relevant offices, rather than company-wide practices ... we must draw the reasonable inference that these factual allegations support, namely, that the unnamed employees described widespread practices at [the company]"); *see also Blanford*, 794 F.3d at 307 (allegations concerning activity in one period can support an inference of similar circumstances in a subsequent period).

"Discovery may reveal that the actual facts support the inferences drawn by the [defendants], rather than those drawn by [plaintiffs]," but that is not the issue at the pleading stage. *Royal Bank of Scot.*, 709 F.3d at 125. As this Court has reiterated, "'a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that recovery is very remote and unlikely.'" *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)). The question, which the district court here failed to correctly answer, is whether the facts alleged in the Complaint, "taken as true, allow us to draw the 'reasonable inference' that the ... offering documents contained misstatements and omissions." *Id.*

4888-4367-9549.v1

**(2) The Complaint adequately alleges that Abengoa violated the percentage-of completion accounting rule by routinely recording future, non-existent, and unrelated expenses on construction projects**

The Complaint plausibly alleges that Abengoa routinely violated the percentage-of-completion accounting rule (allowing a company to recognize construction contract profits in proportion to the expenses incurred on the job) by inflating project costs with non-existent expenses, unrelated expenses, or expenses that had yet to be incurred, in order to prematurely recognize revenue. (JA905¶60) This is sufficient to plead the falsity of Abengoa's statement that it recognized revenue by using the percentage-of-completion method.

FE7 and other former employees described how Abengoa prematurely recorded expenses through accounting entries referred to as "cost provisions." (JA907-08¶¶70-71, JA912¶90) FE7 and others also detailed the failure to adjust initial project margins to reflect actual costs during the execution of the projects. (JA906-07¶¶65-68, JA911¶85) And KPMG reported that Abengoa engaged in a widespread corporate scheme to artificially inflate the percentages of completion of projects, as detailed in Benjumea's emails and confirmed by former employees. (JA913¶93, JA915-18¶¶100-108) These practices all violated the stated percentage-of-completion rule of IAS 11.

4888-4367-9549.v1

As the district court noted, defendants did not dispute that Abengoa deviated from the percentage-of-completion method, but contend the Registration Statement disclaimed strict reliance on it. (SA140 (citing JA1098)) But Abengoa did not merely deviate on occasion from its stated accounting policy based on good faith "estimates" or "significant judgments," as the Registration Statement's risk warnings might suggest. (JA923¶130, JA1098) As alleged, Abengoa routinely and systematically abused it in order to recognize revenue prematurely and inflate profit margins. (JA905-15¶¶59-98)

The district court found the purported "cautionary language" in Abengoa's risk warnings was neither a "generic warning" nor a "specific … disclosure of risk," but "somewhere between these two extremes." (SA141-42) This language, however, utterly failed to inform investors of the Company's abuse of the percentage-of-completion method as part of its ongoing, widespread accounting fraud. *Meyer v. Jinkosolar Holdings Co.*, 761 F.3d 245, 251 (2d Cir. 2014) ("One cannot, for example, disclose in securities offering a business's peculiar risk of fire, the installation of a comprehensive sprinkler system to reduce fire danger, and omit the fact that the system has been found to be inoperable, without misleading investors.")

The court, again, erroneously declined to assume the truth of plaintiffs' allegations from Spanish proceedings that detailed the premature or false recording of

- 56 -

expenses on several projects in violation of the percentage-of-completion rules. (SA143) For the reasons discussed above, this was error.

