UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

Thurgood Marshall U.S. Courthouse   40 Foley Square, New York, NY 10007 Telephone: 212-857-8500

**MOTION INFORMATION STATEMENT**

Docket Number(s): 22-2438-cv _____     _____ Caption [use short title] _____

Motion for: Leave to File a Supplemental Appendix

_____

_____

Set forth below precise, complete statement of relief sought:

Leave to file a supplemental appendix including a filing        Francisco v. Abengoa, S.A.

that was inadvertently omitted from the parties' Joint

Appendix.

_____

_____

_____

MOVING PARTY: Canaccord Genuity Inc., HSBC Securities (USA) Inc., Merrill Lynch International, Société Générale   OPPOSING PARTY: Jesse Sherman, Arlette Sherman, PAMCAH-US Local 675 Pension Fund, Michael Francisco, Daniel LaMoureaux

☐ Plaintiff          ☑ Defendant

☐ Appellant/Petitioner     ☑ Appellee/Respondent

MOVING ATTORNEY: Kannon Shanmugam          OPPOSING ATTORNEY: Andrew S. Love
_____
[name of attorney, with firm, address, phone number and e-mail]

Paul, Weiss, Rifkind, Wharton & Garrison LLP      Robbins Geller Rudman & Dowd LLP

2001 K Street, NW, Washington, DC 20006       Post Montgomery Center, 1 Montgomery Street, San Francisco, CA 94104

Telephone: 202-223-7325 / Email: kshanmugam@paulweiss.com   Telephone: 415-288-4545 / Email: alove@rgrdlaw.com

Court- Judge/ Agency appealed from: Hon. Edgardo Ramos, Southern District of New York

**Please check appropriate boxes:**                 **FOR EMERGENCY MOTIONS, MOTIONS FOR STAYS AND INJUNCTIONS PENDING APPEAL:**

Has movant notified opposing counsel (required by Local Rule 27.1):    Has this request for relief been made below?     ☐ Yes ☐ No
☑ Yes  ☐ No (explain): _____    Has this relief been previously sought in this court?   ☐ Yes ☐ No
_____      Requested return date and explanation of emergency: _____

Opposing counsel's position on motion:         _____
☑ Unopposed ☐ Opposed ☐ Don't Know         _____
Does opposing counsel intend to file a response:      _____
☐ Yes ☐ No ☑ Don't Know               _____

Is oral argument on motion requested?    ☐ Yes ☑ No (requests for oral argument will not necessarily be granted)

Has argument date of appeal been set?    ☐ Yes ☑ No If yes, enter date: _____

Signature of Moving Attorney:

Kannon K. Shanmugam _____ Date: 03/07/2023 _____ Service by: ☑ CM/ECF  ☐ Other [Attach proof of service]

Form T-1080 (rev.12-13)

# In the United States Court of Appeals for the Second Circuit

————————

No. 22-2438-cv

JESSE SHERMAN; ARLETTE SHERMAN;
PAMCAH-UA LOCAL 675 PENSION FUND; MICHAEL
FRANCISCO; AND DANIEL LAMOUREAUX,
PLAINTIFFS-APPELLANTS

*v.*

ABENGOA, S.A.; MANUEL SANCHEZ ORTEGA;
CANACCORD GENUITY INC.; HSBC SECURITIES (USA) INC.;
MERRILL LYNCH INTERNATIONAL; AND SOCIETE GENERALE,
DEFENDANTS-APPELLEES

————————

**MOTION FOR LEAVE TO FILE A SUPPLEMENTAL APPENDIX**

————————

Pursuant to Federal Rule of Appellate Procedure 30, appellees Canacord Genuity Inc., HSBC Securities (USA) Inc., Merrill Lynch International, and Société Générale, respectfully request leave to file a supplemental appendix consisting of a district court filing that was inadvertently omitted from the parties' joint appendix. The proposed supplemental appendix is attached to this motion. Counsel for appellants has stated that appellants do not oppose this request.

Respectfully submitted,

/s/ Kannon K. Shanmugam

KANNON K. SHANMUGAM
PAUL, WEISS, RIFKIND,
  WHARTON & GARRISON LLP
  2001 K Street, N.W.
  Washington, D.C. 20006
  (202) 223-7325
  kshanmugam@paulweiss.com

MARCH 7, 2023

## CERTIFICATE OF COMPLIANCE
## WITH TYPEFACE AND WORD-COUNT LIMITATIONS

I hereby certify, pursuant to Federal Rules of Appellate Procedure 27(d)(2)(A), 32(a)(6), and 32(c)(1) that the attached Motion for Leave to File a Supplemental Appendix is proportionately spaced, has a typeface of 14 points or more, and contains 68 words.

MARCH 7, 2023

/s/ Kannon K. Shanmugam
KANNON K. SHANMUGAM

# 22-2438-cv

## In the United States Court of Appeals for the Second Circuit

---

JESSE SHERMAN; ARLETTE SHERMAN; PAMCAH-UA LOCAL 675 PENSION
FUND; MICHAEL FRANCISCO; AND DANIEL LAMOUREAUX,
PLAINTIFFS-APPELLANTS

*v.*

ABENGOA, S.A.; MANUEL SANCHEZ ORTEGA; CANACCORD GENUITY INC.;
HSBC SECURITIES (USA) INC.; MERRILL LYNCH INTERNATIONAL;
AND SOCIETE GENERALE, DEFENDANTS-APPELLEES

---

*ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK (CIV. NO. 15-6279)
(THE HONORABLE EDGARDO RAMOS, J.)*

---

**SUPPLEMENTAL APPENDIX OF DEFENDANTS-APPELLEES**

---

RICHARD ROSEN
PATRICK MCCUSKER
MUAMERA HADZIC
PAUL, WEISS, RIFKIND,
   WHARTON & GARRISON LLP
*1285 Avenue of the Americas
New York, NY 10019*

KANNON K. SHANMUGAM
ABIGAIL FRISCH VICE*
E. GARRETT WEST
PAUL, WEISS, RIFKIND,
   WHARTON & GARRISON LLP
*2001 K Street, N.W.
Washington, DC 20006
(202) 223-7300*

<sup>*</sup> Admitted in California and practicing law in the District of Columbia pending application for admission to the D.C. Bar under the supervision of bar members pursuant to D.C. Court of Appeals Rule 49(c)(8).

# TABLE OF CONTENTS

Page

First amended complaint, August 2, 2016........................................ Supp. App. 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MICHAEL FRANCISCO, Individually and on Behalf of All Others Similarly Situated, | |
| Plaintiff, | |
| v. | Case No. 1:15-cv-06279 (ER) |
| ABENGOA, S.A., SANTIAGO SEAGE, MANUEL SANCHEZ ORTEGA, BARBARA ZUBIRIA and IGNACIO GARCIA ALVEAR, | |
| Defendants. | |

**AMENDED CLASS ACTION COMPLAINT FOR
VIOLATION OF THE FEDERAL SECURITIES LAWS**

Lead Plaintiffs Jesse and Arlette Sherman ("Lead Plaintiffs") and additional plaintiff PAMCAH-UA Local 675 Pension Fund (collectively, "Plaintiffs"), by their undersigned attorneys, make the allegations set forth herein based upon knowledge as to their own acts and upon the investigation conducted by Plaintiffs' counsel. That investigation included the examination and analysis of information obtained from public and proprietary sources – including, *inter alia*, United States Securities and Exchange Commission ("SEC") filings by Abengoa, S.A. ("Abengoa" or the "Company"), regulatory filings and reports, securities analysts' reports and advisories about the Company, press releases and other public statements issued by the Company, media reports about the Company, and interviews with former employees of the Company. Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a federal securities class action on behalf of purchasers of: (i) the American Depositary Shares ("ADSs") of Abengoa between October 17, 2013 and August 3, 2015, inclusive (the "Class Period"), seeking to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder; and (ii) Abengoa ADSs pursuant and/or traceable to the Company's public offering conducted on or about October 17, 2013 (the "Offering"), seeking to pursue remedies under Sections 11 and 15 of the Securities Act of 1933 (the "Securities Act").

2. Abengoa is an engineering and clean technology company headquartered in Seville, Spain. The Company went public in the United States via the Offering, and its ADSs were publicly traded on the NASDAQ Global Select Market ("NASDAQ") until they were delisted on April 28, 2016, after Abengoa filed for creditor protection.

**Supp. App. 2**

3.     At the time of the Offering and throughout the Class Period, Abengoa operated with a high amount of debt and was subject to a covenant with its lenders, whereby the Company was required to maintain a "leverage" ratio of debt-to-earnings before interest, taxes, depreciation and amortization ("EBITDA") below a given threshold.  Accordingly, investors were highly focused on Abengoa's leverage and ability to generate sufficient cash flow to service its debt and remain in compliance with its debt covenant.

4.     As detailed herein, prior to and during the Class Period, Defendants engaged in a series of actions which resulted in the dissemination of materially inaccurate and/or untrue statements about the Company's financial condition, liquidity, and ability to generate cash by legitimate means.

5.     Notwithstanding Defendants' actions, during the Class Period, Defendants claimed that Abengoa maintained a purportedly "strong liquidity position," "strong cash position" and "ability . . . to generate cash" and "increas[e] free cash flow delivery" – allegedly achieved through "financial discipline."

6.     In November 2014, analysts raised questions about how Abengoa had classified the debt associated with a recently-issued bond.  As a result, Abengoa was forced to disclose that it had excluded the bond and other debt totaling nearly €1.6 billion, plus approximately €1 billion owed to suppliers, from the Company's leverage ratios, in order to report more favorable ratios. In response to this revelation and associated concerns that Abengoa's loss of credibility could harm its borrowing ability, the price of Abengoa ADSs fell nearly 50%.

7.     Defendants continued to materially misstate Abengoa's financial condition, liquidity and cash flow, and, in turn, about the likelihood of, and need for, future capital raises by the Company.  Defendants assured investors in February 2015 that Abengoa was in an "***excellent***

- 3 -

*position to face [its] operational and financial needs*," and stated in May 2015 that the Company was "in a ***very comfortable position*** to face" its operational needs and "financial commitments."

       8.     Ultimately, on July 31, 2015, they were forced to slash Abengoa's free cash flow guidance. Although Abengoa's management had finally begun to acknowledge that Abengoa's financial condition was worse than previously disclosed, they continued to misrepresent both the severity of the Company's liquidity problems and their plans going forward. In response to questions from analysts about whether Abengoa would need to "come back to the market" to raise capital, Defendants steadfastly denied that possibility, stating that "at this point in time, the Company has **no plan** . . . ***to tap the capital markets in any manner***" and "***there's no need to access the market for any reason***."

       9.     On Monday, August 3, 2015 – the very next business day – however, Defendants stunned the market by announcing plans for a capital increase of ***€650 million***, together with asset divestitures totaling €500 million. According to the Company, these "significant actions" were necessary to "reduce corporate debt" and "reinforce [Abengoa's] balance sheet." Analysts and investors interpreted Defendants' sudden reversal regarding Abengoa's need to raise capital as an indication that the Company's liquidity position was not, in fact, "very comfortable." After investors reacted to this news, Abengoa's ADSs closed at $6.00 per share on August 4, 2015 – a decline of 79% from the stock's Class Period high.

      10.     Investors' fears about Abengoa's liquidity position were confirmed on November 25, 2015, when Defendants announced that Abengoa was filing for preliminary creditor protection under the Spanish Insolvency Law.

## JURISDICTION AND VENUE

11.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act [15 U.S.C. §§78j(b) and 78t(a)], Rule 10b-5 promulgated thereunder [17 C.F.R. §240.10b-5] and Sections 11 and 15 of the Securities Act [15 U.S.C. §§77k and 77o].

12.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331, Section 27 of the Exchange Act [15 U.S.C. §78aa] and Section 22 of the Securities Act [15 U.S.C. §77v].

13.     Venue is proper in this District pursuant to Section 27 of the Exchange Act, Section 22 of the Securities Act and 28 U.S.C. §1391(b) and (c).  Many of the acts that constitute the alleged violations of law occurred in this District, and the Offering was marketed in this District.

14.     In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the NASDAQ, a national securities market located in this District.

15.     This Court has jurisdiction over each Defendant named herein because each Defendant has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by the Court permissible under traditional notions of fair play and substantial justice.

16.     At the time of the Offering, more than 30% of Abengoa's revenues were generated in the United States.  Furthermore, the Company has received substantial "stimulus" funds from the federal government.  During the Class Period, the Company's U.S. headquarters were located in St. Louis, Missouri.

## PARTIES

17.     Lead Plaintiffs and Plaintiff PAMCAH-UA Local 675 Pension Fund purchased the ADSs of Abengoa during the Class Period and traceable to the Offering, as set forth in the

**Supp. App. 5**

certifications previously filed with the Court and incorporated herein by reference, and have been damaged thereby.

18.     Defendant Abengoa was founded in 1941 as an engineering and construction company and subsequently expanded its operations into activities including renewable energy, power transmission lines and biofuels.  The Company maintains its principal corporate offices at Campus Palmas Altas, No. 1, Calle Energia Solar, Seville, 41014, Spain.  During the Class Period, Abengoa's ADSs were publicly traded on the NASDAQ under the ticker symbol "ABGB."  On March 28, 2016, Abengoa filed for protection under Chapter 15 of the United States Bankruptcy Code, and as a result, this action is presently stayed against Abengoa.

19.     Defendant Manual Sánchez Ortega ("Sánchez Ortega") served as Abengoa's Chief Executive Officer ("CEO") from March 2010 until his resignation from that position on May 19, 2015.  Defendant Sánchez Ortega also served as First Vice-Chairman of the Board of Directors from January 20, 2015 through July 27, 2015, and was a member of Abengoa's International Advisory Board at all relevant times herein.  In addition, Defendant Sánchez Ortega signed the Registration Statement, as defined herein.

20.     Defendant Santiago Seage ("Seage") served as CEO and First Vice-Chairman of Abengoa from May 2015, following the resignation of Defendant Sanchez Ortega, until his resignation from the Company on November 27, 2015.  Defendant Seage presently serves as CEO of Atlantica Yield plc (formerly known as Abengoa Yield plc) ("ABY" or "Abengoa Yield"), a position he held from its formation in December 2013 through May 2015, and reassumed in November 2015.  Additionally, Seague held other senior management positions at Abengoa since joining the Company in 2005.

- 6 -

21.     Defendant Bárbara Zubiría Furest ("Zubiría") served as Abengoa's Co-Chief Financial Officer ("CFO") and Executive Vice President of Capital Markets and Investor Relations from January 2011 until her sudden departure from the Company, announced on January 19, 2015. In addition, Defendant Zubiría signed the Registration Statement, as defined herein.

22.     Defendant Ignacio Garcia Alvear ("Garcia Alvear") served as Abengoa's Co- CFO for Investor Relations and Capital Markets since February 1, 2015, when he assumed the responsibilities of Defendant Zubiría following her departure from the Company.  Defendant Garcia Alvear previously served as the CFO of Abengoa Bioenergy since January 2004.

23.     Defendants Sánchez Ortega, Seage, Zubiría, and Garcia Alvear are collectively referred to herein as the "Individual Exchange Act Defendants," and together with Abengoa, as the "Exchange Act Defendants."

24.     (a)     Defendant Jesús García-Quilez Gómez was, at all relevant times, Abengoa's Co-CFO of Financial Markets.

        (b)     Defendant Enrique Borrajo Lovera was, at all relevant times, Abengoa's Consolidation Officer.

        (c)     Defendant Felipe Benjumea Llorente is a member of the Company's founding family, the Benjumeas, and served as Executive Chairman of Abengoa's Board of Directors until September 24, 2015, when he was demoted to "Honorary" Chairman of the Board of Directors.

        (d)     Defendant José B. Terceiro was, at all relevant times, Executive Vice-Chairman and Lead Director of Abengoa's Board of Directors.

        (e)     Defendant Christopher Hansmeyer was, at all relevant times, the duly authorized representative for Abengoa in the United States.

- 7 -

(f) Defendants José Joaquín Abaurre Llorente, José Luis Aya Abaurre, José Borrell Fontellés, María Teresa Benjumea Llorente, Javier Benjumea Llorente, Mercedes Gracia Díez, Ricardo Martínez Rico, Claudi Santiago Ponsa, Ignacio Solís Guardiola, Fernando Solís Martínez-Campos, Carlos Sundheim Losada and Alicia Velarde Valiente each served as a Director of Abengoa at all relevant times.

25. Each of the defendants identified in ¶24(a)-(f) above signed the Registration Statement, as defined herein. The defendants identified in ¶24(a)-(f) above, together with Defendants Sánchez Ortega and Zubiría (who likewise signed the Registration Statement) are collectively referred to herein as the "Individual Securities Act Defendants," and together with Abengoa, as the "Securities Act Defendants."

26. Defendants HSBC Securities (USA) Inc., Banco Santander S.A., Canaccord Genuity Inc., Merrill Lynch International and Société Générale are investment banks that served as underwriters for the €517.5 million Offering (which at the time was equal to $703.8 million), helping to draft and disseminate the Registration Statement and sharing more than €18.5 million in underwriting fees.

27. The defendants identified in ¶26 above are collectively referred to herein as the "Underwriter Defendants." The Underwriter Defendants failed to perform adequate due diligence in connection with their roles as underwriters for the Offering and were negligent in failing to ensure that the Registration Statement for the Offering was prepared properly and accurately. The Underwriter Defendants' failure to conduct adequate due diligence was a substantial factor leading to the harm complained of herein.

## CLASS ACTION ALLEGATIONS

28. Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all those who purchased or otherwise

- 8 -

acquired Abengoa ADSs between October 17, 2013 and August 2, 2015, inclusive, and were damaged thereby, seeking to pursue remedies under the Exchange Act, as well as on behalf of all those who purchased or otherwise acquired Abengoa ADSs pursuant and/or traceable to the Offering, and were damaged thereby, seeking to pursue remedies under the Securities Act (the "Class"). Excluded from the Class are Defendants, members of the immediate families of each Defendant, the Company and its officers and directors at all relevant times, any entity in which any excluded party has or had a controlling interest or which is related to or affiliated with any Defendant, and the legal representatives, heirs, successors or assigns of any such excluded party.