The court then restricted its discussion regarding Abengoa's violation of percentage-of-completion to the invoice triangulation allegations. It held those allegations were insufficient, "especially in light of the cautionary language described above, the lack of specific allegations concerning the impact of the alleged triangulation scheme on the financial statements as a whole, and the relatively small percentage of total assets involved." (*Id.*)

This unduly narrow focus not only disregarded allegations from confidential witnesses attesting to recording expenses that had yet to be incurred or would not be incurred—but failed to account for allegations of Abengoa's systemic abuse of percentage-of-completion accounting. Benjumea's emails directing the invoice triangulation scheme for several projects was not the sum total of that scheme, but representative of the fraudulent accounting that, as the KPMG report concluded, was evidence of a widespread scheme to artificially inflate the percentage of completion of projects and project margins worldwide. (JA915¶100) In addition, the ICAC resolution cites specific instances in which Abengoa's financial statements were incorrect and materially misleading due to inflated profit margins. (JA940-41¶¶193-195)

The district court's determination that the Complaint failed to adequately allege the impact of invoice triangulation on Abengoa's finances as a whole was, at best, a premature determination of materiality. This Court holds that "'[b]ecause the materiality element presents a mixed question of law and fact, it will rarely be dispositive in a motion to dismiss.'" *Altimeo Asset Mgmt. v. Qihoo 360 Tech. Co.*, 19 F.4th 145, 151 (2d Cir. 2021) (quoting *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 360 (2d Cir. 2010) and citing *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 163 (2d Cir. 2000)). Indeed, "'[a] complaint may not properly be dismissed ... on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance.'" *Id.* (quoting *Goldman v. Belden*, 754 F.2d 1059, 1067 (2d Cir. 1985)) (second alteration in original).

Abengoa's assertion that it recognized revenue based on the percentage-of-completion method, if assumed false, was something that "'a reasonable investor would have considered significant in making investment decisions.'" *Synchrony*, 988 F.3d at 170 (quoting *Ganino*, 228 F.3d at 161). The Company's alleged systematic false recording of expenses to recognize revenue prematurely so as to inflate its profit margins and hide losses for at least two key subsidiaries is not "so obviously

unimportant to a reasonable investor" that the allegations should be rejected at the pleading stage.

### 3. Abengoa's false and misleading statement about enforcing strict financial discipline was material to investors

As discussed above, Abengoa's statement that it has "successfully grown [the] business while seeking to enforce strict financial discipline" through a "robust project management and control system" (JA923¶130) was false and misleading, standing in stark contrast to the well-corroborated allegations of systemic, widespread accounting fraud.

The district court found this statement to be puffery—"nonactionable as 'expressions of corporate optimism … too general to cause a reasonable investor to rely upon them.'" (SA134) But the statement was not a vague expression of optimism that is typically considered too general to be actionable. *See, e.g.*, *Novak*, 216 F.3d at 315. This was "a 'concrete' description and a 'factual representation'" that purported to describe the state of Abengoa's accounting practices. *Synchrony*, 988 F.3d at 168.

The cases the district court found to be analogous (SA133-34) are inapposite. A definitive statement about enforcing strict financial discipline is far from the vague expression of optimism made by the defendants in *Hutchinson v. Perez*, 2013 WL

- 59 -

1775374, at *2 (S.D.N.Y. Apr. 25, 2013), *aff'd sub nom. Jones v. Perez*, 550 F. App'x 24 (2d Cir. 2013), that "'we feel very comfortable with the level of cash we have and we feel very comfortable with the level we will have at the end of the year.'" *See also Synchrony*, 988 F.3d at 170 ("statements that the company was 'pretty confident' and 'pretty positive' about the prospect of renewing partnerships" in the future "offer[ed] only generally optimistic opinions"); *Singh v. Cigna Corp.*, 918 F.3d 57, 63-64 (2d Cir. 2019) ("statements in Cigna's Code of Ethics" amounting to "general declarations about the importance of acting lawfully" were not "confident detail[ed]" descriptions as to its stated corporate accounting policies).