29.     The members of the Class are so numerous that joinder of all members is impracticable. Abengoa sold 287,500,000 Class B shares (either in the form of Class B shares or ADSs) in the Offering and Abengoa ADSs were actively traded on the NASDAQ throughout the Class Period. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are thousands of members in the proposed Class. In addition, the names and addresses of the Class members can be ascertained from records maintained by Abengoa or its transfer agent. Notice of the pendency of this action can be provided to such record owners by a combination of published notice and first-class mail, using techniques and a form of notice similar to those customarily used in class actions arising under the federal securities laws.

30.     Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class have been similarly affected by Defendants' conduct in violation of federal law that is complained of herein. Plaintiffs do not have any interests antagonistic to, or in conflict with, the Class.

- 9 -

**Supp. App. 9**

31.     Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class action and securities litigation.

32.     Common questions of law and fact apply equally to all members of the Class and predominate over any questions solely affecting individual Class members.  Among the questions of law and fact common to the Class are:

        (a)     whether the federal securities laws were violated by Defendants' acts as alleged herein;

        (b)     whether Defendants misrepresented and/or omitted material facts about Abengoa and its business;

        (c)     whether the price of Abengoa ADSs was artificially inflated during the Class Period; and

        (d)     to what extent the members of the Class have sustained damages and the appropriate measure of damages.

33.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it virtually impossible for members of the Class to individually seek redress for the wrongful conduct alleged.  Plaintiffs know of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action.

### SUBSTANTIVE ALLEGATIONS

### The Company and Its Business

34.     Abengoa is a Spanish multinational corporation focused on engineering and construction, renewable energy and biofuels.  The Company purports to provide innovative technology solutions for sustainability in the energy and environment sectors, through ventures

- 10 -

including generating electricity from renewable resources, converting biomass to biofuels and producing drinking water from sea water.

35. The Company was founded in 1941 in Seville, Spain and its stock began trading on the Madrid and Barcelona Stock Exchanges in 1996. Abengoa went public in the United States via the Offering of the Company's ADSs on the NASDAQ on or about October 17, 2013. At the time of the Offering, Abengoa had operations in more than 70 countries and was comprised of 532 subsidiaries, 17 associates and 34 joint ventures.

36. As a company purportedly engaged in large engineering and construction projects throughout the world, investors viewed cash flow and liquidity as being highly material to Abengoa. Indeed, according to the Registration Statement for the Offering, Abengoa's "operations are capital intensive," and the Company has historically "operate[d] with a significant amount of indebtedness."

37. Abengoa utilized two types of debt: (1) non-recourse debt; and (2) corporate recourse debt. Corporate recourse debt is sometimes referred to herein as either "corporate debt" or "recourse debt." Non-recourse debt is used to finance specific engineering and construction projects, and is guaranteed by the assets and cash flows of the special-purpose "project company" formed to carry out the project. Thus, the lender does not have recourse to Abengoa itself in the event of default. By contrast, corporate recourse debt – used to finance the rest of the Company's operations – is guaranteed by Abengoa.

38. During the Class Period, Abengoa's corporate recourse debt was subject to a debt ratio covenant with the Company's lenders, whereby Abengoa was required to maintain a ratio of "Corporate Net Finance Debt to Consolidated EBITDA" below 3.0x until December 30, 2014, and

- 11 -

**Supp. App. 11**

below 2.5x thereafter.  Consequently, analysts and investors were closely focused on Abengoa's debt and leverage.

39.     According to the Registration Statement, as of June 30, 2013, Abengoa had gross corporate recourse debt of €5.252 billion and non-recourse debt of €5.2976 billion, compared to cash and cash equivalents and short-term financial investments of just €3.2217 billion – resulting in total net debt of €7.3279 billion.  As of that date, the Company's Corporate Net Finance Debt to Consolidated EBITDA ratio was 2.32x, which meant "that the Company ha[d] an additional €581 million corporate borrow[ing] capacity without incurring a breach of covenants . . . ."

### SECURITIES ACT ALLEGATIONS

### The Offering

40.     On or about October 4, 2013, Abengoa filed a Registration Statement with the SEC on Form F-1, pursuant to which the Company offered to U.S. investors Class B shares in the form of ADSs, with each ADS representing the right to receive five Class B shares (the "Offering").

41.     Abengoa subsequently filed the Prospectus, dated October 16, 2013, which formed part of the Registration Statement for the Offering.  The Prospectus increased the size of the Offering from 182,500,000 Class B shares to 250,000,000 Class B shares and set the price of the Offering at $12.18 per ADS (or €1.80 per Class B share).

42.     On October 16, 2013, after the close of the markets, the SEC declared the Registration Statement effective, and Abengoa's ADSs began trading on the NASDAQ on October 17, 2013.

43.     After the Underwriter Defendants exercised their over-allotment rights to purchase an additional 37,500,000 Class B shares, Abengoa realized gross proceeds from the Offering of €517.5 million, which at the time was the equivalent of $703.8 million.

44.     According to the Registration Statement, Abengoa intended to use the proceeds from the Offering to repay €347 million worth of corporate debt maturities due in 2013 and 2014 (approximately one-third of the debt maturities due in those years), as well as to "reinforce [the Company's] liquidity position and strengthen [its] balance sheet."

### The Registration Statement Contained Inaccurate
### Statements of Material Fact and Omitted Material Information

45.     The Registration Statement issued in connection with the Offering was negligently prepared and, as a result, contained untrue statements of material fact, omitted to state other facts necessary to make the statements made not misleading and was not prepared in accordance with the rules and regulations governing its preparation.

46.     In particular, the Registration Statement represented that Abengoa had "[s]trong financial discipline and [a] liquidity profile supported by access to a diverse range of funding sources," and discussed the Company's liquidity position, cash flow and capital structure, in pertinent part, as follows:

> ***We have successfully grown our business while seeking to enforce strict financial discipline to maintain our strong liquidity position***. *As of June 30, 2013, we had cash and cash equivalents and short-term financial investments of €3,222 million, which we believe are sufficient to satisfy our short-term liquidity needs. This strong cash position also assists in bidding for large projects*. . . .

> \*       \*       \*

> Our operations are capital intensive and we operate with a significant amount of ***indebtedness***, which, as of June 30, 2013, totaled €10,549.6 million, ***of which €5,252.0 million was corporate financing and €5,297.6 million was non-recourse financing. Additionally, we have additional corporate borrowing capacity of €581.0 million which we may incur without triggering a breach of our financial covenants***.

> \*       \*       \*

> ***We believe that our existing liquidity and cash flow will be sufficient to meet our requirements and commitments for the foreseeable future***. . . .

- 13 -

\* \* \*

*We believe that we have sufficient corporate debt in place, together with non-recourse debt and cash flows, to fund and adequately support our existing operations and finance our expansion*.

47. In addition, the Registration Statement discussed Abengoa's corporate recourse and

non-recourse debt, in pertinent part, as follows:

*The financing of our projects is executed at two levels: (i) non-recourse debt, which is used at the project company level to fund, as the case may be, the engineering and construction works, operation of the concession-type infrastructures and industrial production projects, and which insulates the rest of the Group from any credit risk; and (ii) corporate debt, which is used to fund the rest of our operations*.

\* \* \*

We utilize two main sources of financing to meet our financial commitments: corporate debt and non-recourse debt. *We use our corporate debt to finance our investments (including in joint ventures and financing at the project company level) and for general corporate purposes. Our corporate debt is used by all of our activities and is primarily incurred by the Company with upstream guarantees from our main operating subsidiaries. We define non-recourse as debt that is generally used for constructing or acquiring an asset, which is guaranteed by the assets and cash flows of the company or group of companies carrying out the financed activities*. We generally finance the construction of our own operations by means of non-recourse debt at the project company level. Non-recourse debt is the principal means of financing for project construction in our Engineering and Construction activity, our Concession-Type Infrastructures activity and our Industrial Production activity. *We believe that we have sufficient corporate debt in place, together with non-recourse debt and cash flows, to fund and adequately support our existing operations and finance our expansion*.

\* \* \*

*As of June 30, 2013, we had €5,252 million of indebtedness with recourse at the corporate level, €5,297.6 million of non-recourse debt* and €3,221.7 million of cash and cash equivalents and short-term financial investments, resulting in total net debt (including other loans and borrowings) of €7,327.9 million.

\* \* \*

While we generally seek to maintain a balance of non-recourse debt and corporate debt to encourage financial discipline, *the majority of our capital expenditures are financed by non-recourse debt* and funding, when applicable, from partners in a particular project. *We incur corporate debt to finance our investments,*

- 14 -

**Supp. App. 14**

*acquisitions and general purpose requirements.  Our corporate debt has the benefit of upstream guarantees from our operating subsidiaries which are subject to debt/EBITDA ratios* as discussed above.  The funding of our corporate capital expenditure is covered by existing cash and corporate EBITDA generation.  *We incur non-recourse debt on a project-by-project basis*, and we do not commit to any projects that we have been awarded prior to securing long-term financing.

48.     With respect to Abengoa's corporate leverage ratio, the Registration Statement stated, in pertinent part, as follows:

> The Company is subject to one single financial covenant under the majority of the corporate facilities consisting of the maintenance of a Corporate Net Finance Debt to Consolidated EBITDA (as such terms are defined therein) lower than 3.00x until December 30, 2014 and lower than 2.50x thereafter.  *As of June 30, 2013 this ratio stood at 2.32x which means that the Company has an additional €581 million corporate borrow capacity without incurring a breach of covenants, considering the last twelve month consolidated EBITDA (as defined therein) of €857.9 million*.
>
> *        *        *
>
> *We intend to achieve a Ratio of Net Corporate Debt to Corporate EBITDA of c. 3.0x in 2013 (c. 2.5x giving effect to the offering, compared with c. 3.7x in 2012 and c. 3.2x in the six months ended June 30, 2013 using last twelve months Corporate EBITDA) and c. 2.5x from 2014 onwards (c. 2.0x giving effect to the offering).*

49.     The statements referenced above in ¶¶46-48 were each inaccurate statements of material fact because they misrepresented and failed to disclose the following adverse facts:

(a)     that Abengoa's corporate leverage ratio was not 2.32x, Abengoa's corporate recourse debt was significantly higher than €5,252 million, and the Company did not have an additional €581 million of corporate borrowing capacity because Abengoa overstated its liquidity by: (i) categorizing a portion of its recourse debt as "non-recourse" debt – even though such debt was actually recourse debt because it was guaranteed by Abengoa; and (ii) failing to characterize as debt funds the Company owed to banks for supplier payments, which resulted in more favorable reported leverage ratios that exceeded the ratios required by the Company's debt covenants;

- 15 -

(b)     that Abengoa's cash flow was inflated because the Company improperly rejected supplier invoices and failed to pay contractors, thereby increasing the Company's reported cash position, which was not actually €3,222 million;

(c)     that shortly before the Offering, the Company obtained lines of credit utilizing erroneous financial reports that overstated the value of certain projects, by showing inaccurate percentages of completion on some projects, and failing to show that some projects were over-budget;

(d)     that the statements that Defendants believed Abengoa had "sufficient" cash to "satisfy [its] short-term liquidity needs," believed Abengoa's "existing liquidity and cash flow [would] be sufficient to meet [its] requirements and commitments for the foreseeable future," and believed Abengoa had "sufficient corporate debt in place, together with non-recourse debt and cash flows, to fund and adequately support [its] existing operations and finance [its] expansion" were false because Abegoa's financial position was materially weaker then stated due to inadequate liquidity and cash flow to fund existing operations and service debt into the foreseeable future;

(e)     as a result of the foregoing, Defendants misled the market about Abengoa's liquidity and cash flow, and, in turn, about the likelihood of, and need for, future capital raises by the Company.

### COUNT I

### Violation of Section 11 of the Securities Act
### Against the Securities Act Defendants and
### the Underwriter Defendants

50.     Plaintiffs incorporate herein ¶1 and ¶¶11-49 by reference.

51.     This Count is brought pursuant to Section 11 of the Securities Act, 15 U.S.C. §77k, against the Securities Act Defendants and the Underwriter Defendants.  For purposes of this Count,

- 16 -

Plaintiffs affirmatively state that they do not claim that the Securities Act Defendants or the Underwriter Defendants committed intentional or reckless misconduct or acted with scienter or fraudulent intent.

52. This count is asserted by Plaintiffs against the Securities Act Defendants and the Underwriter Defendants by, and on behalf of, persons who acquired the Company's ADS traceable to the Registration Statement issued in connection with Abengoa's Offering on or about October 17, 2013.

53. The Registration Statement for the Offering was defective and inaccurate, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

54. The defendants named in this Count were responsible for the contents and dissemination of the Registration Statement.

55. The Securities Act Defendants each caused the issuance of the Registration Statement and/or signed the Registration Statement, either personally or through an Attorney-in-Fact. The Securities Act Defendants each had a duty to make a reasonable and diligent investigation of the truthfulness and accuracy of the statements contained in the Registration Statement. They had a duty to ensure that such statements were true and accurate and that there were no omissions of material facts that would make the statements misleading. None of the Securities Act Defendants made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true, were without omission of any material facts, and/or were not misleading.

56. The Underwriter Defendants were each Underwriters, as that term is used in Section 11(a)(5) of the Securities Act, with respect to the Offering and the Company's ADS sold through

the Registration Statement. The Underwriter Defendants were required to investigate with due diligence the representations contained therein to confirm that they did not contain materially misleading statements or omit material facts. None of the Underwriter Defendants made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true, were without omission of any material facts, and/or were not misleading.

57.     Plaintiffs purchased the Company's ADSs in the Offering, or traceable thereto, in reliance upon the defective Registration Statement and without knowledge of the untruths and/or omissions alleged herein and have been damaged thereby.

58.     By reasons of the conduct herein alleged, each defendant named in this Count violated, and/or controlled a person who violated, Section 11 of the Securities Act.

59.     This claim is brought within one year after the discovery of the untrue statements and omissions in the Registration Statement and within three years of the effective date of the Registration Statement.

## COUNT II

### Violation of Section 15 of the Securities Act
### Against the Individual Securities Act Defendants

60.     Plaintiffs incorporate herein ¶1 and ¶¶11-49 by reference.

61.     This Count is brought pursuant to Section 15 of the Securities Act, 15 U.S.C. §77o, against the Individual Securities Act Defendants. For purposes of this Count, Plaintiffs affirmatively state that they do not claim that the Individual Securities Act Defendants committed intentional or reckless misconduct or acted with scienter or fraudulent intent.

62.     Each of the Individual Securities Act Defendants was a control person of Abengoa by virtue of his or her position as a director and/or senior officer of Abengoa. By reason of their

- 18 -

senior management positions and/or directorships at the Company, as alleged above, the Individual Securities Act Defendants, individually and acting pursuant to a common plan, had the power to influence and exercised the same to cause Abengoa to engage in the conduct complained of herein. In addition, the Individual Securities Act Defendants each had a series of direct and/or indirect business and/or personal relationships with other directors and/or officers and/or major shareholders of Abengoa.  By reason of such conduct, the Individual Securities Act Defendants are liable pursuant to Section 15 of the Securities Act.

63.     Each of the Individual Securities Act Defendants was a culpable participant in the violations of Section 11 of the Securities Act alleged in Count I above, based on their having signed the Registration Statement and/or having otherwise participated in the process which allowed the Offering to be successfully completed.

## EXCHANGE ACT ALLEGATIONS

64.     For the purposes of this section of the Complaint, the term "Defendants" refers only to the Exchange Act Defendants – Abengoa, Sánchez Ortega, Seage, Zubiría, and Garcia Alvear.

## FORMER EMPLOYEES

65.     The allegations made in this section of the Complaint are supported by the knowledge of two former high ranking Abengoa employees as well as other former employees ("FEs").  As detailed below, these former employees each served in positions at Abengoa that provided them with access to the information they are alleged to possess.

66.     FE1 was the Director of Human Resources at Abengoa's U.S. subsidiary Abiensa EPC ("Abiensa") from August 2010 through March 2013, when she resigned due to the stress caused by knowing about, among other things, accounting irregularities at the Company.

- 19 -

67.     FE2 is a former Abengoa employee who had broad oversight for accounting and financial reporting at several of Abengoa's U.S. subsidiaries.  FE2 resigned rather than sign off on false financial statements created to obtain capital for Abengoa.

68.     FE3 worked as a Senior Staff Accountant at Abengoa's corporate office in Chesterfield, Missouri from June 2013 through July 2014, when she resigned due to concerns about Abengoa's financial reporting.  In that position, FE3 was responsible for accounting functions at Abengoa's U.S. subsidiary Abiensa, including, among other things, preparing weekly and monthly financial reports for Abengoa's corporate headquarters in Spain and preparing and analyzing cash flow statements.

**Abengoa Engages in Improper Conduct to Inflate its Cash Flow and Conceal the Company's True Financial Condition**

69.     FE1, the former Director of Human Resources at U.S. subsidiary Abiensa, described a corporate culture whereby Abengoa's leadership believed that they were "above" U.S. laws, including Generally Accepted Accounting Principles ("GAAP").  According to FE1, whenever employees questioned Abiensa's accounting practices and compliance with GAAP, they were "bullied" out of the Company.  According to FE1, this occurred repeatedly.

70.     In addition, FE1 repeatedly heard from employees in Abiensa's accounting department that Abiensa maintained two sets of books.  The Company would show one set of books to its external auditor, but maintained a separate set of books for internal purposes.  FE2, the former U.S.-based accounting executive, confirmed that the U.S. subsidiaries FE2 was responsible for maintained a set of books that were shown to the external auditor and a separate set of books that were for internal use.  FE2 further stated that the Company engaged in a pattern of falsifying the information in the books presented to its external auditor.

- 20 -

**Supp. App. 20**

71.     FE3, the former Senior Staff Accountant, likewise believed that Abengoa maintained a system of double books.  According to FE3, Abengoa utilized a "SAP" software system[1] for its accounting, but also maintained a separate online accounting system based out of the Company's corporate headquarters in Spain.