The court also relied on *Asay v. Pinduoduo Inc.*, 2021 WL 3871269, at *1 (2d Cir. Aug. 31, 2021), which found statements about the company's "'strict' anti-counterfeiting measures" to be puffery. In the context of the facts of that case, this Court noted that the term "'strict'" to describe the company's anti-counterfeiting measures was vague and generalized language. *Id*. at *2-*3. The company did not, however, misrepresent its anti-counterfeiting efforts, but disclosed that its efforts were not succeeding. *Id*. at *3 ("'[a]lthough we have adopted strict measures to protect us ... these measures may not always be successful or timely'") (alterations in original, emphasis omitted). Thus, "a reasonable investor, based on the specificity of the

4888-4367-9549.v1

contemporaneous examples of anti-counterfeiting failures and risks, would have understood that Pinduoduo's anti-counterfeiting measures were not [successful]." *Id.*

Here, in stark contrast, reasonable investors would not have understood Abengoa's representation of "strict financial discipline" through a "robust project management and control system" to mean that the Company was engaged in pervasive and systemic accounting fraud. Even generally positive statements are not insulated from liability "if they are 'misrepresentations of existing facts.'" (JA923¶130, JA1098) *Haw. Structural Ironworkers Pension Tr. Fund v. AMC Ent. Holdings, Inc.*, 422 F. Supp. 3d 821, 845 (S.D.N.Y. 2019) (quoting *Novak*, 216 F.3d at 315 (statements that defendants' inventory was "'in good shape'" and "'under control'" were not puffery because "'they allegedly knew that the contrary was true'")).

Contrasted with the well-documented and corroborated accounting fraud involving artificially inflated project costs and improperly transferred expenses between projects, resulting in the premature recognition of revenue, this statement was a "determinate, verifiable statement." *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 184 (2015). And it was verifiably false.

4888-4367-9549.v1

**B.**     **Exchange Act Claims**

   **1.**     **The Complaint adequately alleged that defendants'
            statements were false and misleading**

        **a.**     **The misstatements of fact and omissions
                 supporting the Securities Act claims also
                 support the Exchange Act claims**

The false representations in the Registration Statement regarding strict financial

discipline and reliance on percentage-of-completion accounting that were alleged to

violate the Securities Act, above, also violate the Exchange Act.   There is no

distinction between falsity for Securities Act purposes and for Exchange Act purposes.

*Abramson v. Newlink Genetics Corp.*, 965 F.3d 165, 175 (2d Cir. 2020)

("§11 … shares the relevant text concerning false and misleading statements with

Rule 10b-5"); *City of Omaha, Neb. Civilian Emps.' Ret. Sys. v. CBS Corp.*, 679 F.3d

64, 67-68 (2d Cir. 2012) ("the same reasoning applies" under §10(b) as §11, "as these

claims all share a material misstatement or omission element").

        **b.**     **Defendants' post-Offering statements about
                 Abengoa's cash flow and liquidity in the face of
                 a liquidity crisis concealed by fraud were false
                 and misleading**

Abengoa and its top executives, including Ortega, continued to conceal the

Company's accounting scheme and severe liquidity risk after the Offering by

representing that Abengoa's EBITDA was increasing year-over-year and that it had

achieved its "liquidity reinforcement plans" because of its "strict financial discipline."

- 62 -

(JA895¶11; *see, e.g.*, JA950-52¶¶234-236, JA960¶265, JA966-67¶¶285-288)  For

example, on September 3 and 4, 2014, Ortega represented that Abengoa had achieved

a "[s]trong liquidity position" thanks to successfully "reinforc[ing] [Abengoa's]

financial discipline" and "reduc[ing] … corporate leverage." (JA960-61¶¶265-266)

These statements about Abengoa's "EBITDA growth" and "cash flow" all "strongly

suggested that [the Company] faced no liquidity risk at [all]." *In re Vivendi, S.A. Sec.

Litig.*, 838 F.3d 223, 251 (2d Cir. 2016).  And they materially misled investors into

believing that the Company was able to timely meet its financial obligations and fund

its operations when, in reality, Abengoa was engaged in a massive accounting scheme

in order to hide the severe liquidity crisis it was facing.  (*Id.*; JA985-86¶¶351, 356,

JA988¶¶365-366)

The district court summarily dismissed these statements concerning cash flow

and liquidity by reiterating its holding that "plaintiffs have not sufficiently alleged the

underlying accounting fraud." (SA147)  For the reasons discussed above, this was

error.