72.     FE3 received numbers, including costs and revenues, from Abiensa's various projects and entered those numbers into the SAP system.  On a monthly basis, FE3 was required to make sure that the numbers reported in the SAP system precisely matched the numbers in Abengoa's corporate online system.

73.     FE3 reported that on some occasions, the revenue numbers in Abengoa's corporate online system were higher than the actual numbers booked in the SAP system.  When this occurred, FE3 was required to defer to the corporate online system's numbers, and would need to move costs and expenses around in the SAP system and create journal entries, until the SAP system's numbers matched those of the corporate online system.

74.     FE3 believed that the numbers in Abengoa's online system came from the same projects reported in the SAP system, and thus, there was no apparent reason for the discrepancies between the numbers reported in the two systems.

75.     FE3 brought the accounting discrepancies to the attention of her CFO, Juan Callesi, who attempted to make excuses for the discrepancies, such as blaming them on exchange rates.

76.     In addition, FE2 was aware of instances in which Abengoa intentionally ignored accounting principles in order to knowingly inflate profits, and then used those inflated profit numbers to obtain hundreds of millions of dollars of financing.

---

[1]     SAP AG is a German multinational software corporation whose best known product is its enterprise resource planning ("ERP") business management software.  ERP is a suite of integrated applications that companies utilize to store and manage data from every stage of their businesses.

77.     FE2 believed that Abengoa intentionally misstated various accounting figures and frequently falsified information to make the Company's financial condition appear more favorable than it actually was.

78.     FE2 further believed that executives at Abengoa's U.S. subsidiaries were aware of the accounting malfeasance and were acting at the direction of Abengoa's senior leadership in Spain. FE1 corroborated that Abengoa's senior executives in Spain closely monitored every aspect of the business at the Company's various subsidiaries.  For example, FE1 stated that Abengoa senior executives, including Defendants, held weekly conference calls on Wednesday mornings between 4:00 am and 5:00 am with all of the senior executives and financial teams at the Company's subsidiaries.

79.     FE1 confirmed that cash flow was a critical financial metric for Abengoa, and described various underhanded tactics that the Company engaged in to artificially increase the amount of cash on its books.  For example, Abengoa held a training class during which managers were taught to reject supplier invoices for the purpose of intentionally delaying payment, and thereby increasing the Company's reported cash position.  According to FE1, because Abiensa's contracts with suppliers provided that rejected invoices could not be resubmitted for 30 days, the practice of rejecting invoices helped to preserve the Company's cash on hand and thereby increase its reported cash flow.  FE1 stated that it was so commonplace for employees at the U.S. subsidiary Abiensa to reject supplier invoices, that one employee responsible for invoices was nicknamed "The Rejecter."

80.     FE3 confirmed that Abengoa artificially inflated its reported cash and thereby preserved its cash flow by maintaining a slow and cumbersome process for invoice approval, which often stretched on for months.  According to FE3, Abengoa required an approval process of

- 22 -

**Supp. App. 22**

up to six steps before an invoice could be forwarded to the department responsible for approval, where it was then subject to additional layers of approval. If an invoice was rejected at any point, it was sent back to the vendor for resubmission and the approval process then started over. Once an invoice was finally approved, Abengoa held onto it until a certain point in the month when all approved invoices were forwarded to banks in a single package, thus further delaying payment by up to an additional 30 days.

81. Another tactic described by FE1 to preserve cash was Abengoa's routine refusal to pay contractors on its projects. Abengoa instead forced the contractors to file liens against the Company and to ultimately settle their claims in arbitration for "pennies on the dollar," and in some instances, to file for bankruptcy.

**Abengoa Creates "Shell" Subsidiaries in Order to Artificially Inflate its Reported Cash Flow and Profits**

82. Abengoa also artificially inflated its cash flow and profits during the Class Period by creating "shell" U.S. subsidiaries, and then purportedly hiring those subsidiaries as subcontractors, when in fact those subsidiaries had other subcontractors perform the work at a lower cost.

83. Specifically, as a condition to receiving financial incentives and funds from the federal government for certain clean energy projects, Abengoa was required to hire United States companies as subcontractors. Instead, Abengoa created dozens of "shell" companies with between one and five employees, which were designed to appear as legitimate U.S. subsidiaries of Abengoa, performing subcontracting work for Abengoa at various projects throughout the United States, including the Company's "Mojave" solar project in California.

84. In reality, however, the subsidiaries did not perform any work. Rather, Abengoa awarded subcontracting projects to its own "shell" subsidiaries at high prices, but then hired other

- 23 -

**Supp. App. 23**

companies to actually perform the work at much lower prices – enabling Abengoa to illicitly profit by pocketing the difference.

85.     This practice had the effect of artificially inflating Abengoa's cash flow and profits, by enabling the Company to keep profits that should have been paid out to legitimate subcontractors, while at the same time retaining lucrative financial incentives from the federal government.

**Shortly Before the Offering, Abengoa's U.S. Subsidiary Uses Inflated Financial Reports to Obtain Lines of Credit**

86.     According to FE1, shortly before the Offering, Abiensa's internal auditor tendered his letter of resignation to FE1.  FE1 subsequently participated in an exit interview with the internal auditor, during which he told FE1 that he was resigning from the Company because he had been directed to sign off on financial reports that falsely inflated the value of certain projects.  The internal auditor explained to FE1 that the reports showed false percentages of completion on some projects, and also failed to show that some projects were over-budget.  The internal auditor conveyed to FE1 during the exit interview that those financial reports had been prepared to present to banks for the purpose of obtaining larger lines of credit.

87.     During the exit interview, the internal auditor further told FE1 that he had expressed his concerns directly to the CFO of Abiensa, Santiago Duran ("Duran"), but was instructed by Duran to "shut the f--k up and just sign" the reports.  The internal auditor told FE1 that he believed it would be illegal for him to sign off on the reports knowing that they would be used to obtain lines of credit.  Therefore, the internal auditor refused to sign off on the reports and instead resigned from the Company.

88.     Following the exit interview with the internal auditor, FE1 approached Duran to discuss what the internal auditor had reported, but was told by Duran that he was too busy to

- 24 -

discuss the issue. FE1 then memorialized what the internal auditor had reported in an email to Duran and copied Abiensa's Legal Director. After receiving the email, Duran approached FE1 and expressed his view that the internal auditor could not report his concerns to anyone outside of the Company because he had signed a non-disclosure agreement.

89. Notwithstanding the internal auditor's refusal to sign off on the financial reports, FE1 learned, during leadership meetings FE1 attended, that prior to the internal auditor's resignation, those reports were presented to various lenders who subsequently provided Abengoa with large lines of credit.

**Defendants Mislead Investors about Abengoa's Liquidity by Mischaracterizing its Debt**

90. In addition to the foregoing misconduct, during the Class Period, the Company sought to improve its balance sheet and leverage through a series of related measures: (1) the "spin-off" of Abengoa Yield; (2) the announcement of the "Abengoa 3.0" business model; and (3) the issuance of the Greenfield Bonds.

91. Those measures, however, drew scrutiny from analysts and investors and ultimately led to the revelation on November 12, 2014 that Abengoa was mischaracterizing some of its debt as non-recourse debt – even though it was guaranteed by the Company – in order to exclude the debt from Abengoa's corporate leverage ratio.

92. Investors further learned that Abengoa was disguising its debt by failing to characterize as debt more than €1 billion tied to supplier payments.

**Materially False and Misleading Statements
Made During the Class Period**

**The Offering**

93. The Class Period begins on October 17, 2013, when Abengoa's ADSs began trading on the NASDAQ following the Offering.

- 25 -

94.     The Registration Statement for the Offering represented that Abengoa had "*[s]trong financial discipline* and [a] liquidity profile supported by access to a diverse range of funding sources," and discussed the Company's liquidity position, cash flow and capital structure, in pertinent part, as follows:

> *We have successfully grown our business while seeking to enforce strict financial discipline to maintain our strong liquidity position. As of June 30, 2013, we had cash and cash equivalents and short-term financial investments of €3,222 million, which we believe are sufficient to satisfy our short-term liquidity needs. This strong cash position also assists in bidding for large projects*. . . .

> \*     \*     \*

> Our operations are capital intensive and we operate with a significant amount of *indebtedness*, which, as of June 30, 2013, totaled €10,549.6 million, *of which €5,252.0 million was corporate financing and €5,297.6 million was non-recourse financing. Additionally, we have additional corporate borrowing capacity of €581.0 million which we may incur without triggering a breach of our financial covenants*.

> \*     \*     \*

> *We believe that our existing liquidity and cash flow will be sufficient to meet our requirements and commitments for the foreseeable future*. . . .

> \*     \*     \*

> *We believe that we have sufficient corporate debt in place, together with non-recourse debt and cash flows, to fund and adequately support our existing operations and finance our expansion*.

95.     In addition, the Registration Statement discussed Abengoa's corporate recourse and non-recourse debt, in pertinent part, as follows:

> *The financing of our projects is executed at two levels: (i) non-recourse debt, which is used at the project company level to fund, as the case may be, the engineering and construction works, operation of the concession-type infrastructures and industrial production projects, and which insulates the rest of the Group from any credit risk; and (ii) corporate debt, which is used to fund the rest of our operations*.

> \*     \*     \*

- 26 -

We utilize two main sources of financing to meet our financial commitments: corporate debt and non-recourse debt. *We use our corporate debt to finance our investments (including in joint ventures and financing at the project company level) and for general corporate purposes. Our corporate debt is used by all of our activities and is primarily incurred by the Company with upstream guarantees from our main operating subsidiaries. We define non-recourse as debt that is generally used for constructing or acquiring an asset, which is guaranteed by the assets and cash flows of the company or group of companies carrying out the financed activities*. We generally finance the construction of our own operations by means of non-recourse debt at the project company level. Non-recourse debt is the principal means of financing for project construction in our Engineering and Construction activity, our Concession-Type Infrastructures activity and our Industrial Production activity. *We believe that we have sufficient corporate debt in place, together with non-recourse debt and cash flows, to fund and adequately support our existing operations and finance our expansion*.

*     *     *

*As of June 30, 2013, we had €5,252 million of indebtedness with recourse at the corporate level, €5,297.6 million of non-recourse debt and €3,221.7 million of cash and cash equivalents and short-term financial investments, resulting in total net debt (including other loans and borrowings) of €7,327.9 million*.

*     *     *

While we generally seek to maintain a balance of non-recourse debt and corporate debt to encourage financial discipline, *the majority of our capital expenditures are financed by non-recourse debt* and funding, when applicable, from partners in a particular project. *We incur corporate debt to finance our investments, acquisitions and general purpose requirements. Our corporate debt has the benefit of upstream guarantees from our operating subsidiaries which are subject to debt/EBITDA ratios* as discussed above. The funding of our corporate capital expenditure is covered by existing cash and corporate EBITDA generation. *We incur non-recourse debt on a project-by-project basis*, and we do not commit to any projects that we have been awarded prior to securing long-term financing.

96.     With respect to Abengoa's corporate leverage ratio, the Registration Statement

stated, in pertinent part, as follows:

The Company is subject to one single financial covenant under the majority of the corporate facilities consisting of the maintenance of a Corporate Net Finance Debt to Consolidated EBITDA (as such terms are defined therein) lower than 3.00x until December 30, 2014 and lower than 2.50x thereafter. *As of June 30, 2013 this ratio stood at 2.32x which means that the Company has an additional €581 million corporate borrow capacity without incurring a breach of covenants, considering*

- 27 -

*the last twelve month consolidated EBITDA (as defined therein) of €857.9 million*.

\*     \*     \*

*We intend to achieve a Ratio of Net Corporate Debt to Corporate EBITDA of c. 3.0x in 2013 (c. 2.5x giving effect to the offering, compared with c. 3.7x in 2012 and c. 3.2x in the six months ended June 30, 2013 using last twelve months Corporate EBITDA) and c. 2.5x from 2014 onwards (c. 2.0x giving effect to the offering).*

97.     The statements referenced above in ¶¶94-96 were materially false and misleading at the time they were made because Defendants misrepresented and failed to disclose that: (a) Abengoa's corporate leverage ratio was not 2.32x, Abengoa's corporate recourse debt was significantly higher than €5,252 million, and the Company did not have an additional €581 million of corporate borrowing capacity because Abengoa was misrepresenting its liquidity by: (i) categorizing a portion of its recourse debt as "non-recourse" debt – even though such debt was guaranteed by Abengoa; and (ii) failing to characterize as debt funds the Company owed to banks for supplier payments, in order to report more favorable leverage ratios that exceeded the ratios required by the Company's debt covenants; (b) Defendants were improperly inflating Abengoa's cash flow by: (i) rejecting supplier invoices in order to intentionally delay payment; (ii) refusing to pay contractors; and (iii) pocketing funds that should have been paid out to legitimate subcontractors, thereby increasing the Company's reported cash position, which was not actually €3,222 million; (c) the Company obtained lines of credit utilizing inflated financial reports that overstated the value of certain projects, by showing false percentages of completion on some projects and failing to show that some projects were over-budget; (d) Abengoa falsified financial information in order to make the Company's financial condition appear more favorable than it actually was, and maintained separate sets of books for its external auditor and for internal use; and (e) as a result of the foregoing, Defendants misled the market about Abengoa's liquidity and

- 28 -

cash flow, and, in turn, about the likelihood of, and need for, future capital raises by the Company. Consequently, Defendants had no reasonable basis to characterize Abengoa's "financial discipline" as "strong" and "strict," or to describe the Company's liquidity and cash position as "strong."

**First Nine Months of 2013 Financial Results**

98.     On November 11, 2013, Abengoa issued a press release announcing its financial results for the nine months ended September 30, 2013.  The Company reported that EBITDA had risen 29% year-over-year, to €860 million, and reported a pro-forma corporate leverage ratio of 2.5x.  In addition, Abengoa confirmed its guidance of EBITDA between €1,180 million and €1,230 million for 2013, Corporate EBITDA between €800 and €825 million for 2013, and "positive free cash flow at the corporate level" beginning in 2014.  The press release further stated that Abengoa was "***accelerating its deleverage targets***," and now intended "to achieve a corporate debt to EBITDA ratio of 2.5x in 2013 and 2.0x in 2014 onwards," as opposed to the Company's "previous targets of 3.0x in 2013 and 2.5x in 2014 onwards."

99.     Commenting on the Company's financial condition, Defendant Sánchez Ortega stated that the Offering had "***strengthen[ed] [Abengoa's] balance sheet***," and represented that Defendants "***continue[d] to be committed to*** meeting all our financial targets, including ***reducing the leverage of the company*** . . . ."

100.     Later that day, Defendants held a conference call with analysts and investors to discuss the Company's financial results.  The corresponding presentation slides were filed with the SEC on Form 6-K the following day, on November 12, 2013.  During the call, Defendant Sánchez Ortega stated that Defendants "***continue[d] to target 2014 as the first year to generate positive free cash flow at the corporate level*** . . . ."

- 29 -

101.    Defendant Sánchez Ortega also commented on the Company's leverage ratios, in pertinent part, as follows:

> First of all, the business momentum for Abengoa continues to be impressive . . . . [W]e are delivering on the work we have given to the markets through 2013 . . . . ***[W]e have deleveraged the company to the levels we wanted it to be by year end, with a ratio of 2.5 times the corporate EBITDA***.

102.    Moreover, in the earnings presentation slides, Defendants represented that liquidity protection was a "key priorit[y]" for the Company.

103.    The statements referenced above in ¶¶98-102 concerning Abengoa's financial results and guidance, including its leverage, cash flow and EBITDA, were materially false and misleading at the time they were made because Defendants misrepresented and failed to disclose that: (a) Abengoa had not reduced corporate leverage and its corporate leverage ratio was not 2.5x because Abengoa was misrepresenting its liquidity by: (i) categorizing a portion of its recourse debt as "non-recourse" debt – even though such debt was guaranteed by Abengoa; and (ii) failing to characterize as debt funds the Company owed to banks for supplier payments, in order to report more favorable leverage ratios that exceeded the ratios required by the Company's debt covenants; (b) Defendants expected "to generate positive free cash flow only because they were improperly inflating Abengoa's cash flow by: (i) rejecting supplier invoices in order to intentionally delay payment; (ii) refusing to pay contractors; and (iii) pocketing funds that should have been paid out to legitimate subcontractors, thereby increasing the Company's reported cash position; (c) the Company obtained lines of credit utilizing inflated financial reports that overstated the value of certain projects, by showing false percentages of completion on some projects and failing to show that some projects were over-budget; (d) Abengoa falsified financial information in order to make the Company's financial condition appear more favorable than it actually was, and maintained separate sets of books for its external auditor and for internal use; and (e) as a result of the

**Supp. App. 30**

foregoing, Defendants misled the market about Abengoa's liquidity and cash flow, and, in turn, about the likelihood of, and need for, future capital raises by the Company. Consequently, Defendants were "committed to meeting" Abengoa's "financial targets" only through accounting manipulations, and it was merely the appearance of liquidity protection that was a "key priority" for Abengoa.

**Full Year 2013 Financial Results**

104. On February 20, 2014, Abengoa issued a press release announcing its financial results for the full year ended December 31, 2013. The Company reported that EBITDA had grown 44% year-over-year, to €1,365 million. With respect to Abengoa's leverage, the press release stated that the Company's "corporate net debt ratio stood at 2.2x, representing a reduction of 1.5x compared to 3.7x in December of 2012, hence *delivering on the commitment to reduce corporate leverage*," and further represented that "[t]he ratio of total net debt (including debt associated to [Abengoa's] concessions business) stood at 5.8x, a reduction of 1.3x year-over-year." In addition, Abengoa initiated 2014 guidance of EBITDA between €1,350 million and €1,400 million, and Corporate EBITDA between €860 million and €885 million. The press release further stated that Abengoa was "reiterat[ing] its financial targets for 2014" of "a corporate net debt to EBITDA ratio of 2.0x in 2014 onwards," and "positive free cash flow at the corporate level from 2014 onwards." In the press release, Defendant Sánchez Ortega commented that Abengoa had "*ended 2013 reinforced financially and with a clear business plan to deliver*."