> c.    **Abengoa's statement that it did not need to access capital markets immediately before seeking a capital increase was false and misleading**

Abengoa's statement on July 31, 2015, that it had no need to access the capital

markets for additional financing—not for "anything" or "any reason" (JA976-

78¶¶320-321)—was false given that, on the *very next business day*, Abengoa did in fact need additional capital and did have plans to raise it. (JA978-79¶¶324-325)

In dismissing the SAC, the court acknowledged that "the timing of Abengoa's actions is suggestive." (SA37) Nevertheless, the court held that falsity was inadequately pled. *Id.*

Plaintiffs cured any deficiency in the Complaint with details that show that the July 31, 2015 statement was part of the overarching scheme to hide Abengoa's true liquidity risk. As alleged, over the course of the Class Period, Abengoa executed a series of transactions designed to obtain badly needed cash to sustain its operations. (JA928-30¶¶146-161) Analysts questioned some of the transactions, but Abengoa repeatedly maintained and emphasized that its EBITDA was increasing year-over-year and that it had achieved its "liquidity reinforcement plans" as a result of its "strict financial discipline." (*See, e.g.*, JA929¶152, JA972-73¶305) Thus, when Abengoa, in a stunning about-face on August 3, 2015, announced a €650 million capital raise, analysts were alarmed. (JA987-88¶¶359-365) As *Bloomberg* reported, the abrupt reversal "eroded trust in Abengoa's accounting methods and ability to generate sufficient cash to service its debt." (JA987-88¶364)

Without further addressing the new allegations, the district court dismissed this claim because, again, it erroneously held that "plaintiffs have not sufficiently alleged

4888-4367-9549.v1

the existence of an accounting fraud scheme" (SA148), apparently choosing to credit an inference in defendants' favor—nowhere raised in the Complaint—that after defendants left the meeting where they disclaimed the need for capital, they went and prepared the paperwork for a €650 million Offering overnight. Again, the court erred.

### 2. Scienter is adequately alleged

#### a. Management-level employees' involvement in company-wide fraud supports a compelling inference of corporate scienter

Corporate scienter is adequately pled "by pleading facts sufficient to create a strong inference either (1) that 'someone whose intent could be imputed to the corporation acted with the requisite scienter' or (2) that the statements 'would have been approved by corporate officials sufficiently knowledgeable about the Company to know that those statements were misleading.'" *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 177 (2d Cir. 2015).

Thus, it is not required to establish scienter by "imput[ing] it from an individual defendant who made the challenged misstatement." *Jackson v. Abernathy*, 960 F.3d 94, 98 (2d Cir. 2020). Indeed, "[t]he scienter of the other officers or directors who were involved in the dissemination of the fraud may also be imputed to the corporation, even if they themselves were not the actual speaker," and "a shareholder

need not always identify the individuals responsible for the fraudulent statement." *Id.* at 98-99 (citing *Loreley*, 797 F.3d at 177).

"'There is no formulaic method or seniority prerequisite for employee scienter to be imputed to the corporation, but scienter by management-level employees is generally sufficient to attribute scienter to corporate defendants.'" *Bos. Ret. Sys. v. Alexion Pharms., Inc.*, 556 F. Supp. 3d 100, 131-32 (D. Conn. 2021); *see also In re Moody's Corp. Sec. Litig.*, 599 F. Supp. 2d 493, 515 (S.D.N.Y. 2009), *opinion corrected on denial of reconsideration*, 612 F. Supp. 2d 397 (S.D.N.Y. 2009); *In re Marsh & Mclennan Cos., Inc. Sec. Litig.*, 501 F. Supp. 2d 452, 481 (S.D.N.Y. 2006) ("While there is no simple formula for how senior an employee must be in order to serve as a proxy for corporate scienter, courts have readily attributed the scienter of management-level employees to corporate defendants."). That is precisely what was alleged here.