105. Later that day, Defendants held a conference call with analysts and investors, during which Defendant Zubiría commented on Abengoa's EBITDA, leverage reduction, and corporate leverage ratio, in pertinent part, as follows:

> *Delivery on our deleverage plan has been the focus of the management team during each of the 365 days of 2013*. And that is why I am so glad to share with

- 31 -

you that *we have reduced our corporate leverage from 3.7 times corporate EBITDA at the end of 2012 to 2.2 times at the end of 2013, a 1.5 times reduction.*

\* \* \*

Secondly, I would outline our delivery on all of the key commitments that we have shared with the market, reducing by 15% our corporate net debt to EUR2.124 billion, beating guidance of corporate EBITDA, which has reached EUR978 million for the year December 2013, up 48% compared to 2012, and *thereby achieving a corporate leverage ratio of 2.2 times, well below the 2.5 times that we set as the target for the year and 1.5 times below the levels at the beginning of the year*.

\* \* \*

. . . . *[T]hanks to our proactive and successful financial policy*, we are entering 2014 with little if no maturities in the short-term, *an improved capital profile, and more deleverage to come*. . . . As anticipated to you, *we have achieved significant deleverage at the corporate level during this year – during 2013, overtaking our initial guidance for December of 2.5 times corporate EBITDA, and placing the Company at 2.2 times at the corporate level*. Compared to 2012, leverage has gone down by 1.5 times, from 3.7, a significant progress towards achieving our 2014 target of 2 times, a sound leverage for our corporate activities . . . .

106.     During the call, Defendant Sánchez Ortega discussed Abengoa's leverage and cash flow targets for 2014, in pertinent part, as follows:

. . . . I would like to share with you our guidance for 2014, a year in which *we expect the business to continue on the positive path begun in 2013 with growth, further deleverage, and generation of free cash flow at corporate level, which is probably the most remarkable of the targets that we are confirming today*. And regarding the key financial targets, I can confirm that *we remain committed to the following: net corporate leverage is expected to be additionally reduced to below 2 times* . . . . *And finally, 2014 is expected to be the first year in many for the Company to generate positive free cash flow at a corporate level, excluding the proceeds from any disposals*.

107.     The statements referenced above in ¶¶104-06 concerning Abengoa's financial results and guidance, including its leverage, cash flow and EBITDA, were materially false and misleading at the time they were made because Defendants misrepresented and failed to disclose that: (a) Abengoa's corporate leverage ratio was not 2.2x and Defendants had purportedly "deliver[ed] on the commitment to reduce corporate leverage" only by misrepresenting Abengoa's

- 32 -

liquidity through: (i) categorizing a portion of its recourse debt as "non-recourse" debt – even though such debt was guaranteed by Abengoa; and (ii) failing to characterize as debt funds the Company owed to banks for supplier payments, in order to report more favorable leverage ratios that exceeded the ratios required by the Company's debt covenants; (b) Defendants' "clear business plan" and purported "proactive and successful financial policy" included: (i) improperly inflating Abengoa's cash flow by rejecting supplier invoices in order to intentionally delay payment, refusing to pay contractors, and pocketing funds that should have been paid out to legitimate subcontractors, thereby increasing the Company's reported cash position; (ii) obtaining lines of credit utilizing inflated financial reports that overstated the value of certain projects, by showing false percentages of completion on some projects and failing to show that some projects were over-budget; and (iii) falsifying financial information in order to make the Company's financial condition appear more favorable than it actually was, and maintaining separate sets of books for its external auditor and for internal use; and (c) as a result of the foregoing, Defendants misled the market about Abengoa's liquidity and cash flow, and, in turn, about the likelihood of, and need for, future capital raises by the Company.

**Abengoa Raises Capital on Favorable Terms Through the "Spinoff" of Abengoa Yield**

108.    On March 3, 2014, Abengoa issued a press release announcing that it planned to launch an initial public offering ("IPO") of a "yieldco."[2]   The IPO of Abengoa Yield plc ("Abengoa Yield") was completed on June 12, 2014, and its common stock began trading on the

---

[2]    A yieldco is a separate business that owns and operates power plants and similar energy-related assets that produce a steady flow of income.  Yieldcos sell electricity from their power plants and use the proceeds to buy more projects, often from their "developer" parent companies (in this case, Abengoa).  A yieldco enables its developer to sell existing power plants into the yeildco, and thereby raise capital for building new projects at a lower cost.  For investors, yeildcos are attractive because they pay out the majority of their revenues in quarterly dividends.

- 33 -

NASDAQ the following day under the ticker symbol "ABY." Abengoa Yield's IPO generated gross proceeds of $828.7 million. All of the net proceeds from the IPO, minus $30 million, were paid to Abengoa as "part of the consideration . . . for the transfer of assets to Abengoa Yield."

109.    Following its IPO, Abengoa Yield was 71.1% owned by Abengoa. Thereafter, Abengoa reduced its stake in Abengoa Yield through a series of lucrative asset sales, as well as a secondary offering of its shares of Abengoa Yield. Those transactions allowed Abengoa to raise hundreds of millions of euros worth of badly-needed capital from Abengoa Yield on favorable terms. By July 14, 2015, Abengoa had reduced its stake in Abengoa Yield to a minority interest of 49.05%.

**The 2013 20-F**

110.    On March 19, 2014, Abengoa filed its annual report for the year ended December 31, 2013 with the SEC on Form 20-F (the "2013 20-F"). The 2013 20-F was signed and certified as to its veracity, as required by the Sarbanes-Oxley Act of 2002 ("Sarbanes-Oxley"), by Defendant Sánchez Ortega. The 2013 20-F discussed the Company's liquidity position and cash flow, in pertinent part, as follows:

> ***Based on our current level of operations, we believe our cash flow from operations, available cash and available borrowings under our credit facilities will be adequate to meet our future liquidity needs for at least twelve months***.
>
> \*       \*       \*
>
> ***We believe that our existing liquidity and cash flow will be sufficient to meet our requirements and commitments for the foreseeable future***.
>
> \*       \*       \*
>
> Our operations are capital intensive and we operate with a significant amount of ***indebtedness***, which, as of December 31, 2013, totaled €11,975.4 million, ***of which €5,654.4 million was Gross Corporate Debt and €6,320.9 million was non-recourse financing. Additionally, we have additional corporate borrowing capacity of €581.0 million which we may incur without triggering a breach of our financial covenants***.

- 34 -

*    *    *

*We believe that we have sufficient corporate debt in place, together with non-recourse debt and cash flows, to fund and adequately support our existing operations and finance our expansion.*

111.    In addition, the 2013 20-F contained a similar discussion of Abengoa's corporate

recourse and non-recourse debt to that contained in the Registration Statement, stating, in pertinent

part:

We utilize two main sources of financing to meet our financial commitments: corporate debt and non-recourse debt. *We use our corporate debt to finance our investments (including in joint ventures and financing at the project company level) and for general corporate purposes. Our corporate debt is used by all of our activities and is primarily incurred by the Company with upstream guarantees from our main operating subsidiaries. We define non-recourse as debt that is generally used for constructing or acquiring an asset, which is guaranteed by the assets and cash flows of the company or group of companies carrying out the financed activities.* We generally finance the construction of our own operations by means of non-recourse debt at the project company level. Non-recourse debt is the principal means of financing for project construction in our Engineering and Construction activity, our Concession-Type Infrastructures activity and our Industrial Production activity. *We believe that we have sufficient corporate debt in place, together with non-recourse debt and cash flows, to fund and adequately support our existing operations and finance our expansion.*

*    *    *

*As of December 31, 2013, we had €5,654.4 million of indebtedness with recourse at the corporate level, €6,320.9 million of non-recourse debt and €3,877.5 million of cash and cash equivalents and short-term financial investments, resulting in total net debt (including other loans and borrowings) of €8,098.8 million.*

*    *    *

While we generally seek to maintain a balance of non-recourse debt and corporate debt to encourage financial discipline, *the majority of our capital expenditures are financed by non-recourse debt* and funding, when applicable, from partners in a particular project. *We incur corporate debt to finance our investments, acquisitions and general purpose requirements. Our corporate debt has the benefit of upstream guarantees from our operating subsidiaries which are subject to debt/EBITDA ratios* as discussed above. The funding of our corporate capital expenditure is covered by existing cash and corporate EBITDA generation. *We incur non-recourse debt on a project-by-project basis*, and we do not commit to any projects that we have been awarded prior to securing long-term financing.

- 35 -

**Supp. App. 35**

112.    With respect to the leverage ratio that Abengoa was required by its lenders to maintain, the 2013 20-F stated, in pertinent part, as follows:

> The Company is subject to one single financial covenant under the majority of the corporate facilities consisting of the maintenance of a Corporate Net Finance Debt to Consolidated EBITDA (as such terms are defined therein) lower than 3.00x until December 30, 2014 and lower than 2.50x thereafter. ***As of December 31, 2013 this ratio stood at 1.69x which means that the Company has an additional €1,369 million corporate borrow capacity without incurring a breach of covenants, considering the last twelve month consolidated EBITDA (as defined therein) of €1,047 million***.

113.    The statements referenced above in ¶¶110-12 concerning Abengoa's corporate recourse and non-recourse debt and the Company's leverage ratios were materially false and misleading at the time they were made because Defendants misrepresented and failed to disclose that: (a) Abengoa's corporate leverage ratio was not 1.69x, Abengoa's corporate debt was significantly higher than €5,654.4 million, and the Company did not have an additional €1,369 million of corporate borrowing capacity because Abengoa was misrepresenting its liquidity by: (i) categorizing a portion of its recourse debt as "non-recourse" debt – even though such debt was guaranteed by Abengoa; and (ii) failing to characterize as debt funds the Company owed to banks for supplier payments, in order to report more favorable leverage ratios that exceeded the ratios required by the Company's debt covenants; and (b) as a result of the foregoing, Defendants misled the market about Abengoa's liquidity and cash flow, and, in turn, about the likelihood of, and need for, future capital raises by the Company.

**Eighth Annual Analyst and Investor Day**

114.    On April 3, 2014, Abengoa held its Eighth Annual Analyst and Investor Day in New York. A financial review presentation given by Defendant Zubiría stated that the Company was "on the path to [becoming] corporate free cash flow positive." The presentation also stated

- 36 -

that Abengoa's "EBITDA Growth potential . . . will be one of the drivers for improved Free Cash Flow" and that the Company's corporate leverage ratio stood at "~2.0x."

115.    Additionally, during the Analyst and Investor Day, Defendant Sánchez Ortega gave a presentation on Abengoa's "strategic priorities." The corresponding slides stated that the Company was "delivering everything that we committed to," including, a "**strong liquidity position**" and "**reinforced financial discipline**."

116.    The statements referenced above in ¶¶114-15 concerning Abengoa's cash flow and leverage were materially false and misleading at the time they were made because Defendants misrepresented and failed to disclose that: (a) Abengoa's corporate leverage ratio was not 2.0x because Abengoa was misrepresenting its liquidity by: (i) categorizing a portion of its recourse debt as "non-recourse" debt – even though such debt was guaranteed by Abengoa; and (ii) failing to characterize as debt funds the Company owed to banks for supplier payments, in order to report more favorable leverage ratios that exceeded the ratios required by the Company's debt covenants; (b) the Company was not "on the path to [becoming] corporate free cash flow positive," but instead, Defendants were improperly inflating Abengoa's cash flow by: (i) rejecting supplier invoices in order to intentionally delay payment; (ii) refusing to pay contractors; and (iii) pocketing funds that should have been paid out to legitimate subcontractors, thereby increasing the Company's reported cash position; (c) the Company obtained lines of credit utilizing inflated financial reports that overstated the value of certain projects, by showing false percentages of completion on some projects and failing to show that some projects were over-budget; (d) Abengoa falsified financial information in order to make the Company's financial condition appear more favorable than it actually was, and maintained separate sets of books for its external auditor and for internal use; and (e) as a result of the foregoing, Defendants misled the market about Abengoa's

- 37 -

**Supp. App. 37**

liquidity and cash flow, and, in turn, about the likelihood of, and need for, future capital raises by the Company. Consequently, Abengoa was not "delivering" on its commitments to a "strong liquidity position" and "reinforced financial discipline."

**First Quarter of 2014 Financial Results**

117. On May 14, 2014, Abengoa issued a press release announcing its financial results for the quarter ended March 31, 2014. The Company reported that EBITDA had increased 24% year-over-year, to €302 million, and "*[c]orporate leverage stood at 2.5x*." In addition, Abengoa confirmed its guidance of EBITDA between €1,350 million and €1,400 million for 2014, Corporate EBITDA between €860 million and €885 million for 2014, "a corporate net debt to EBITDA ratio of 2.0x in 2014 onwards," and "positive free cash flow at the corporate level from 2014 onwards." In the press release, Defendant Sánchez Ortega declared that he was "*confident to confirm our business and financial targets for the year*."

118. Also on May 14, 2014, Abengoa filed with the SEC a Form 6-K containing a presentation entitled, "Evolution of the Business First Quarter 2014." The presentation included figures on the Company's "Composition of Net Debt," which reported "Total net corporate debt / EBITDA corporate" at 2.5x and "Total Net debt / EBITDA" at 6.0x.

119. Later that day, Defendants held a conference call with analysts and investors, during which Defendant Sánchez Ortega discussed the Company's free cash flow generation and corporate leverage ratio, in pertinent part, as follows:

> *We will see during 2014 additional improvements in the cash flows day after day, with excellent availability level already in Q1 2014, thanks to a successful management of our portfolio.*
>
> \*     \*     \*
>
> I would like to highlight once again that Q1 has confirmed a positive trend in the main key performance indicators for the business, confirming that the ability on the rest of the year in terms of growth and, more importantly, *the ability of the business*

- 38 -

*to generate cash, going forward.* So, this, together with a **sound and confirmed disciplined investment policy** and improvement in the credit profile of the business, **make us more and more confident to achieve our financial commitments** and guidance that we shared with you in the last call and that we reiterate in this call of the Q1 numbers.

*      *      *

**And finally, our corporate leverage reached a level of 2.5 times our corporate EBITDA, a better beginning compared to March 2013 when we began the year with a 3.3-times level and in the same level that we ended last year.**

120.    Defendant Zubiría also commented on Abengoa's corporate leverage ratio and free cash flow generation, in pertinent part, as follows:

> Given the seasonality in the E&C business, which has impacted our working capital for the period, corporate net debt increased by 14% quarter on quarter, reaching EUR2,421 million. **As a result, the corporate leverage has increased to 2.5 times, from the 2.2 times achieved at the end of 2013, but improved significantly, by 0.8 times, from the levels at the end of March 2013.** This is not atypical, as Q1 has been historically weaker in cash flow generation, and the level of backlog and pipeline make us feel **confident that we will improve as the year goes by, and expect to reach our corporate leverage and corporate free cash flow targets at year end.**

121.    The statements referenced above in ¶¶117-20 concerning Abengoa's financial results and guidance, including its leverage, cash flow and EBITDA, were materially false and misleading at the time they were made because Defendants misrepresented and failed to disclose that: (a) Abengoa's corporate leverage ratio was not 2.5x because Abengoa was misrepresenting its liquidity by: (i) categorizing a portion of its recourse debt as "non-recourse" debt – even though such debt was guaranteed by Abengoa; and (ii) failing to characterize as debt funds the Company owed to banks for supplier payments, in order to report more favorable leverage ratios that exceeded the ratios required by the Company's debt covenants; (b) Abengoa's "improvements in the cash flows" were not attributable to "successful management of [the Company's] portfolio," but rather to Defendants' conduct of improperly inflating Abengoa's cash flow by: (i) rejecting supplier invoices in order to intentionally delay payment; (ii) refusing to pay contractors; and (iii)

- 39 -

pocketing funds that should have been paid out to legitimate subcontractors, thereby increasing the Company's reported cash position; (c) the Company obtained lines of credit utilizing inflated financial reports that overstated the value of certain projects, by showing false percentages of completion on some projects and failing to show that some projects were over-budget; (d) Abengoa falsified financial information in order to make the Company's financial condition appear more favorable than it actually was, and maintained separate sets of books for its external auditor and for internal use; and (e) as a result of the foregoing, Defendants misled the market about Abengoa's liquidity and cash flow, and, in turn, about the likelihood of, and need for, future capital raises by the Company. Consequently, it was only the foregoing misconduct that gave Defendants "confiden[ce]" about Abengoa's ability to achieve its "business and financial targets."

**First Half of 2014 Financial Results**

122. On August 12, 2014, Abengoa issued a press release announcing its financial results for the six months ended June 30, 2014, which was filed with the SEC on Form 6-K. The Company reported that EBITDA had increased 31% year-over-year, to €695 million, which Defendant Sánchez Ortega attributed to "an improvement in the margins of all our activities." With respect to Abengoa's leverage, the press release stated that the Company's "*corporate net debt to corporate EBITDA ratio (Corporate Leverage Ratio) as of June 30, 2014 was 2.5x*, in line with the previous quarter, and 0.7x lower than twelve months ago." In addition, Abengoa "reiterated its guidance for the fiscal year 2014."

123. The same day, Abengoa filed with the SEC a Form 6-K reporting the Company's financial results for the six months ended June 30, 2014 (the "1H14 6-K"). The 1H14 6-K included Abengoa's Consolidated Condensed Financial Statements for the Six-Month Period Ended June 30, 2014, filed with the Spanish market regulator, the Comisión Nacional del Mercado de

- 40 -

Valores on August 12, 2014 (the "CNMV"), which discussed the Company's liquidity, in pertinent

part, as follows:

> ***Abengoa's financing and liquidity objectives are to ensure that the company has
> sufficient funds available on an ongoing basis to honor all upcoming financial
> commitments and obligations.***
>
> *          *          *
>
> ***To ensure that the Company has sufficient funds to repay the debt with respect
> to its capacity to generate cash flow, Abengoa has to comply with a Corporate Net
> Debt/EBITDA financial ratio with the financial institutions.*** According to the
> financing agreements, the maximum limit of this ratio is 3.0 for the years 2012,
> 2013 and until December 30, 2014 and 2.5 starting December 31, 2014. ***As of June
> 30, 2014, Corporate Net Debt/EBITDA financial ratio is 2.44.***

124.    Also on August 12, 2014, Defendants held a conference call with analysts and

investors, during which Defendant Zubiría discussed the Company's free cash flow generation, in

pertinent part, as follows:

> ***From a cash flow standpoint, I can say that we have all the right levers to
> continue on the path of increasing free cash flow delivery.  First, we have a strong
> and growing corporate EBITDA generation***. . . .