First, the Complaint alleges that Benjumea, Abengoa's former Executive Chairman, was directly involved in—and responsible for—the alleged fraud. (JA915-18¶¶99-108) This is "more than sufficient to impute his scienter to the Company." *Constr. Laborers Pension Tr. for S. Cal. v. CBS Corp.*, 433 F. Supp. 3d 515, 549 (S.D.N.Y. 2020).

4888-4367-9549.v1

As the emails identified by KPMG make clear, Benjumea and his subordinates, Inabensa's former Administration Department Director and Abengoa's general secretary, were personally involved in orchestrating the scheme to artificially inflate revenue through invoice triangulation. (JA916-17¶¶104-107, JA979¶327) The district court rejected these allegations because "the KPMG report describing the triangulation scheme is merely an allegation in a foreign proceeding." (SA149) But the scheme, based on incriminatory emails alleged in the Complaint, reviewed by KPMG—which after conducting an analysis for 2012-2016, concluded that the accounting fraud occurred at the direction of senior management, including Benjumea—should not be so easily dismissed at the pleading stage.

As discussed above, the Spanish National Court expanded the criminal complaint to include two members of Abengoa's Audit Committee, Abengoa's auditor (Deloitte S.L.), and the audit partner responsible for the audit. The Court independently evaluated the evidence against them—including the ICAC's finding that Deloitte knowingly certified incorrect and materially misleading financial statements (JA941¶¶194-195)—and found it sufficient to show "some type of criminal offense." (JA935-39¶¶182-187, JA980¶329) *See In re Petrobras Sec. Litig.*, 116 F. Supp. 3d 368, 382-83 (S.D.N.Y. 2015) (imputing scienter to company from non-

defendant executives who were part of senior management and who were arrested by Brazilian authorities for their roles in the alleged fraud).

The district court rejected these allegations as insufficient to support an inference of scienter, stating it was not clear that a finding of scienter by the National Court was ever made. (SA150) It is not alleged that the National Court found scienter—but that the evidence it considered sufficiently reliable to meet the requirements for a crime provide a strong inference of scienter. (JA979¶328) And that evidence, including the ICAC's determination that Deloitte knew Abengoa's financial statements contained material inaccuracies, provides the "'connective tissue'" the district court improperly found lacking. (SA150)

Further, Abengoa's department heads are also implicated in the widespread fraud at issue here. As described by FE4, FE5, and FE7, Abeinsa and Inabensa's various department heads and directors participated in and/or were complicit in the fraud, given the fact that their approval was required to transfer expenses among the various subsidiaries. (JA909¶74, JA912-13¶¶91, 94, JA980¶330) Abengoa's management also was motivated to artificially inflate profit margins—which were tied to its bonuses. (JA980-81¶332)

Indeed, the fraud included employees ranging from project managers, who instructed FE5 to falsify project margins, to the CFO of Abeinsa, who told Abeinsa

EPC's internal auditor to "shut the f—k up and just sign" reports known to contain false financial information. (JA918¶110, JA920¶115) *See Moody's*, 599 F. Supp. 2d at 515-16 ("scienter by management-level employees is generally sufficient to attribute scienter to corporate defendants").

The false and misleading statements do not involve "a case of mere mismanagement, but rather the product of collective fraudulent conduct." *Jackson*, 960 F.3d at 96. The existence of such company-wide policies is highly indicative of corporate scienter. *In re EZCorp, Inc. Sec. Litigs.*, 181 F. Supp. 3d 197, 209 (S.D.N.Y. 2016) (scienter supported by "collective picture painted by the confidential witnesses: a culture of unscrupulous [] practices and lax oversight that was so widespread as to be 'a matter of course'"). Plaintiff has adequately pleaded facts that raise a strong inference of corporate scienter.