125.    During the call, Defendant Sánchez Ortega commented on Abengoa's corporate

leverage, stating in pertinent part, as follows:

> . . . .***[O]ur corporate leverage is improving*** up to 2.5 times of corporate EBITDA,
> down from the results of June of last year by 0.7 times.

126.    The statements referenced above in ¶¶122-25 were materially false and misleading

at the time they were made because Defendants misrepresented and failed to disclose that: (a)

Abengoa's corporate leverage ratio was not 2.5x and its "corporate leverage [was] improving"

only because Abengoa was misrepresenting its liquidity by: (i) categorizing a portion of its

recourse debt as "non-recourse" debt – even though such debt was guaranteed by Abengoa; and

(ii) failing to characterize as debt funds the Company owed to banks for supplier payments, in

order to report more favorable leverage ratios that exceeded the ratios required by the Company's

- 41 -

debt covenants; (b) the "levers to continue . . . increasing free cash flow delivery" included improperly inflating Abengoa's cash flow by: (i) rejecting supplier invoices in order to intentionally delay payment; (ii) refusing to pay contractors; and (iii) pocketing funds that should have been paid out to legitimate subcontractors, thereby increasing the Company's reported cash position; (c) the Company obtained lines of credit utilizing inflated financial reports that overstated the value of certain projects, by showing false percentages of completion on some projects and failing to show that some projects were over-budget; (d) Abengoa falsified financial information in order to make the Company's financial condition appear more favorable than it actually was, and maintained separate sets of books for its external auditor and for internal use; and (e) as a result of the foregoing, Defendants misled the market about Abengoa's liquidity and cash flow, and, in turn, about the likelihood of, and need for, future capital raises by the Company.

**Strategy Update Breakfasts**

127. On September 3, 2014, Abengoa filed with the SEC a Form 6-K containing a slide presentation to be given at the Company's "strategy update" breakfasts held in London and New York on September 3-4, 2014, respectively. In the presentation, Defendants highlighted that Abengoa had achieved a "*[s]trong liquidity position*" and "*[r]einforced financial discipline*" and represented that Abengoa's "*[k]ey [s]trategic [p]riorities*" included "[r]eduction of [c]orporate leverage," "positive [free cash flow] in 2014," "[r]educ[ing] [l]evels of [g]ross [d]ebt," "[s]ignificant [r]eduction of [f]inancial [c]osts," and "[i]mproving [Abengoa's] [c]redit [r]ating." The presentation further stated that Abengoa maintained a "*[s]trong focus on financial discipline . . . .*"

128. Speaking during the September 3, 2014 update breakfast in London, Defendant Sánchez Ortega commented on the Company's purported "strong liquidity position" in pertinent part, as follows:

- 42 -

. . . And *we told you we were planning to reinforce the financial discipline* with certain targets that we told you. And I am happy to tell you that *all those targets that we told you are either achieved or on track* and, therefore, *we have been strict on the financial discipline managing the Company* as one of the priorities of the management team.

*     *     *

And the whole picture, I mean the global picture . . . is that *we are finishing at the Company what we call the period of balance sheet optimization* and we recognized that our balance sheet was not optimal.

I mean we have suffered even 2011, 2012, I mean this crisis that we have gone through, it was – it was really tough. And *we believe that we have done a lot of homework trying to improve the balance sheet of the Company and the financial discipline in the Company and we believe we are about to complete that balance sheet optimization*.

So *the main* . . . *focus point of that is to continue with a reduction of the corporate leverage*, to reduce the corporate CapEx, *to achieve the corporate free cash flow or the operating free cash flow in 2014 positive* and to set this record and vehicle of equity results.

I mean in the next period we call [it] . . . financial expense reduction, we can call it EPS expansion, if you want, . . . on the other side.

Because *basically what we're trying to do is to reduce the levels of gross debt and cash, enhance the liquidity that we have in the Company*, to reduce the negative working capital and related costs that it has, to reduce the financial cost of the Company and materially improve the EPS of the Company therefore and hopefully *leading* all of them *to an improvement of the credit rating* [which] as you know has been one of our main targets.

129.     In addition, Defendant Zubiría commented on the Company's plans to reduce debt

and improve cash flow in pertinent part, as follows:

So Manuel talked about unlocking further value and rerating of Abengoa. How do we do that? The simplest way and the way that every single one of you that I speak with daily insist is pay down debt – *pay down debt, reduce financial expenses. And that is definitely the name of the game for 2015*.

And how do we do that? And because it's *through our financial expense reduction*, it's obvious, *we are going to be improving significantly our cash flow generation at the corporate level*, we are going to be improving significantly our EPS *and thereby improving our credit profile* and hopefully credit rating by the agency soon.

- 43 -

130.    The statements referenced above in ¶¶127-29 were materially false and misleading at the time they were made because Defendants misrepresented and failed to disclose that: (a) Defendants were reducing corporate leverage and enhancing liquidity only by misrepresenting Abengoa's liquidity by: (i) categorizing a portion of its recourse debt as "non-recourse" debt – even though such debt was guaranteed by Abengoa; and (ii) failing to characterize as debt funds the Company owed to banks for supplier payments, in order to report more favorable leverage ratios that exceeded the ratios required by the Company's debt covenants; (b) Defendants were "improving . . . cash flow generation" and improperly inflating Abengoa's cash flow by: (i) rejecting supplier invoices in order to intentionally delay payment; (ii) refusing to pay contractors; and (iii) pocketing funds that should have been paid out to legitimate subcontractors, thereby increasing the Company's reported cash position; (c) the Company obtained lines of credit by misrepresenting, rather than "improving," its "credit profile," by utilizing inflated financial reports that overstated the value of certain projects, by showing false percentages of completion on some projects and failing to show that some projects were over-budget; (d) Abengoa falsified financial information in order to make the Company's financial condition appear more favorable than it actually was, and maintained separate sets of books for its external auditor and for internal use; and (e) as a result of the foregoing, Defendants misled the market about Abengoa's liquidity and cash flow, and, in turn, about the likelihood of, and need for, future capital raises by the Company. Consequently, Defendants were attempting to achieve Abengoa's "key strategic priorities" and "balance sheet optimization" through the foregoing misconduct, and it was such misconduct that gave Defendants "confiden[ce]" about Abengoa's ability to achieve its "business and financial targets." Accordingly, Defendants had no reasonable basis to characterize Abengoa's "financial discipline" as "strict," or to state that Abengoa had a "strong focus on financial discipline."

- 44 -

**Defendants Announce a Plan to Reduce the Company's Debt and Improve its Cash Flow Through "Abengoa 3.0"**

131.    During the update breakfasts, Defendants announced the Company's transition to an "asset-light" business model referred to as "Abengoa 3.0," as part of an effort to address investors' concerns about Abengoa's balance sheet.

132.    The new business model was aimed at generating cash throughout the lifecycle of construction projects and fast-tracking the early stages of such projects before long term, project-level financing was secured.  This was to be achieved, in part, through the creation of a subsidiary called Abengoa Greenfield, S.A. ("Abengoa Greenfield"), which was designed to secure short-term "bridge" financing from Abengoa's external partners for the beginning stages of new projects.

133.    According to the Company, the new Abengoa 3.0 business model would enable Abengoa to control the entire value chain of its construction projects.  Completed projects would ultimately be sold to Abengoa Yield, thereby generating cash for Abengoa.  Abengoa, in turn, would reinvest a portion of those proceeds in new projects via Abengoa Greenfield, in a process the Company referred to as "equity recycling."

134.    Analysts and investors expressed optimism concerning the new business model, with a September 12, 2014 Santander analyst report declaring that Abengoa was "moving in the right direction" by "focus[ing] on cash flow generation to improve [its] rating . . . and [on] slimming down the company."

**Abengoa Issues the Greenfield Bonds**

135.    In connection with the launch of Abengoa 3.0, on September 22, 2014, Abengoa announced a €500 million private placement of "green bonds" issued by Abengoa Greenfield (the "Greenfield Bonds").  The proceeds from the offering would be used to finance certain

- 45 -

environmentally sustainable energy projects "until the long-term funds associated with those projects are obtained," while "optimizing financial costs" for Abengoa.

136. The Greenfield Bonds were offered in two tranches (one in euros and one in U.S. dollars), both maturing in 2019. The Greenfield Bond offering closed on September 30, 2014 – the last day of the third quarter.

137. According to Abengoa's press release announcing the offering, the Greenfield Bonds would "be **_guaranteed by the company_** and several of the company's subsidiaries." Likewise, the Greenfield Bonds' offering memorandum represented that the bonds were "irrevocably guaranteed on a senior unsecured basis" by Abengoa. The offering memorandum further represented that Abengoa "**_intend[ed] to classify_**" the Greenfield Bonds as corporate recourse debt "upon issuance." Thus, Abengoa's investors and purchasers of the Greenfield Bonds alike expected the bonds to be recorded as corporate recourse debt on Abengoa's balance sheet.

**First Nine Months of 2014 Financial Results**

138. On November 12, 2014, Abengoa issued a press release announcing its financial results for the nine months ended September 30, 2014, which was filed with the SEC on Form 6-K. The Company reported that EBITDA had risen 24% year-over-year, to €1,071 million, which Defendant Sánchez Ortega attributed to "an improvement in our activities." With respect to Abengoa's leverage, the press release stated that the Company's "**_pro-forma corporate net debt to corporate EBITDA ratio (Corporate Leverage Ratio) as of September 30, 2014 was 2.1x_**, [a] 0.4x reduction versus the previous quarter, [and] **_on track for full year 2014 target of 2.0x_**." In addition, Abengoa raised its 2014 Corporate EBITDA guidance from a range of €860 million to €885 million, to a range of €885 million to €900 million, and reaffirmed its 2014 EBITDA guidance of a range of €1,350 million to €1,400 million.

- 46 -

139.    Later that day, Defendants held a conference call with analysts and investors to discuss the Company's financial results.  The corresponding presentation slides were filed with the SEC on Form 6-K the same day.  During the call, Defendant Zubiría discussed the Company's EBITDA, free cash flow generation, as well as debt and cash flow targets, in pertinent part, as follows:

> . . . What's also very important is ***that our corporate EBITDA target has been increased*** despite the lower volumes. . . . From a balance sheet and cash flow perspective, ***the Company has been able to continue delivering on its financial commitments and has been preparing itself for delivery of its leverage and cash flow targets***. . . . ***We have generated EUR164 million of free cash flow in the quarter***.  And most importantly, we have started to see the positive trend that we had anticipated from working capital, which has recovered over EUR250 million of the cash consumed in the first part of the year.  ***We feel, therefore, confident to reconfirm the debt and cash flow targets for the year***.
>
> *    *    *
>
> . . . [W]e are ***expecting to see a strong, a very strong fourth quarter in terms of cash flow generation from working capital***.

140.    Defendant Sánchez Ortega also commented on the Company's leverage ratio, stating in pertinent part, as follows:

> . . . . ***Last but not least important, the management has been diligent in maintaining a keen eye on our financial commitments, continuing executing on our deleveraged plans. As of September, our pro forma corporate net debt leverage stood at 2.1 times our corporate EBITDA, one step closer to our end-of-the-year target of 2 times***. . . .

141.    Additionally, in the earnings presentation slides, Defendants reported that Abengoa was "on track to achieve our positive [free cash flow] target for FY 2014E."

142.    The statements referenced above in ¶¶138-41 concerning Abengoa's financial results and guidance, including its leverage, cash flow and EBITDA, were materially false and misleading at the time they were made because Defendants misrepresented and failed to disclose that: (a) Abengoa's corporate leverage ratio was not 2.1x because Abengoa was misrepresenting

- 47 -

its liquidity by: (i) categorizing a portion of its recourse debt as "non-recourse" debt – even though such debt was guaranteed by Abengoa; and (ii) failing to characterize as debt funds the Company owed to banks for supplier payments, in order to report more favorable leverage ratios that exceeded the ratios required by the Company's debt covenants; (b) Abengoa had not generated €164 million of free cash flow in the quarter, Defendants were "expecting . . . very strong . . . cash flow generation," and Abengoa was "on track to achieve" its free cash flow guidance because Defendants were improperly inflating Abengoa's cash flow by: (i) rejecting supplier invoices in order to intentionally delay payment; (ii) refusing to pay contractors; and (iii) pocketing funds that should have been paid out to legitimate subcontractors, thereby increasing the Company's reported cash position; (c) the Company obtained lines of credit utilizing inflated financial reports that overstated the value of certain projects, by showing false percentages of completion on some projects and failing to show that some projects were over-budget; (d) Abengoa falsified financial information in order to make the Company's financial condition appear more favorable than it actually was, and maintained separate sets of books for its external auditor and for internal use; and (e) as a result of the foregoing, Defendants misled the market about Abengoa's liquidity and cash flow, and, in turn, about the likelihood of, and need for, future capital raises by the Company. Consequently, Defendants had "been diligent in . . . executing on [Abengoa's] deleverag[ing] plans," had been "delivering on [their] financial commitments," and were "prepar[ed]" to "deliver[]" on Abengoa's "leverage and cash flow targets" only by engaging in the foregoing misconduct.

**The Greenfield Bond Reclassification Forces Defendants to Reveal Additional Information About Abengoa's Debt and Leverage Ratios**

143.    During the November 12, 2014 conference call, HSBC analyst Sean McLoughlin sought clarification about the fact that "the green bond . . . [did not] seem to be" included in

- 48 -

Abengoa's reported corporate leverage ratio of 2.1x. In response, Defendant Zubiría revealed that Abengoa had reclassified the Greenfield Bond as non-recourse debt, thereby excluding it from Abengoa's debt and leverage ratios. Defendant Zubiría stated, in pertinent part: "So, it is included in the September 30th numbers. It is, however, . . . categorized under nonrecourse financing [in process]."

144. Likewise, Barclays analyst Tom Southton questioned why the Greenfield Bonds had not been included in Abengoa's reported corporate leverage ratio of 2.1x, stating in pertinent part: "[S]o obviously the greenfield bonds . . . are the same as the other debts guaranteed by Abengoa. And yet, you're not including it in the corporate debt. I just wanted to understand why." Defendant Zubiría similarly responded that, "It is, for accounting purposes, classified in a different bucket. . . . It is preoperational nonrecourse debt. And that is accounted for as what we call nonrecourse debt . . . ."

145. Analysts and investors were stunned to learn that Abengoa had reclassified the Greenfield Bonds as non-recourse debt on September 30, 2014 – the very same day the offering closed – in order to report a lower corporate leverage ratio in the Company's third quarter financial statements, and questioned the Company's reporting of its debt and leverage figures. For example, a Lucror Analytics report issued on November 13, 2014 "caution[ed] that Abengoa's calculation of corporate leverage should be taken with a grain of salt, *as the real corporate leverage is higher, in our view*. . . . [A]s long as the debt issued by Abengoa Greenfield is recourse debt, we do not believe that it is appropriate to exclude it from the corporate leverage calculation." The report concluded that: "With its weak and constantly changing disclosure, Abengoa is creating the impression that it is trying to hide something from analysts . . . ."

146. On November 14, 2014, Fitch Ratings issued a report noting that under Fitch's calculations of Abengoa's leverage – which included the Greenfield Bonds – "our adjusted FY14 net recourse leverage estimate (4x) is ***nearly twice the company's most recent figure of 2.1x*** . . . ." A BPI analyst report issued the same day noted that the "credibility and uncertainty issues" raised by the reclassification of the Greenfield Bonds "pose[d] relevant risks in funding access and related cost" – of particular concern since "access to credit markets is critical for [Abengoa.]"

147. In response to the revelation that Abengoa had reclassified the Greenfield Bonds in order to report a more favorable corporate leverage ratio and concerns that the Company's lack of credibility could harm its borrowing ability, the price of Abengoa ADSs fell nearly ***50%*** over the next three trading days, on heavy trading volume, as the market digested the adverse announcements – falling from a closing price of $17.59 per ADS on November 11, 2014, to close at $8.83 per ADS on November 14, 2014.

148. The fallout from the November 12, 2014 revelation of the Greenfield Bonds' reclassification forced Defendants to make additional disclosures about Abengoa's debt and leverage during a conference call held on Monday, November 17, 2014, in an effort to repair the Company's credibility.

149. During the call and in an accompanying presentation filed with the SEC on Form 6-K, Defendants revealed that Abengoa accounted for a total of ***€1.595 billion*** (including the €500 million Greenfield Bonds) as so-called "non-recourse debt in process" – thereby excluding such debt from the Company's corporate leverage ratio – even though the debt was guaranteed by Abengoa.

150. Defendants further revealed that after including "non-recourse debt in process," Abengoa's corporate leverage ratio was 3.9x, its "total net debt" was over €9 billion, and its "total

- 50 -

net leverage" ratio was 5.6x. Finally, Defendant Zubiría disclosed that Abengoa did not characterize as debt "approximately €1 billion of cash linked to supplier payment[s] that is [set aside] on collateral accounts."

151. Notwithstanding these disclosures, during the call, Defendants continued to highlight the Company's purportedly adequate liquidity position, stating, in pertinent part, as follows:

Defendant Sánchez Ortega:

. . . *[W]e have a sound financial health, which is underpinned by the strong liquidity that we have in the Company, which will allow us to continue [to] manage the Company*. *It's business as usual*.

Defendant Zubiría:

. . . I think that's the most important thing, which was the point – *the message at the end is that we are in a sound financial position, underpinned by our strong liquidity position*. I think our liquidity protection policy, that, as we have always explained, and some of you have not like because it's not the most cost efficient, I think, today is extremely valuable because *we have the liquidity to be able to undertake our short-term obligations*.