> **b.** **Ortega's resignation shortly before the fraudulent scheme was exposed and followed by criminal charges support a compelling inference of scienter**

The Complaint contains sufficient allegations to support scienter as to Ortega. First, Ortega served as CEO at a company rife with fraud. The criminal charges brought against him in Spain provide a strong inference of scienter. (JA983¶345) Ortega's certification of Abengoa's internal controls over financial reporting under Sarbanes-Oxley places him at the center of the fraud. (JA983¶346)

- 69 -

Further, Ortega abruptly resigned in May 2015, following a highly damaging revelation concerning Abengoa's leverage ratios and amidst tightening internal controls while on the brink of financial collapse. (JA981-83¶¶334-346) The timing of Ortega's resignation, when internal auditors and controllers began uncovering evidence of fraud—and only months before the scheme was exposed—supports the inference that Ortega acted with scienter. *See, e.g.*, *Fresno Cnty. Emps.' Ret. Ass'n v. comScore, Inc.*, 268 F. Supp. 3d 526, 553 (S.D.N.Y. 2017) (resignation contributes to an inference of scienter); *Van Dongen v. CNinsure Inc*., 951 F. Supp. 2d 457, 474 (S.D.N.Y. 2013) ("[T]he resignation and retirement of company insiders alleged to have been involved in the scheme ... all contribute to the inference of scienter."); *Ho v. Duoyuan Glob. Water, Inc.*, 887 F. Supp. 2d 547, 575 (S.D.N.Y. 2012) (executive resignation supported inference of scienter).

### C.    Control person liability was adequately pled

The court dismissed control liability claims because it found no primary liability.  Because the court erred in rejecting primary liability, its rejection of control liability was also error.

4888-4367-9549.v1

## VIII. CONCLUSION

Based in the foregoing, the district court's dismissal of the Complaint should be reversed.

DATED:  December 12, 2022          Respectfully submitted,

ROBBINS GELLER RUDMAN
  & DOWD LLP
ANDREW S. LOVE


*s/Andrew S. Love*
ANDREW S. LOVE

Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA  94104
Telephone:  415/288-4545
415/288-4534 (fax)
alove@rgrdlaw.com

ROBBINS GELLER RUDMAN
  & DOWD LLP
ROBERT M. ROTHMAN
ERIN W. BOARDMAN
ROBERT D. GERSON
58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)
rrothman@rgrdlaw.com
eboardman@rgrdlaw.com
rgerson@rgrdlaw.com

- 71 -

LEVI & KORSINSKY, LLP
NICHOLAS I. PORRITT
ADAM M. APTON
55 Broadway, 10th Floor
New York, NY 10006
Telephone: 212/363-7500
212/363-7171 (fax)
nporritt@zlk.com
aapton@zlk.com

*Counsel for Lead Plaintiffs-Appellants and
Movant-Appellant*

4888-4367-9549.v1

## RULE 32(g) CERTIFICATE

The undersigned counsel certified that PLAINTIFFS-APPELLANTS' OPENING BRIEF uses a proportionally spaced Times New Roman typeface, 14-point, and that the text of the brief comprises 13,998 words according to the word count provided by Microsoft Word 2016 word processing software.

*s/Andrew S. Love*
ANDREW S. LOVE

## DECLARATION OF SERVICE

I, the undersigned, declare:

1.     That declarant is and was, at all times herein mentioned, a citizen of the United States and employed in the City and County of San Francisco, over the age of 18 years, and not a party to or interested party in the within action; that declarant's business address is Post Montgomery Center, One Montgomery Street, Suite 1800, San Francisco, California 94104.

2.     I hereby certify that on December 12, 2022, I electronically filed the foregoing document:  PLAINTIFFS-APPELLANTS' OPENING BRIEF with the Clerk of the Court for the United States Court of Appeals for the Second Circuit by using the appellate CM/ECF system.

3.     I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

I declare under penalty of perjury that the foregoing is true and correct. Executed on December 12, 2022, at San Francisco, California.

*s/Andrew S. Love*

ANDREW S. LOVE

4888-4367-9549.v1