152. Defendant Sánchez Ortega also commented on Abengoa's guidance for EBITDA, cash flow, and corporate leverage ratio, stating in pertinent part, as follows:

. . . I would like to remind you that for 2014 we target to grow . . . EBITDA between 10% and 14% . . . . And, in addition, as we confirmed only a few days ago, *we continued targeting corporate free cash flow positive* before asset rotation, and net corporate leverage below 2 times.

\*       \*       \*

Now, regarding the target that we have for 2014 and 2015, what we are establishing is a corporate net debt of below 2 times for this year, and next year; and a corporate net debt plus non-recourse in process ratio of below 5 times for 2014, below 4.5 times for 2015.

153. The statements referenced above in ¶¶151-52 concerning Abengoa's financial condition, liquidity and guidance were materially false and misleading at the time they were made

- 51 -

**Supp. App. 51**

because Defendants misrepresented and failed to disclose that: (a) Defendants "continued targeting" positive free cash flow by improperly inflating Abengoa's cash flow by: (i) rejecting supplier invoices in order to intentionally delay payment; (ii) refusing to pay contractors; and (iii) pocketing funds that should have been paid out to legitimate subcontractors, thereby increasing the Company's reported cash position; (b) the Company obtained lines of credit utilizing inflated financial reports that overstated the value of certain projects, by showing false percentages of completion on some projects and failing to show that some projects were over-budget; (c) Abengoa falsified financial information in order to make the Company's financial condition appear more favorable than it actually was, and maintained separate sets of books for its external auditor and for internal use; and (d) as a result of the foregoing, Defendants misled the market about Abengoa's liquidity and cash flow, and, in turn, about the likelihood of, and need for, future capital raises by the Company. Consequently, Defendants had no reasonable basis to characterize Abengoa's financial health and position as "sound," or to describe its liquidity as "strong."

154. Analysts and investors continued to criticize the Company following the November 17, 2014 conference call. A Santander analyst report issued on November 17, 2014 noted that the fact that Abengoa "accounts for a total of €1,592 [million] under the[] same conditions" as the Greenfield Bond was "*something the market was unaware of* . . . ."

155. According to a November 18, 2014 *Reuters* article, the reclassification of the Greenfield Bonds as non-recourse debt "*flies in the face of the traditional definition of non-recourse debt*, which usually has no claim on the parent company." The article reported that during the conference call, Abengoa "faced myriad further questions about how various liabilities are treated on its balance sheet" – including the Company's failure to categorize the €1 billion linked

- 52 -

**Supp. App. 52**

to supplier payments as debt – and quoted a hedge fund analyst as stating: "***The more they open the door on their financials, the more questions there are***."

156.    Although Defendants had been forced to "open the door on [Abengoa's] financials" just a crack, investors remained unaware that Defendants were inflating the Company's cash position and falsifying financial information.  By doing so, Defendants continued to conceal Abengoa's true financial condition and its ability to generate sufficient cash to service its debt, and thereby misled the market about the Company's liquidity and the likelihood of, and need for, of future capital raises by the Company.

**February 9, 2015 Announcements**

157.    On February 9, 2015, Abengoa issued a press release concerning its "preliminary results for 2014," its "targets for 2015" and "the progress of its strategic plan[.]"  The Company reported that consolidated EBITDA for 2014 was "expected" to be "slightly more than" €1,400 million – in line with 2014 guidance – and "[c]orporate free cash flow after asset rotations in 2014 [was] expected to be around €135 [million]."

158.    With respect to Abengoa's debt and leverage, the press release stated that "[c]orporate net debt [was] expected to be around €2,350 [million] as [of] December 31, 2014, with a corporate leverage ratio of 2.4x" – missing the Company's guidance of 2.0x.  The press release emphasized, however, that "[t]aking into account the €390 [million] in cash proceeds from the corporate transactions carried out during the first few weeks of 2015 (the sale of 13% of Abengoa Yield, and the sale of assets to Abengoa Yield . . .) adjusted corporate net debt as at December 31, 2014 would be approximately €1,960 [million], equivalent to a corporate leverage ratio of 2.0x."  The press release further stated that "[n]onrecourse debt in process (NRDP) as at December 31, 2014 [was] estimated at €1,940 [million], resulting in a corporate leverage ratio including NRDP of 4.5x or an adjusted ratio of 4.1x" and "consolidated net debt [was]

- 53 -

approximately €7,290 [million], which implies a consolidated leverage ratio of 5.2x or an adjusted ratio of 4.9x."

159.    In addition, Abengoa initiated 2015 guidance of EBITDA between €1,400 million and €1,450 million, and corporate free cash flow "after asset rotations" of "approximately" €1,400 million.   The Company also announced "new targets for net financial borrowing" of: (1) a corporate net debt to corporate EBITDA ratio of 1.2x; (2) a corporate net debt ratio, including NRDP, of 3.2x; and (3) a consolidated net leverage ratio of 3.9x.

160.    Later that day, Defendants held a conference call with analysts and investors to discuss the Company's progress and outlook for 2015.  The corresponding presentation slides were filed with the SEC on Form 6-K the same day.  During the call, Defendants Garcia Alvear and Sánchez Ortega discussed the Company's liquidity position and free cash flow generation, in pertinent part, as follows:

Defendant Garcia Alvear:

. . . *[W]e never stress enough the importance of maintaining a solid liquidity buffer to guarantee the flexibility of the business.* [As a consequence of our] strategic actions . . . , *we are significantly enhancing our liquidity position, leaving us with a comfortable outlook for the future*.

\*      \*      \*

All in all, *this represents a very strong liquidity position for the Company and makes us look to the remainder of the year with a very positive visibility*.

\*      \*      \*

Defendant Sánchez Ortega:

*[In] 2015, we'll definitely see significant cash generation* on top of the operating activity, *and that will be prompted by the strong execution of our financial plan, optimizing our business model*.

\*      \*      \*

- 54 -

**Supp. App. 54**

And we of course **maintain our commitment to keep** a **healthy level of liquidity** . . . . **[T]he business model of Abengoa now is set for a strong positive cash flow generation**.

*     *     *

. . . **2015 will be focused on further deleverage, while keeping on providing sustainable growth on the operating side**. . . .

161.    In addition, the presentation slides stated that the Company was "**maintaining a healthy level of liquidity**" and that its new business model, Abengoa 3.0, was "**poised to generate positive free-cash flow**."

162.    The statements referenced above in ¶¶157-61 concerning Abengoa's preliminary financial results and guidance, including its leverage, cash flow and EBITDA, were materially false and misleading at the time they were made because Defendants misrepresented and failed to disclose that: (a) Abengoa's corporate free cash flow was not €135 million, and Abengoa was purportedly "set for strong positive cash flow generation" and "poised to generate positive free cash flow" only because Defendants were improperly inflating Abengoa's cash flow by: (i) rejecting supplier invoices in order to intentionally delay payment; (ii) refusing to pay contractors; and (iii) pocketing funds that should have been paid out to legitimate subcontractors, thereby increasing the Company's reported cash position; therefore, Defendants' expectation of "significant cash generation" was not "prompted by the strong execution of [Abengoa's] financial plan" or by "optimizing [its] business model," but rather, by Defendants' misconduct; (b) the Company obtained lines of credit utilizing inflated financial reports that overstated the value of certain projects, by showing false percentages of completion on some projects and failing to show that some projects were over-budget; (c) Abengoa falsified financial information in order to make the Company's financial condition appear more favorable than it actually was, and maintained separate sets of books for its external auditor and for internal use; and (d) as a result of the

- 55 -

foregoing, Defendants misled the market about Abengoa's liquidity and cash flow, and, in turn, about the likelihood of, and need for, future capital raises by the Company. Consequently, Defendants had no reasonable basis to characterize Abengoa's liquidity as "strong," "healthy," "solid" or "comfortable."

**Full Year 2014 Financial Results**

163. On February 23, 2015, Abengoa issued a press release announcing its financial results for the full year ended December 31, 2014, which was filed with the SEC on Form 6-K. The press release stated that "[a]ll the figures presented [on] February 9, 2015, as part of the market update held by the company, have been confirmed" and reiterated Abengoa's 2015 guidance and leverage targets. Commenting on the results, Defendant Sánchez Ortega stated, in pertinent part:

> I am very pleased with the ***strong operating performance*** delivered by the company one more year. . . . We are enthusiastic with the ***delivery of our strategic plan achieved so far to consolidate our business model based on recurrent free cash flow generation***.

164. The same day, Abengoa filed its annual report for the year ended December 31, 2014 with the SEC on Form 20-F ("2014 20-F"), which was signed and certified pursuant to Sarbanes-Oxley by Defendant Sánchez Ortega. The 2014 20-F contained a similar discussion of the Company's liquidity position and cash flow to that contained in the 2013 20-F, stating, in pertinent part, as follows:

> ***Based on our current level of operations, we believe our cash flow from operations, available cash and available borrowings under our credit facilities will be adequate to meet our future liquidity needs for at least twelve months***.

> \*   \*   \*

> ***We are committed to maintaining a sound capital structure and a strong liquidity position***.

> \*   \*   \*

- 56 -

*We believe that our existing liquidity and cash flow will be sufficient to meet our requirements and commitments for the foreseeable future*.

165.   The 2014 20-F also reported the Company's leverage ratio, as follows:

We are subject to one single financial covenant under the majority of the corporate facilities consisting of the maintenance of a Corporate Net Finance Debt to Consolidated EBITDA (as such terms are defined therein) lower than 3.00x until December 30, 2014 and lower than 2.50x thereafter. *As of December 31, 2014 this ratio stood at 2.11x which means that the Company has an additional €386 million corporate borrow capacity without incurring a breach of covenants, considering the last twelve month consolidated EBITDA (as defined therein) of €970 million*.

166.   Also on February 23, 2015, Defendants held a conference call with analysts and investors to discuss the Company's full year 2014 financial results.   The corresponding presentation slides were filed with the SEC on Form 6-K the same day.   During the call, Defendant Garcia Alvear discussed the Company's approach to managing its liquidity, in pertinent part, as follows:

*As liquidity is a cornerstone to our financial management*, *we are taking all the necessary steps to enhance it through 2015* and improve the flexibility of our business. . . . To replenish the liquidity buffer is important; after having supported the credit through liquidity, we plan to monetize our investments for a further EUR1.6 billion, based on a plan already shared with the market . . . . Altogether this will leave [us] with a total corporate cash source of plus EUR4.4 billion.  *That leaves us in an excellent position to face our operational and financial needs*.

167.   Additionally, Defendant Sánchez Ortega commented on the Company's business model, stating, in pertinent part, as follows:

After the completion of the strategic milestones that we announced in Q1, *we think that our business model is all set to enhance our free cash flow generation* and activate our eventual cycle.

\*       \*       \*

. . . *Abengoa will be less capital-intensive* and increase the returns per euro spent *and improving the overall financial strength of the Company through a sustainable free cash flow generative model*.

- 57 -

168.    Additionally, Defendant Garcia Alvear discussed the Company's leverage targets and deleveraging plan, in pertinent part, as follows:

> *This year we will be focused on taking an additional step in growing sustainably and accelerating deleverage*.

*    *    *

> *We expect further deleverage at the corporate level, reaching 1.2 times corporate EBITDA.  Our previous target was below 2, and corporate leverage plus nonrecourse debt in process down to 3.2 times.  As a reduction, the target can be paid back in November of 4.5 times.  For the first time we are providing a consolidated deleverage guidance at 3.9 times*.

169.    In the presentation slides, Defendants reiterated that the Company was "*maintaining a healthy level of liquidity*" and noted that the Abengoa had "*substantial liquidity sources to face our corporate commitments*."  Defendants also assured investors that "strong cash generation [was] expected for 2015" and that the Company had a "business model poised to generate positive free-cash flow."

170.    The statements referenced above in ¶¶163-69 were materially false and misleading at the time they were made because Defendants misrepresented and failed to disclose that: (a) Abengoa was purportedly "all set to enhance [] free cash flow generation" and generate "sustainable free cash flow" because Defendants were improperly inflating Abengoa's cash flow by: (i) rejecting supplier invoices in order to intentionally delay payment; (ii) refusing to pay contractors; and (iii) pocketing funds that should have been paid out to legitimate subcontractors, thereby increasing the Company's reported cash position; (b) the Company obtained lines of credit utilizing inflated financial reports that overstated the value of certain projects, by showing false percentages of completion on some projects and failing to show that some projects were over-budget; (c) Abengoa falsified financial information in order to make the Company's financial condition appear more favorable than it actually was, and maintained separate sets of books for its

- 58 -

external auditor and for internal use; and (d) as a result of the foregoing, Defendants misled the market about Abengoa's liquidity and cash flow, and, in turn, about the likelihood of, and need for, future capital raises by the Company. Consequently, Defendants had no reasonable basis to characterize Abengoa's liquidity as "strong," "healthy" and "substantial," or to state that Abengoa was "in an excellent position" with respect to liquidity and had sufficient cash and liquidity not only "for at least twelve months," but "for the foreseeable future."

**First Quarter of 2015 Preliminary Financial Results and Ninth Annual Analyst and Investor Day**

171. On April 7, 2015, Abengoa issued a press release announcing its preliminary financial results for the quarter ended March 31, 2015, which was filed with the SEC on Form 6-K. The Company reported that consolidated EBITDA was expected to be between €265 million and €285 million. The press release stated that during the quarter, Abengoa had "[a]nnounced transactions with expected cash proceeds of approximately [€1.1 billion]," and highlighted that "together with the corporate transactions announced during this first quarter, Abengoa's corporate liquidity at the end of March is approximately [€3.0 billion], a 5% increase compared to the [€2.8 billion] available by the end of 2014."

172. Also on April 7, 2015, Abengoa held its 9th Annual Analyst and Investor Day in New York. A financial review presentation given by Defendant Garcia Alvear, and filed with the SEC on Form 6-K, stated that the Company had taken "*[s]ignificant liquidity enhancement actions during Q1 to protect [its] credit profile*," had achieved its "*liquidity reinforcement plan*," expected "*significant corporate cash generation*" for 2015, and had "*[r]einforced and de-risked [its] free cash flow generation profile*." In addition, Defendants reaffirmed Abengoa's corporate free cash flow target of €1.4 billion for FY 2015.

173.    Defendants also highlighted the Abengoa 3.0 model, which was referred to in the presentation slides as a "positive game changer" that "*de-risk[ed] [the Company's] business model*."

174.    Additionally, Defendants emphasized the Company's supposed corporate leverage reduction, stating that the company had "Corporate leverage of 1.2x after planned transactions in 2015" and that "[s]ignificant deleverage [was] expected for 2015 after execution of strategic transactions."

175.    The statements referenced above in ¶¶171-74 were materially false and misleading at the time they were made because Defendants misrepresented and failed to disclose that: (a) Defendants expected "significant corporate cash generation" only because they were improperly inflating Abengoa's cash flow by: (i) rejecting supplier invoices in order to intentionally delay payment; (ii) refusing to pay contractors; and (iii) pocketing funds that should have been paid out to legitimate subcontractors, thereby increasing the Company's reported cash position, and such misconduct had not legitimately "reinforced" or "de-risked" Abengoa's "free cash flow generation profile"; (b) the Company obtained lines of credit utilizing inflated financial reports that overstated the value of certain projects, by showing false percentages of completion on some projects and failing to show that some projects were over-budget; (c) Abengoa falsified financial information in order to make the Company's financial condition appear more favorable than it actually was, and maintained separate sets of books for its external auditor and for internal use; and (d) as a result of the foregoing, Defendants misled the market about Abengoa's liquidity and cash flow, and, in turn, about the likelihood of, and need for, future capital raises by the Company. Consequently, Abengoa had not achieved its "liquidity reinforcement plan" or "protect[ed]" its

- 60 -

**Supp. App. 60**

"credit profile," and Defendants had no reasonable basis to state that they had "de-risked" Abengoa's "business model."

**Abengoa Borrows Shares From Its Majority Shareholder**

176.    Despite Defendants' repeated assurances that the Company's liquidity position and cash flow generation were more than adequate, the Company entered into several transactions beginning in May 2015 to address what was quickly becoming a reality to Defendants – their efforts to manipulate the Company's financial results and cash flow were no longer enough to keep Abenoa afloat, and the Company desperately needed cash.

177.    On May 8, 2015, Abengoa borrowed 95 million Class B shares from its majority shareholder, Inversión Corporativa IC, S.A. ("Inversión"), equal to **10%** of its total outstanding stock and worth approximately **€275 million**.

178.    On the **very same day** that Abengoa borrowed the Class B shares from Inversión, the Company agreed to subscribe to 51% of a $670 million capital increase announced by Abengoa Yield, designed to fund the acquisition of four solar power assets owned by Abengoa.

179.    Analysts questioned the timing of these two contemporaneous transactions executed by the Company.  For example, in a July 2015 research note, Berenberg's fixed income sales and trading desk stated that, "while there is no confirmation that the shares were indeed used to get access to funding," if that were the case, "it would be very surprising and worrying at the same time."  Berenberg also noted that the share borrow raised "questions [about the] excess liquidity" of the Company.

**First Quarter of 2015 Financial Results**

180.    On May 14, 2015, Abengoa issued a press release announcing its financial results for the quarter ended March 31, 2015, which was filed with the SEC on Form 6-K.  The Company reported that EBITDA had risen 22% year-over-year, to €321 million.  With respect to Abengoa's

- 61 -

leverage, the press release stated that the Company's "adjusted corporate net debt to corporate EBITDA ratio (Adjusted Corporate Leverage Ratio) as of March 31, 2015 was 1.5x, a 1.0x reduction versus March 31, 2014, on track for full year 2015 target of 1.2x." In addition, Abengoa reduced its 2015 consolidated EBITDA guidance to a range of €1,330 million to €1,380 million, in light of the Company's agreement "to sell a third asset package" to Abengoa Yield, while reaffirming its 2015 guidance of: (1) a corporate net debt to corporate EBITDA ratio of 1.2x; (2) a corporate net debt ratio of 3.2x; (3) a consolidated net leverage ratio of 3.9x; and (4) corporate free cash flow after asset rotations of approximately €1,400 million. Commenting on the Company's financial results, Defendant Sánchez Ortega stated, in pertinent part:

> In terms of strategy, *we have completed a crucial transformation of Abengoa's business model*. . . .

181.    The same day, Abengoa filed with the SEC a separate Form 6-K reporting the Company's financial results for the Quarter ended March 31, 2015 (the "1Q15 Form 6-K"). The 1Q15 Form 6-K included Abengoa's Consolidated Condensed Interim Financial Statements for the First Quarter of 2015, filed with the CNMV on May 14, 2015, which discussed the Company's liquidity position, pertinent part, as follows:

> *Abengoa's financing and liquidity objectives are to ensure that the company has sufficient funds available on an ongoing basis to honor all upcoming financial commitments and obligations*.

182.    The 1Q15 Form 6-K also reported the Company's Corporate Net Finance Debt to Consolidated EBITDA ratio, in pertinent part, as follows:

> To ensure that the Company has sufficient funds to repay the debt with respect to its capacity to generate cash flow, Abengoa has to comply with a financial ratio (Net Financial Debt/Corporate EBITDA) with the financial institutions.
>
> According to the financing agreements the maximum limit of this ratio is 2.5 starting December 31, 2014. *As of March 31, 2015, Corporate Net Debt/EBITDA financial ratio is 2*. . . .

- 62 -

183.  Also on May 14, 2015, Defendants held a conference call with analysts and investors, during which Defendant Garcia Alvear provided reassurances about the Company's liquidity position, stating in pertinent part, as follows:

> . . . *[C]orporate liquidity . . . stands at EUR3.022 billion as at March 31, 2015. . . . Thus the Company can access quite readily to accompany the needs of the business.*
>
> \*       \*       \*
>
> *During 2015, management has decided to put a strong focus on the enhancement of our liquidity position, and to keep on reinforcing our balance sheet.*
>
> \*       \*       \*
>
> Let me remind you that we have the ability of another EUR400 million of undrawn working capital line facilities, an extra cushion that leaves us *in a very comfortable position to face the needs of the operation of our business and our strategic commitments.* Given the current corporate liquidity available of EUR3 billion on the total estimated liquidity sources of EUR4.3 billion, *we feel we're in a very comfortable position to face and fulfill our commitments for the future. . . .*

184.  Additionally, Defendant Sánchez Ortega commented on the Company's capital structure, in pertinent part, as follows:

> From the financial point of view, *we continue to make progress on improving our capital structure and leverage position. . . .*
>
> \*       \*       \*
>
> . . . *And we believe that now we have the adequate structure to be able to grow without penalizing the balance sheet of the Company, on the contrary, with contribution on the cash flow generation of the Company, every time we continue growing. . . .*

185.  The statements referenced above in ¶¶180-84 were materially false and misleading at the time they were made because Defendants misrepresented and failed to disclose that they had not "completed a crucial transformation of Abengoa's business model" or made "progress on improving [the Company's] capital structure and leverage position, but instead were: (a) improperly inflating Abengoa's cash flow by: (i) rejecting supplier invoices in order to

- 63 -

intentionally delay payment; (ii) refusing to pay contractors; and (iii) pocketing funds that should have been paid out to legitimate subcontractors, thereby increasing the Company's reported cash position; (b) obtaining lines of credit utilizing inflated financial reports that overstated the value of certain projects, by showing false percentages of completion on some projects and failing to show that some projects were over-budget; (c) falsifying financial information in order to make the Company's financial condition appear more favorable than it actually was, and maintaining separate sets of books for its external auditor and for internal use; and (d) as a result of the foregoing, Defendants misled the market about Abengoa's liquidity and cash flow, and, in turn, about the likelihood of, and need for, future capital raises by the Company. Consequently, Abengoa was not in a "very comfortable position" to face its financial commitments, or to "grow without penalizing the balance sheet," and the Company did not have "sufficient funds available" to "honor all upcoming financial commitments" absent substantial measures to raise capital.

**Abengoa Takes Out a Margin Loan**

186. On June 29, 2015, Abengoa entered into yet another transaction for the reason that – unbeknownst to investors – the Company needed to raise money immediately. That day, Abengoa filed a Schedule 13D with the SEC stating its subsidiary, Abengoa Concessions Investment Limited ("ACIL"), had entered into a margin loan facility agreement with a financial institution pursuant to which ACIL was permitted to borrow up to *$200 million*.

187. As collateral for the loan, Abengoa posted a 14% stake in Abengoa Yield which, according to reports, was worth approximately *$450 million* at the time.

188. Through this transaction, the Company created for itself another makeshift alternative source of liquidity.

- 64 -

**Abengoa Sells All of Its Treasury Stock**

189.    On July 16, 2015, Abengoa made yet another move indicative of a company that badly needed cash, when it filed a Form 6-K announcing that it had raised €97.6 million from the sale of *all* of its Class B shares in treasury stock at a price of €2.80 per share.

190.    The Company's sale of its treasury stock raised suspicions among analysts and investors.  For example, a July 17, 2015 *Reuters* article entitled "Abengoa's Liquidity Questioned After Treasury Shares Sale" quoted an investor as stating that the transaction "suggests that they really need hard cash."

191.    A July 17, 2015 BPI analyst report expressed confusion regarding the transaction in light of Abengoa's purportedly adequate liquidity, stating that the "rationale behind" the transaction was "not clear," since "*[a]lthough* . . . *this should allow a slight reduction of* . . . *net debt* . . . *and a reinforcement of liquidity, we don't see the need to do it now* . . . ."

192.    Defendants, however, continued to mislead investors regarding Abengoa's true financial state, attributing the impetus for the sale to support for hedging requirements on convertible bonds that was no longer needed, and denied that there was a connection between the sale of the treasury stock and the immediate need for cash.

**July 23, 2015 Announcements**

193.    On July 23, 2015, Defendants held a conference call with analysts and investors to discuss the Company's preliminary results for the first half of 2015, during which they reaffirmed the Company's 2015 free cash flow guidance.  The corresponding presentation slides were filed with the SEC on Form 6-K the same day.  According to the presentation slides, Abengoa expected EBITDA to grow 9% year-over-year, to between €640 million and €660 million.   In the presentation, Defendants represented that "*[d]ecreasing our cost of debt is a key priority for the [C]ompany*," which would be facilitated by Abengoa's "*[r]ecent credit upgrade by S&P[.]*"

- 65 -

**Supp. App. 65**

**First Half of 2015 Financial Results**

194.     On Friday, July 31, 2015, Abengoa issued a press release announcing its financial results for the six months ended June 30, 2015, which was filed with the SEC on Form 6-K.  The Company reported purportedly "*[s]trong business performance*," driven by "healthy growth in EBITDA" of 9% year-over-year, or €650 million.  With respect to Abengoa's leverage, the press release stated that the Company's "corporate net debt to corporate EBITDA ratio (Corporate Leverage Ratio) as of June 30, 2015 was 2.5x, a 0.1x reduction versus March 31, 2015."

195.     The statements referenced above in ¶¶194 were materially false and misleading at the time they were made because Defendants misrepresented and failed to disclose that: (a) Defendants were improperly inflating Abengoa's cash flow by: (i) rejecting supplier invoices in order to intentionally delay payment; (ii) refusing to pay contractors; and (iii) pocketing funds that should have been paid out to legitimate subcontractors, thereby increasing the Company's reported cash position; (b) the Company obtained lines of credit utilizing inflated financial reports that overstated the value of certain projects, by showing false percentages of completion on some projects and failing to show that some projects were over-budget; (c) Abengoa falsified financial information in order to make the Company's financial condition appear more favorable than it actually was, and maintained separate sets of books for its external auditor and for internal use; (d) Abengoa's "recent credit upgrade from S&P" had been obtained only by concealing the foregoing misconduct; (e) Defendants were actively planning to raise capital in an effort to stave off Abengoa's collapse; and (f) as a result of the foregoing, Defendants misled the market about Abengoa's liquidity and cash flow, and, in turn, about the likelihood of, and need for, future capital raises by the Company.  Consequently, Defendants had no reasonable basis to characterize Abengoa's business performance as "strong."

- 66 -

**Supp. App. 66**

196.    Later that day, Defendants held a conference call with analysts and investors to discuss the Company's results for the first half of 2015.  During call, Defendants *finally* began to reveal the dire financial situation that the Company was facing, but continued to misrepresent the Company's plans to access the capital markets for additional financing.  Specifically, Defendant Seage disclosed that the Company was drastically reducing its corporate free cash flow guidance, stating in pertinent part, as follows:

> Free cash flow, as we have seen before, we have decided to take a more conservative view after analyzing first half results and after updating our forecasts regarding the second part of the year.  That is the reason why *we are moving guidance from EUR1.4 billion to a range between EUR600 million and EUR800 million*.  This we believe is a good number for Abengoa.  But, *we understand that, clearly, this is a number far away from the guidance we provided before*.

197.    Defendants further announced the Company's plan to divest *€400 million* worth of assets.

198.    Although Defendants had finally been forced to acknowledge that Abengoa's financial condition and cash flow were worse than previously disclosed, they continued to misrepresent both the severity of the Company's liquidity problems and their plans going forward. After borrowing a massive amount of shares from Inversión, taking out a $200 million margin loan pursuant to which it posted a 14% stake in Abengoa Yield as collateral, and selling *all* of its treasury stock, Defendants *still* told investors that Abengoa was in an adequate position with respect to its liquidity.

199.    In particular, Defendant Garcia Alvear gave a detailed presentation on the Company's liquidity position during the call, which included a "potential downside scenario," stating, in pertinent part, as follows:

> Taking into the account the liquidity that we went through before and including the monetized of the treasury stock, we will end with an expect liquidity of EUR1,865 million.  In the right side, *we have run a potential downside scenario*, arriving to the same conclusions.  With this estimation for the second semester, we meet our

- 67 -

guidance for operating cash flow generation, reaching between EUR480 million and EUR530 million for the full year – sorry, for this, in 2016, there is no significant debt maturities other than remaining EUR125 million of the high yield of 2016 and with a cash flow generation that we're expecting, *even under conservative scenario . . . we expect to maintain even higher level of liquidity*.

\* \* \*

*Given the current liquidity position and the options we have reviewed with you to access additional liquidity, we believe we are in a comfortable position to face the future maturities of our corporate debt*. . . .

200.    In addition, Defendant Seage stated that Defendants were "***being prudent managers of liquidity***."

201.    In response to a question from an analyst about the "downside liquidity scenario," Defendant Seage provided the following reassurances:

*Regarding the downside scenario* . . . I don't think we have ever provided a liquidity analysis in a presentation. So, this has been something new for all of us. And the investment bankers have told [us] that this is about putting *very negative scenarios we believe are impossible. So, this is what we have put in front of you, scenarios that we believe are very unlikely*.

202.    Also during the call, Defendants were asked directly by analysts whether the Company was adequately funded, or whether any additional capital was necessary to support the business, and Defendant Seage responded, in pertinent part, as follows:

Pinaki Das – BofA Merrill Lynch – Analyst:

. . . So, can you tell us, for H2, what are your funding needs? *The one thing that the market has been worried about when you have recently issued some of the loans or even sold your treasury shares that you need to fund the business.*

*So, can you tell us, for H2, will you come back to the market?* Is there – what are your funding needs? Is it zero, or do you need – I don't know – EUR500 million to invest in new CapEx? I don't have a problem with investing in CapEx. I think it's fine. But, if you have a need, is it possible for you to make it clear to the market that, on a consolidated level, this is the amount of CapEx we need to spend, and this is how we'll fund it. We might come back to the market for an -- I don't know – bond issuance or – I don't know – we'll sell more assets or maybe go for bank funding. So, that's for H2, H2 2015. Is there any funding? Do you need to come back for anything else?

- 68 -

Defendant Seage:

So, in H2, ***there is no need to fund anything***. . . . Ignacio [Garcia Alvear] showed you on a scenario, a liquidity analysis, as he called it, where you can see that ***we not – don't need to access the market for anything***.  The way we finance our consolidated CapEx, as you know, mostly is through nonrecourse debt and, in second place, with partners. . . . [W]e have taken into account the equity we need to invest ourselves.  As you can see here, ***there's no need to access the market for any reason***.

*      *      *

John Quealy – Cannacord Genuity – Analyst:

Given the concerns in the equity and debt markets, even though you said there's nothing planned on corporate market injections in the Company in 2015, is it worthwhile putting an equity injection or something into this to just give a margin of safety to the marketplace, given your end market seems fairly demand – fairly strong, and your position in it is strong as well.  It's just a scrutiny around this business model.  I can't see you guys slowing down project development, quite frankly.  So, would you care to comment on that comment?  Thank you.

Defendant Seage:

. . . Going to your second part of the question, ***at this point in time, the Company has no plan to do what you were suggesting, to tap the capital markets in any manner***.

203.    The statements referenced above in ¶¶199-202 were materially false and misleading at the time they were made because Defendants misrepresented and failed to disclose that: (a) Abengoa's liquidity situation was far worse than disclosed, and thus the Company was not in "a comfortable position to face the future maturities of [its] corporate debt," Defendants had no reasonable basis to "expect to maintain even higher levels of liquidity, Defendants were not "being prudent managers of liquidity," and their "downside" liquidity scenario was far from "impossible"; and (b) Defendants were actively planning to raise capital in an effort to stave off Abengoa's collapse.

204.    Despite Defendants' adamant reassurances during the July 31 conference call that Abengoa's liquidity was sufficient and that the Company had "***no plan . . . to tap the capital***

- 69 -

*markets in any manner*," on **the very next business day**, Defendants stunned the market when they announced that Abengoa would do just that.

205.    Before the markets opened on Monday, August 3, 2015, Abengoa issued a press release and filed a Form 6-K filed with the SEC announcing that the Company would hold an extraordinary shareholders meeting to seek approval of: (1) a massive capital increase with pre-emptive rights of **€650 million** ($713 million); and (2) asset divestitures totaling €500 million – €100 million more than announced on July 31 – plus "additional divestitures of bioenergy assets." According to the Company, these admittedly "significant actions" were necessary to "reduce corporate debt" and "reinforce [Abengoa's] balance sheet."

206.    According to a Sabadell analyst report dated August 3, 2015, the planned €650 million capital increase represented **34%** of Abengoa's market capitalization at the time it was announced.

207.    Analysts and investors were stunned by the Company's announcement, and interpreted Defendants' sudden reversal regarding Abengoa's need to raise capital as an indication that the Company's liquidity position was not, in fact, "comfortable."

208.    For example, an August 3, 2015, Cannacord Genuity analyst report stated that "Monday's . . . announcements **caught the market by surprise, triggering renewed fears over liquidity**."

209.    A Citi analyst report issued on August 4, 2015 noted that Defendants "**expressly stated on the call** that the company would not need to come back to the markets (equity and credit) this year, and **that liquidity was 'comfortable'** . . . [but] **then announced a material rights issue** . . . **on the next trading day** . . . ."  The Citi report concluded that the reversal "**inevitably raises the question as to why the rights issue should be necessary if there is not a liquidity situation**."

- 70 -

210.    An August 3, 2015 *Bloomberg* article similarly noted that the Company's announcements that day, following on the heels of the July 31, 2015 announcement lowering Abengoa's 2015 free cash flow guidance, had "***eroded trust in Abengoa's accounting methods and ability to generate sufficient cash to service its debt***."

211.    In response to the revelation that Abengoa's liquidity position was so precarious, and its financial condition so poor, that the Company needed to immediately raise capital – just one business day after Defendants had publicly stated that the Company had "no plans" to do so – the price of Abengoa's ADS plummeted nearly 30%, from a closing price of $11.06 per share on July 31, 2015, to close at $7.75 per share on August 3, 2015.  The price of Abengoa's ADSs fell an additional $1.75 per share on the following trading day, as the market digested the Company's announcements, closing at $6.00 per share on August 4, 2015 – a total decline of more than 45%. In total, the Company lost ***$8.1 billion*** in market capitalization and approximately ***$837 million*** in ADS market share over the course of two trading days.

212.    Investors' fears about Abengoa's liquidity position were confirmed on November 25, 2015, when Defendants announced that Abengoa was filing for preliminary creditor protection under the Spanish Insolvency Law.

### Post-Class Period Events

213.    On November 8, 2015, Abengoa announced that Spanish investment firm Gonvarri Corporación Financiera ("Gonvarri") had agreed to invest approximately €350 million in connection with Abengoa's planned €650 million capital increase, and would thereafter become the majority shareholder of the Company, in an agreement that was contingent upon "the signing of a substantial package of financial support . . . by a group of financial institutions."

- 71 -

214. However, on November 25, 2015, the Company announced that Gonvarri had cancelled the agreement and as a result, Abengoa was filing for preliminary creditor protection under the Spanish Insolvency Law, which provided a four month window (until March 28, 2016) for the Company to seek to avoid bankruptcy by reaching an agreement with its creditors.

215. At the time of the filing, Abengoa reported gross financial debt of €8.9 billion. In addition, analysts estimated that the Company had approximately €2.1 billion in "confirming lines" (*i.e.*, funds owed to suppliers) and €5.9 billion of debt held by subsidiaries, bringing its total debt to €16.9 billion.

216. Shortly thereafter, on November 27, 2015, Defendant Seage resigned from the Company.

217. On March 1, 2016, Abengoa disclosed that the Company had lost €1.2 billion in 2015 and its gross financial debt had risen to €9.4 billion.

218. On March 10, 2016, Abengoa announced that it had reached a preliminary debt-restructuring agreement, pending approval by creditors holding at least 75% of the Company's debt. Under the restructuring plan, Abengoa's creditors would take control of at least 90% of the Company, while existing shareholders would be left with only a 5% stake. The plan provided that Abengoa would shed noncore assets and emerge as a smaller company focused on engineering and construction, with €4.9 billion in debt.

219. On March 28, 2016, Abengoa filed for bankruptcy protection in the United States Bankruptcy Court for the District of Delaware (the "Delaware Bankruptcy Court") under Chapter 15 of the U.S. Bankruptcy Code.

220. On April 6, 2016, the Mercantile Court of Seville nº 2 (the "Spanish Bankruptcy Court") approved a "standstill" agreement between Abengoa and its creditors granting the

- 72 -

**Supp. App. 72**

Company an additional seven months (until October 28, 2016) to restructure. The same day, Abengoa filed a Form 6-K announcing that it would "immediately" commence proceedings to delist the Company's ADSs from the NASDAQ and deregister its Class B shares with the SEC.

221.    The Delaware Bankruptcy Court granted recognition of the Spanish bankruptcy action as a "foreign main" (*i.e.*, controlling) proceeding, pursuant to 11 U.S.C. §1517, on April 27, 2016. The Delaware Bankruptcy Court's decision gave effect in the U.S. to the seven month standstill agreement, and meant that Abengoa would receive the protections of the automatic stay under Chapter 11 of the U.S. Bankruptcy Code. The next day, Abengoa's ADSs and Class B shares were delisted from the NASDAQ.

222.    In addition, between February 24, 2016 and April 7, 2016, dozens of Abengoa's U.S.-based affiliates filed for Chapter 11 bankruptcy protection in Missouri, Kansas and Delaware.

### Additional Scienter Allegations

223.    As alleged herein, Defendants acted with scienter in that Defendants knew, or recklessly disregarded, that the public documents and statements they issued or disseminated in the name of the Company or in their own name during the Class Period were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. Defendants, by virtue of their receipt of information reflecting the true facts regarding Abengoa, their control over, and/or receipt and/or modification of Abengoa's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Abengoa, were active and culpable participants in the fraudulent scheme alleged herein.

- 73 -

224.     Defendants knew and/or recklessly disregarded the falsity and misleading nature of the information which they caused to be disseminated to the investing public. The fraudulent scheme described herein could not have been perpetrated during the Class Period without the knowledge and complicity or, at least, the reckless disregard of the personnel at the highest levels of the Company, including each of the Defendants.

225.     Defendants, because of their positions with Abengoa, controlled the contents of the Company's public statements during the Class Period. Defendants were provided with or had access to copies of the documents alleged herein to be false and/or misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information, Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public and that the positive representations that were being made were false and misleading. As a result, each of the Defendants is responsible for the accuracy of Abengoa's corporate statements and is therefore responsible and liable for the misrepresentations contained therein.

226.     According to FE1, Abengoa's senior executives in Spain closely monitored every aspect of the business at the Company's various subsidiaries. For example, FE1 stated that Abengoa senior executives, including Defendants, held weekly conference calls on Wednesday mornings between 4:00 am and 5:00 am with all of the senior executives and financial teams at the Company's subsidiaries.

227.     In addition to the accounts of former employees, each of whom had first-hand knowledge about Abengoa's business, the following facts further contribute to a strong inference that Defendants acted with scienter:

- 74 -

228.     On May 19, 2015, Abengoa announced that Defendant Sánchez Ortega was resigning from his position as CEO, effective immediately.  According to the Company, Defendant Sánchez Ortega was stepping down as CEO for "strictly personal reasons," but would continue as non-executive First Vice Chairman of Abengoa and would be joining Abengoa's International Advisory Board.

229.     In an analyst report issued the same day, Cannacord Genuity noted that it was "surprised by the timing" of Defendant Sánchez Ortega's resignation from the Company, which had only recently implemented its Abengoa 3.0 business model.  In fact, Defendant Sánchez Ortega had hosted a conference call with analysts and investors just five days earlier, on May 14, 2015, during which he had not given any indication that his tenure as CEO was about to come to an immediate end.

230.     In a May 20, 2015 interview with the Spanish newspaper *Expansión*, Defendant Sánchez Ortega explained that he was leaving Abengoa for personal and health reasons, after undergoing heart surgery in 2012.

231.     According to *Expansión*, Defendant Sánchez Ortega stated his desire to live a quieter life after many years in an executive position.  He told *Expansión* that he would now "have time to calmly take a coffee . . . or better, a few beers."  Similarly, a May 27, 2015 Santander analyst report noted that Defendant Sánchez Ortega resigned from Abengoa "due to health and personal reasons."

232.     Despite resigning for ostensibly personal reasons, on July 6, 2015 – a mere **six weeks** after stepping down as Abengoa's CEO – Defendant Sánchez Ortega joined one of the world's largest asset managers, U.S.-based BlackRock, Inc. ("BlackRock"), as the Head of Strategic Development for its Latin American Infrastructure Investment Group.

- 75 -

**Supp. App. 75**

233.     Shortly after **Defendant Sánchez Ortega** joined BlackRock **armed with the inside knowledge** that Abengoa, *inter alia*, faced a major liquidity crisis, two Blackrock subsidiaries, BlackRock Institutional Trust Company, N.A and BlackRock Investment Management (UK) Ltd., **began amassing large short positions** against Abengoa.  For example, according to information obtained from the CNMV's website, on July 23, 2015, while Defendant Sánchez Ortega was still a member of Abengoa's Board of Directors – and thus had access to material non-public information about the Company – BlackRock Institutional Trust Company, N.A. took a short position equal to .510% of Abengoa's equity.

234.     Defendant Sánchez Ortega remained on Abengoa's Board of Directors until July 27, 2015 – three weeks **after** joining BlackRock.

235.     Despite announcing on July 27, 2015 that Defendant Sánchez Ortega had resigned from Abengoa's Board of Directors, the Company stated that Defendant Sánchez Ortega would remain on the Company's International Advisory Board, serving as its Vice-Chairman.  This ensured that Defendant Sánchez Ortega's connection to the Company – and his access to material non-public information – would continue.

236.     According to data obtained from the CNMV, BlackRock Investment Management (UK) Ltd. increased its short position in Abengoa on August 6, 2015 and August 11, 2015.  The total short position across both BlackRock Institutional Trust Company, N.A and BlackRock Investment Management (UK) Ltd grew as high as 1.28% of Abengoa's equity by August 11, 2015.

237.     Sánchez Ortega is currently a defendant in a lawsuit pending in Spain's National Court filed by Abengoa bondholders alleging, *inter alia*, that he committed insider trading in connection with the short positions taken by BlackRock immediately following his arrival.  The

**Supp. App. 76**

lawsuit also alleges claims arising from the exorbitant compensation he received – a €4.48 million severance payment upon leaving the Company and €8.4 million in total compensation during 2015 – as Abengoa was concealing its true cash position and headed toward creditor protection.

238.    On December 18, 2015, the Spanish National Court said that it would investigate the claims and ordered Defendant Sánchez Ortega to post a €4.5 million bond.  The Court also requested that the CNMV provide information on BlackRock's transactions in Abengoa beginning on August 1, 2015.

239.    Defendant Sánchez Ortega's sudden resignation, only to join BlackRock shortly thereafter, which then amassed a large short position in Abengoa, supports the inference that Defendant Sánchez Ortega knew that Abengoa's true financial condition and liquidity situation were worse than publicly disclosed – and sought to capitalize on his nonpublic information.

240.    Defendant Sánchez Ortega was not the only high ranking official of Abengoa to resign during the Class Period before the truth about the Company's dire financial condition emerged.

241.    On January 19, 2015, Defendant Zubiría suddenly resigned from her position as Executive Vice President of Investor Relations and Capital Markets.  According to a Form 6-K filed by the Company on January 20, 2015, Defendant Zubiría left "to begin a new professional adventure as financial director of a company in a different sector."

242.    The unexpected and immediate resignations of two of Abengoa's most senior executives, at a time when Defendants were concealing the true extent of Abengoa's liquidity issues, provides additional circumstantial evidence of scienter.

243.     Additionally, on November 27, 2015, the Company announced that Defendant Seage had stepped down from his position of CEO, effective immediately, after just six months on the job.

244.     As set forth above, Defendants were motivated to misrepresent Abengoa's liquidity by: (1) categorizing a portion of recourse its debt as "non-recourse debt," even though such debt was guaranteed by Abengoa; and (2) failing to characterize as debt funds the Company owed to banks for supplier payments.  The foregoing conduct enabled Abengoa to exclude as much as €2.2 billion in debt and €1.4 billion in supplier payments, respectively, from the Company's corporate leverage ratio, and thereby report a more favorable ratio and avoid breaching debt covenants with its lenders.  The various bank loans containing a debt ratio covenant collectively permitted Abengoa to borrow nearly *€4 billion* during the Class Period.

245.     Defendants' fraudulent conduct likewise enabled Abengoa to maintain a higher credit rating, which allowed the Company to obtain critical financing on more favorable terms during the Class Period.

### Loss Causation/Economic Loss

246.     During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Abengoa ADSs and operated as a fraud or deceit on Class Period purchasers of Abengoa ADSs by failing to disclose and misrepresenting the adverse facts detailed herein.  When Defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the price of Abengoa ADSs fell precipitously as the prior artificial inflation dissipated.  As a result of their purchases of Abengoa ADSs during the Class Period, Plaintiffs and the other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws.

247.    By failing to disclose to investors the adverse facts detailed herein, Defendants presented a misleading picture of Abengoa's business and prospects.    Defendants' false and misleading statements and omissions had the intended effect and caused Abengoa ADSs to trade at artificially inflated levels throughout the Class Period, reaching as high as $29.14 per share on September 4, 2014, before falling to $6.00 per share on August 4, 2015 – a decline of 79%.

248.    Under questioning from analysts during the Company's November 14, 2014 conference call, Defendants were forced to reveal Abengoa had excluded the Greenfield Bonds from the Company's leverage ratios, in order to report more favorable ratios.    In response to this revelation and concerns that the Company's lack of credibility could harm its borrowing ability, the price of Abengoa ADSs fell nearly 50% over the next three trading days, on heavy trading volume, as the market digested the adverse announcements – falling from a closing price of $17.59 per ADS on November 11, 2014, to close at $8.83 per ADS on November 14, 2014.

249.    During a follow-up conference call on November 17, 2014, Defendants further revealed that Abengoa had classified debt totaling debt totaling nearly €1.6 billion, plus approximately €1 billion owed to suppliers, from the Company's leverage ratios.    Defendants false and misleading reassurances during the call about the Company's liquidity and financial condition, however, prevented a further decline in Abengoa's stock price.

250.    Thereafter, Defendants continued to conceal their misconduct, while assuring investors that Abengoa was "in a very comfortable position to face" its operational needs and "financial commitments."    Defendants thus misled the market about Abengoa's financial condition, liquidity and cash flow, and, in turn, about the likelihood of, and need for, future capital raises by the Company.

- 79 -

251.    Ultimately, Defendants' misconduct was not enough to prop up the Company, and on July 31, 2015, they were forced to slash Abengoa's free cash flow guidance and announce plans to divest €400 million worth of assets.  Although Defendants had finally begun to acknowledge that Abengoa's financial condition was worse than previously disclosed, they continued to misrepresent both the severity of the Company's liquidity problems and their plans going forward. In response to questions from analysts about whether Abengoa would need to "come back to the market" to raise capital, Defendants steadfastly denied that possibility, stating that "at this point in time, the Company has no plan . . . to tap the capital markets in any manner" and  "there's no need to access the market for any reason."

252.    On Monday, August 3, 2015 – the very next business day – however, Defendants stunned the market by announcing plans for: (1) a capital increase of €650 million; (2) asset divestitures totaling €500 million (€100 million more than announced on July 31) and (3) "additional divestitures of bioenergy assets."  According to the Company, these admittedly "significant actions" were necessary to "reduce corporate debt" and "reinforce [Abengoa's] balance sheet."  Analysts and investors interpreted Defendants' sudden reversal regarding Abengoa's need to raise capital as an indication that the Company's liquidity position was not, in fact, "very comfortable."

253.    In response to the revelation that Abengoa's liquidity position was so precarious that the Company needed to immediately raise capital – just one business day after Defendants had publicly stated that the Company had "no plans" to do so – the price of Abengoa's ADS plummeted nearly 30%, from a closing price of $11.06 per share on July 31, 2015, to close at $7.75 per share on August 3, 2015.  The price of Abengoa's ADSs fell an additional $1.75 per share on the following trading day, as the market digested the Company's announcements, closing at $6.00 per

share on August 4, 2015 – a total decline of more than 45%. In total, the Company lost $8.1 billion in market capitalization and approximately $837 million in ADS market share over the course of two trading days.

254. The precipitous decline in the price of Abengoa ADSs was a direct result of the nature and extent of Defendants' fraud finally being revealed to investors and the market. The timing and magnitude of the decline in the price of Abengoa ADSs negates any inference that the loss suffered by Plaintiffs and the other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to Defendants' fraudulent conduct. The economic loss, *i.e.*, damages, suffered by Plaintiffs and the other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the price of Abengoa ADSs and the subsequent significant decline in the value of Abengoa ADSs when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

**Applicability of Presumption of Reliance:**
**Fraud on the Market Doctrine**
**and *Affiliated Ute* Doctrine**

255. Plaintiffs will rely upon the presumption of reliance established by the fraud on the market doctrine in that, among other things:

(a) Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b) the omissions and misrepresentations were material;

(c) the Company's ADSs traded in an efficient market;

(d) the misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's ADSs; and

(e)     Plaintiffs and the other members of the Class purchased Abengoa ADSs between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

256.    At all relevant times, the market for Abengoa ADSs was an efficient market for the following reasons, among others:

(a)     Abengoa ADSs met the requirements for listing, and were listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b)     as a regulated issuer, Abengoa filed periodic public reports with the SEC and the NASDAQ;

(c)     Abengoa regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)     Abengoa was followed by securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

257.    As a result of the foregoing, the market for Abengoa ADSs promptly digested current information regarding Abengoa from all publicly available sources and reflected such information in the prices of Abengoa's ADSs. Under these circumstances, all purchasers of Abengoa ADSs during the Class Period suffered similar injury through their purchase of Abengoa ADSs at artificially inflated prices and a presumption of reliance applies.

258. A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. U.S.*, 406 U.S. 128 (1972), because the Class' claims are grounded on Defendants' material omissions. Because this action involves Defendants' failure to disclose material adverse information regarding Abengoa's business operations and financial prospects – information that Defendants were obligated to disclose – positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.

259. Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here, and, therefore, *Affiliated Ute* provides a separate, distinct basis for finding the applicability of a presumption of reliance.

**No Safe Harbor**

260. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the false statements alleged herein. Many of the statements alleged were not identified as "forward-looking" when made, and, to the extent any statements were forward-looking, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor applies to any forward-looking statements alleged, Defendants are liable for such statements because, at the time they were made, the speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Abengoa who knew that those statements were false when made.

- 83 -

## COUNT III

### Violation of Section 10(b) of the Exchange Act
### and Rule 10b-5 Promulgated Thereunder
### Against the Exchange Act Defendants

261.    Plaintiffs incorporate herein ¶¶1-39 and ¶¶64-260 by reference.

262.    During the Class Period, the Exchange Act Defendants disseminated or approved the materially false and misleading statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

263.    The Exchange Act Defendants violated §10(b) of the 1934 Act, 15 U.S.C. §78j(b), and Rule 10b-5, 17 C.F.R. §240.10b-5, in that they: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's ADSs during the Class Period.

264.    Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Abengoa ADSs.  Plaintiffs and the Class would not have purchased Abengoa ADSs at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by the Exchange Act Defendants' misleading statements and/or omissions.

265.    As a direct and proximate result of the Exchange Act Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their purchases of Abengoa ADSs during the Class Period.

- 84 -

## COUNT IV

### Violation of Section 20(a) of the Exchange Act
### Against the Individual Exchange Act Defendants

266.    Plaintiffs incorporate herein ¶¶1-39 and ¶¶64-265 by reference.

267.    The Individual Exchange Act Defendants acted as controlling persons of Abengoa within the meaning of §20(a) of the Exchange Act, as alleged herein.  By reason of their high-level positions with the Company, their ownership of Abengoa ADSs, their participation in and/or awareness of the Company's operations and/or intimate knowledge of the false and materially misleading statements filed by the Company with the SEC and disseminated to the investing public, the Individual Exchange Act Defendants had the power to influence and control (and did influence and control), directly or indirectly, the decision-making of the Company, and caused Abengoa to engage in the wrongful conduct complained of herein, including the dissemination of the various statements which Plaintiffs contend are false and misleading.  The Individual Exchange Act Defendants were provided with or had access to: Company reports, press releases, public filings and other information and statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.  In particular, each of the Individual Exchange Act Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

268.    As set forth above, the Individual Exchange Act Defendants violated §10(b) and Rule 10b-5 by their acts and/or omissions as alleged in this Complaint.  Moreover, by virtue of their positions as controlling persons, the Individual Exchange Act Defendants had the power and authority to, and did, cause Abengoa to engage in the wrongful conduct alleged.  As a direct and

proximate result of the Individual Exchange Act Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's ADSs during the Class Period. By reason of such conduct, the Individual Exchange Act Defendants are liable pursuant to §20(a) of the Exchange Act.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

A.  Determining this action to be a class action properly maintained pursuant to Rule 23 of the Federal Rules of Civil Procedure, certifying Plaintiffs as Class representatives, and designating Lead Counsel as Class Counsel;

B.  Awarding compensatory damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, together with interest thereon;

C.  Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.  Awarding such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

//

//

//

//

//

//

//

- 86 -

Dated: August 2, 2016

Respectfully submitted,

LEVI & KORSINSKY LLP

/s/ Nicholas I. Porritt
Nicholas I. Porritt
Adam M. Apton
30 Broad Street, 24th Floor
New York, NY 10004
Tel: (212) 363-7500
Fax: (866) 367-6510

*Counsel for Lead Plaintiffs Jesse Sherman and
Arlette Sherman and Lead Counsel for Class*

Robert M. Rothman
Erin W. Boardman
Robert D. Gerson
ROBBINS GELLER RUDMAN & DOWD LLP
30 Vesey Street, Suite 200
New York, New York 10007
Tel: (212) 693-1058
Fax: (212) 693-7423

*Counsel for Plaintiff PAMCAH-UA Local 675
Pension Fund and Additional Counsel for Class*

4824-0056-1449, v. 1

- 87 -