# No. 22-2438

*(Docket Number in District Court: 1:15-cv-06279-ER-SLC)*

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

Jesse Sherman, Arlette Sherman,
*Lead Plaintiffs-Appellants*,

PAMCAH-UA Local 675 Pension Fund,
*Movant-Appellant*,

Michael Francisco, Individually and on Behalf of All Others Similarly Situated,
*Plaintiff*,

[Caption continued on following page.]

_____

Appeal from the United States District Court
for the Southern District of New York

## PLAINTIFFS-APPELLANTS' REPLY BRIEF

ROBBINS GELLER RUDMAN
  & DOWD LLP
ANDREW S. LOVE
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA 94104
Telephone: 415/288-4545
415/288-4534 (fax)

LEVI & KORSINSKY, LLP
NICHOLAS I. PORRITT
ADAM M. APTON
55 Broadway, 4th Floor
New York, NY 10006
Telephone: 212/363-7500
212/363-7171 (fax)

[Additional counsel appear on signature page.]

*Counsel for Lead Plaintiffs-Appellants and Movant-Appellant*

Daniel LaMoureaux, Individually and on Behalf of All Others Similarly Situated,
*Consolidated-Plaintiff*

vs.

Abengoa, S.A., Manuel Sanchez Ortega, Canaccord Genuity Inc., HSBC Securities
(USA) Inc., Merrill Lynch International, Société Générale,
*Defendants-Appellees*,

Santiago Seage, Barbara Zubiria, Ignacio Garcia Alvear, Alicia Velarde Valiente,
Banco Santander, S.A., Carlos Sundheim Losada, Christopher Hansmeyer, Claudi
Santiago Ponsa, Enrique Borrajo Lovera, Felipe Benjumea Llorente, Fernando
Solis Martinez-Campos, Ignacio Solis Guardiola, Javier Benjumea Llorente, Jesus
Garcia-Quilez Gomez, Jose B. Terceiro, Jose Borrell Fontelles, Jose Joaquin
Abaurre Llorente, Jose Luis Aya Abaurre, Maria Teresa Benjumea Llorente, Maria
Teresa Benjumea Llorente, Ricardo Martinez Rico,
*Defendants*.

# TABLE OF CONTENTS

Page

I.    ARGUMENT..................................................................................1

    A.    The Complaint Amply Pleads Abengoa's Accounting Fraud...............1

        1.    Plaintiffs' non-conclusory allegations must be accepted
              as true at the pleading stage ..........................................2

            a.    Allegations from Spanish proceedings were
                  independently corroborated by plaintiffs and,
                  considered together with other non-conclusory
                  facts, are sufficient to plead material falsity....................2

            b.    The consistent and non-conclusory allegations
                  from former employees provide sufficient support
                  to plead falsity...................................................................3

                (1)    The confidential whistleblower's
                       allegations, corroborated by other former
                       employees, are reliable ..........................................3

                (2)    Former employees provide a non-
                       conclusory, consistent picture of fraud .................6

        2.    Defendants minimize the fraud committed at two key
              Abengoa subsidiaries ................................................10

        3.    Defendants obfuscate the significance of the fraud
              prosecutions in Spain ................................................12

            a.    The acquittals of Ortega and Benjumea in a
                  completely unrelated proceeding are irrelevant .............12

            b.    The acceptance of the criminal complaints by
                  investigating judges in the two Spanish
                  proceedings demonstrates the reliability of the
                  accounting fraud allegations..........................................13

- i -

4. The Complaint adequately alleges that defendants' dual bookkeeping constitutes accounting fraud.................................18

5. The Complaint adequately alleges Abengoa's fraudulent invoice triangulation scheme ....................................................20

B. Abengoa Misled Investors by Making Materially False and Misleading Statements ..........................................................23

1. False and misleading statements about Abengoa's use of the percentage-of-completion method are not saved by purported cautionary language..................................................23

2. Abengoa misled investors by stating it did not need to access capital markets right before doing so ...........................25

C. Financial Discipline Statements, in Context, Are Not Puffery...........27

D. The Complaint Alleges a Compelling Inference of Scienter..............29

1. Rule 9(b) does not add a scienter requirement to Section 11 of the Securities Act............................................................29

2. Corporate scienter is adequately alleged ..................................30

3. The Complaint adequately alleges Ortega's scienter...............33

E. Control Person Liability for Ortega Is Adequately Alleged ..............35

F. Securities Act Claims Were Timely Filed ..........................................36

1. The Securities Act claims against the Underwriters were timely filed within the one-year limitations period .................36

2. The Complaint properly relates back to the AC under Rule 15(c)...................................................................................41

a.     The Complaint's allegations concerning
       Abengoa's lack of "strict financial discipline"
       relate back to the AC .......................................................43

b.     The Complaint's allegations concerning the
       "percentage-of-completion" method relate back to
       the AC .............................................................................44

II.    CONCLUSION .............................................................................49

# TABLE OF AUTHORITIES

Page

**CASES**

*Altimeo Asset Mgmt. v. Qihoo 360 Tech. Co.*,
19 F.4th 145 (2d Cir. 2021) ................................................................22

*Amorosa v. Gen. Elec. Co.*,
2022 WL 3577838 (S.D.N.Y. Aug. 19, 2022)........................................5

*Ark. Tchr. Ret. Sys. v. Bankrate, Inc.*,
18 F.Supp.3d 482 (S.D.N.Y. 2014) ....................................................27

*Batson v. Rim San Antonio Acquisition, LCC*,
2016 WL 6901312 (S.D.N.Y. Nov. 22, 2016)......................................26

*Caldwell v. Berlind*,
543 F. App'x 37 (2d Cir. 2013) ...........................................................47

*CBF Industria de Gusa S/A v. AMCI Holdings, Inc.*,
2020 WL 1673701 (S.D.N.Y. Apr. 6, 2020) ........................................45

*City of Brockton Ret. Sys. v. Avon Prods., Inc.*,
2014 WL 4832321 (S.D.N.Y. Sept. 29, 2014) .....................................14

*City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Techs. Corp.*,
450 F. Supp. 3d 379 (S.D.N.Y. 2020) .................................................25

*City of Pontiac Gen. Emps.' Ret. Sys. v. Lockheed Martin Corp.*,
875 F. Supp. 2d 359 (S.D.N.Y. 2012) ...........................................10, 22

*City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*,
752 F.3d 173 (2d Cir. 2014) ...............................................................29

*Constr. Laborers Pension Tr. for S. Cal. v. CBS Corp.*,
433 F. Supp. 3d 515 (S.D.N.Y. 2020) .................................................30

*Cosmas v. Hassett*,
886 F.2d 8 (2d Cir. 1989) ...................................................................34

4893-4106-7353.v1

*Davidoff v. Farina*,
  2005 WL 2030501 (S.D.N.Y. Aug. 22, 2005).......................................9

*Emps.' Ret. Sys. v. Blanford*,
  794 F.3d 297 (2d Cir. 2015) ..............................................7, 19, 21

*Fed. Hous. Fin. Agency for Nat'l Mortg. Ass'n v. Nomura Holding*
  *Am., Inc.*,
  873 F.3d 85 (2d Cir. 2017) ............................................36, 39, 40

*Gebhardt v. ConAgra Foods, Inc.*,
  335 F.3d 824 (8th Cir. 2003) ............................................22

*Gorman v. Consol. Edison Corp.*,
  488 F.3d 586 (2d Cir. 2007) ..............................................7

*Groisman v. Feler*,
  2017 WL 11690933 (E.D.N.Y. Sept. 27, 2017) ..............................7

*Gruber v. Gilbertson*,
  2021 WL 2482109 (S.D.N.Y. June 17, 2021) ...............................34

*In re Alcatel Securities Litigation*,
  382 F. Supp. 2d 513 (S.D.N.Y. 2005) ....................................46

*In re DraftKings Inc. Sec. Litig.*,
  __ F. Supp. 3d __, 2023 WL 145591 (S.D.N.Y. Jan. 10, 2023)..............6

*In re Eletrobras Sec. Litig.*,
  245 F. Supp. 3d 450 (S.D.N.Y. 2017) ...................................30

*In re Gentiva Sec. Litig.*,
  932 F. Supp. 2d 352 (E.D.N.Y. 2013) ................................13, 14

*In re iAnthus Capital Holdings, Inc. Sec. Litig.*,
  2022 WL 19037215 (S.D.N.Y. Dec. 7, 2022) .............................35

*In re Inv. Tech. Grp., Inc. Sec. Litig.*,
2018 WL 1449206 (S.D.N.Y. Mar. 23, 2018) ..................................................7

*In re Merrill Lynch Auction Rate Sec. Litig.*,
851 F. Supp. 2d 512 (S.D.N.Y. 2012), *aff'd sub nom. La. Pac.
Corp. v. Merrill Lynch & Co., Inc.*, 571 F. App'x 8 (2d Cir. 2014).................30

*In re Petrobras Sec. Litig.*,
116 F. Supp. 3d 368 (S.D.N.Y. 2015) ............................................................27

*In re Sanofi Sec. Litig.*,
87 F. Supp. 3d 510 (S.D.N.Y. 2015) ..............................................................29

*In re Suprema Specialties, Inc. Sec. Litig.*,
438 F.3d 256 (3d Cir. 2006) ............................................................................11

*In re Turquoise Hill Res. Ltd. Sec. Litig.*
__ F. Supp. 3d __, 2022 WL 4085677 (S.D.N.Y. Sept. 2, 2022)......................28

*In re Wachovia Equity Sec. Litig.*,
753 F. Supp. 2d 326 (S.D.N.Y. 2011) ............................................................11

*Ind. Elec. Workers' Pension Tr. Fund IBEW v. Shaw Grp., Inc.*,
537 F.3d 527 (5th Cir. 2008) ..........................................................................25

*Ind. Pub. Ret. Sys. v. SAIC, Inc*.,
818 F.3d 85 (2d Cir. 2016) .............................................................................26

*Jackson v. Abernathy*,
960 F.3d 94 (2d Cir. 2020) .......................................................................32, 35

*Janbay v. Canadian Solar, Inc.*,
2013 WL 1287326 (S.D.N.Y. Mar. 28, 2013) ..................................................7

*Johnson v. Holder*,
564 F.3d 95 (2d Cir. 2009) .............................................................................37

*KBC Asset Mgmt. NV v. MetLife, Inc.*,
   2022 WL 480213 (2d Cir. Feb. 17, 2022) ........................................32

*Krupski v. Costa Crociere S. p. A.*,
   560 U.S. 538 (2010)............................................................................48

*Lasker v. N.Y. State Elec. & Gas Corp.*,
   85 F.3d 55 (2d Cir. 1996) ..................................................................28

*LC Cap. Partners, LP v. Frontier Ins. Grp., Inc.*,
   318 F.3d 148 (2d Cir. 2003) .........................................................40, 41

*Lehman XS Tr., Series 2006-GP2 by U.S. Bank Nat'l Ass'n v. GreenPoint
   Mortg. Funding, Inc.*,
   916 F.3d 116 (2d Cir. 2019) ..............................................................46

*Lipow v. Net1 UEPS Techs., Inc.*,
   131 F. Supp. 3d 144 (S.D.N.Y. 2015) ...............................................14

*Litwin v. Blackstone Grp., L.P.*,
   634 F.3d 706 (2d Cir. 2011) ..............................................................11

*Long Miao v. Fanhua, Inc.*,
   442 F. Supp. 3d 774 (S.D.N.Y. 2020) .................................................6

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*,
   797 F.3d 160 (2d Cir. 2015) ...........................................3, 5, 32, 43

*Makor Issues & Rights, Ltd. v. Tellabs Inc.*,
   513 F.3d 702 (7th Cir. 2008) .............................................................26

*Merck & Co. v. Reynolds*,
   559 U.S. 633 (2010).............................................................36, 40, 41

*Novak v. Kasaks*,
   216 F.3d 300 (2d Cir. 2000) ...............................................................7

*Panther Partners Inc. v. Ikanos Commc'ns, Inc.*,
  681 F.3d 114 (2d Cir. 2012) ................................................................29

*Pehlivanian v. China Gerui Advanced Materials Grp., Ltd.*,
  153 F. Supp. 3d 628 (S.D.N.Y. 2015) ..................................................28

*Peifa Xu v. Gridsum Holding Inc.*,
  2021 WL 773002 (S.D.N.Y. Feb. 23, 2021) ........................................47

*Plumbers & Pipefitters Loc. Union No. 630 Pension-Annuity Tr. Fund
  v. Arbitron Inc.*,
  741 F. Supp. 2d 474 (S.D.N.Y. 2010) ..................................................30

*Rombach v. Chang*,
  355 F.3d 164 (2d Cir. 2004) ..........................................................29, 30

*Schiro v. Cemex, S.A.B. de C.V.*,
  396 F. Supp. 3d 283 (S.D.N.Y. 2019) ..................................................11

*Schwab v. E\*TRADE Fin. Corp.*,
  258 F. Supp. 3d 418 (S.D.N.Y. 2017) ..................................................35

*Se. Pa. Transp. Auth. v. Orrstown Fin. Servs. Inc.*,
  12 F. 4th 337 (3d Cir. 2021) ................................................................48

*Set Cap. LLC v. Credit Suisse Grp. AG*,
  996 F.3d 64 (2d Cir. 2021) ..................................................................29

*Siegel v. Converters Transp., Inc.*,
  714 F.2d 213 (2d Cir. 1983) ..........................................................42, 43

*Slayton v. Am. Exp. Co.*,
  460 F.3d 215 (2d Cir. 2006) ......................................42, 44, 47, 48

*Steinberg v. Ericsson LM Tel. Co.*,
  2008 WL 5170640 (S.D.N.Y. Dec. 10, 2008) ......................................11

*Stevelman v. Alias Rsch., Inc.*,
    174 F.3d 79 (2d Cir. 1999) ........................................................42, 46

*Svezzese v. Duratek, Inc.*,
    67 F. App'x 169 (4th Cir. 2003) ........................................................25

*Tongue v. Sanofi*,
    816 F.3d 199 (2d Cir. 2016) ........................................................29

*Villante v. Dep't of Corrs. of City of N.Y.*,
    786 F.2d 516 (2d Cir. 1986) ........................................................42

*Wash. State Inv. Bd. v. Odebrecht S.A.*,
    461 F. Supp. 3d 46 (S.D.N.Y. 2020) ........................................................28

## STATUTES, RULES AND REGULATIONS

15 U.S.C.
    §77k ........................................................29, 44
    §77l(a)(2) ........................................................29
    §77o ........................................................35
    §78j(b) ........................................................35
    §78t(a) ........................................................35

Federal Rules of Civil Procedure
    Rule 9(b) ........................................................29, 30
    Rule 15(c) ........................................................41, 42, 46, 48

## SECONDARY AUTHORITIES

Public Company Accounting Oversight Board, *Basics of Inspections*,
    https://pcaobus.org/oversight/inspections/basics-of-inspections ........................16

## I.  ARGUMENT

### A.  The Complaint Amply Pleads Abengoa's Accounting Fraud

The district court's dismissal was based largely on its erroneous fact-bound determination that plaintiffs failed to allege an accounting fraud scheme.  It reached this finding by rejecting wholesale any inferences from facts sourced from several former employees, including a confidential whistleblower.  These facts were corroborated by a forensic report from KPMG (and the emails it analyzed) and a resolution from Spain's top financial accounting regulator ICAC, and were found sufficiently reliable to support the Spanish prosecution in two cases of criminal accounting fraud against Ortega, Benjumea, and Abengoa and its main subsidiaries, Abeinsa and Inabensa, along with its auditor, audit committee members, and others.

Defendants agree with the district court's erroneous view that no inference of fraud can be drawn from these foreign proceedings, or even from the well-vetted evidence considered in those proceedings.  In so arguing, they obscure the significance of the Complaint's allegations and seek the benefit of favorable inferences to which they are not entitled at the pleading stage.

1.    **Plaintiffs' non-conclusory allegations must be accepted as true at the pleading stage**

   a.    **Allegations from Spanish proceedings were independently corroborated by plaintiffs and, considered together with other non-conclusory facts, are sufficient to plead material falsity**

In defendants' view, plaintiffs have merely "'parrot[ted]'" unverified allegations from the Spanish proceedings and any such allegations "borrowed" from those proceedings should be rejected. (Brief for Defendant-Appellee Abengoa, S.A. ("Abengoa") 35, 44) But the Complaint is the product of an extensive investigation by counsel. (JA892) It relies on: (1) statements from seven witnesses, including three from the Spanish proceedings—all but the confidential whistleblower who were vetted by plaintiffs' counsel—who provided examples of specific construction jobs and invoices used to commit accounting fraud (JA900-02¶¶42-44, JA910-14¶¶84-97); (2) screenshots of emails sent by Abengoa's most senior executive, Benjumea, ordering his subordinates to commit accounting fraud (JA917¶107); (3) certified translations of complete "whistleblower" statements submitted to Spanish authorities, including evidence from Abengoa's internal servers (JA906-09¶¶63-75, JA995-1015); (4) excerpts from incriminating internal audits conducted by KPMG at the request of new management after Benjumea's demotion (JA915-18¶¶99-108); and (5) certified translations of court orders from Madrid's National Court identifying and, at times,

4893-4106-7353.v1

quoting factual evidence of accounting fraud committed by Benjumea, Ortega, and other top executives at Abengoa. (JA935-39¶¶184-187, JA1049-85) This is not a complaint that "*merely* recites others' allegations" but instead "allege[s] non-conclusory facts" with proof to support them. *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 180 (2d Cir. 2015)[1] (emphasis in original).

### b. The consistent and non-conclusory allegations from former employees provide sufficient support to plead falsity

#### (1) The confidential whistleblower's allegations, corroborated by other former employees, are reliable

FE7's detailed ten-page letter to the Office of the Prosecutor of the National Court (JA1006-15) explained how Inabensa used two sets of books to artificially inflate profit margins, manipulate cost provisions, falsify costs, and prematurely recognize revenue. (JA902¶46, JA906-09¶¶63-74) While defendants contend FE7 failed to provide particularized allegations of fraud, the non-conclusory details of accounting malfeasance speak for themselves. (JA906-07¶¶63-68). FE7 provided specific examples, supported by internal accounting file screenshots, of how Inabensa

---

[1]   Unless otherwise noted, internal citations and footnotes are omitted and emphasis is added throughout.

4893-4106-7353.v1

inflated margins and abused cost provisions. (JA907-09¶¶69-74) FE7's account was deemed sufficiently credible to be relied upon in the Spanish proceedings.

Defendants, as did the court below, contend FE7's "borrowed and unverified statements" (Abengoa 24) should not be considered because plaintiffs' counsel failed to identify FE7. (Abengoa 26) But FE7 is a "confidential" whistleblower and thus, plaintiffs had no way to identify him or her—and it would have been improper to do so. Indeed, much of the proceedings in Spain remain confidential. (JA892¶4)

Instead, plaintiffs verified the contents of FE7's letter through other former employees—all of whom their counsel sufficiently vetted. (JA891; ECF 154 at 15 n.2)

FE4, who worked at Inabensa as Chief of Critical Projects Follow Up and in the Controller Department (JA900-01¶42), similarly described the dual accounting system with disparate margins, explained how Inabensa, and, therefore, Abengoa, recognized revenue prematurely, and detailed how it improperly used cost provisions on the same projects in Kenya and Ukraine described by FE7. (JA910-12¶¶84-91) Witnesses from other subsidiaries described the same practice of utilizing two sets of books, one with inflated margins for external auditors and a separate, more accurate internal accounting. (JA909¶¶76-77)

4893-4106-7353.v1

FE5, the project control manager in Inabensa's Controller Department assigned to the AVE Mecca Medina project (JA901¶43), also corroborated FE7's report of premature revenue recognition, and described how expenses were transferred to new projects. (JA912-13¶¶92-94) FE5's account was, in turn, corroborated by KPMG's forensic analysis, which identified internal emails involving Benjumea and other executives, further evidencing this invoice triangulation scheme. (JA915-18¶¶99-108)

The investigating judge in Seville admitted the claims against Inabensa and Abeinsa after considering FE7's letter (and the testimony of FE4 and FE5). (JA939¶189) The National Court recited evidence of "systematic concealment of substantial losses of its assets, as well as the inclusion of insufficiently accredited certifications that indicate a visible misrepresentation of the reality of the entity's economic and financial situation." (JA937-39¶186) It noted that the ICAC report "highlights" losses that were not accounted for "in significant amounts" and "would have been deliberately hidden to give a misrepresented appearance of the company's equity and financial situation." (*Id.*)

Given the consistent and corroborative nature of these allegations, defendants' authority is inapposite. This is not like *Amorosa v. Gen. Elec. Co.*, 2022 WL 3577838, at *1 (S.D.N.Y. Aug. 19, 2022), which "copied almost verbatim from the operative complaint" in another class action. Unlike that case—and others relied on

by defendants—counsel here conducted an independent investigation that confirmed plaintiffs' key allegations of accounting fraud. *C.f., e.g.*, *Long Miao v. Fanhua, Inc.*, 442 F. Supp. 3d 774, 802 (S.D.N.Y. 2020) ("The FAC does not allege any independent corroborative facts, any independent investigation by counsel, or any contact by plaintiff's counsel with the interviewees."); *In re DraftKings Inc. Sec. Litig.*, __ F. Supp. 3d __, 2023 WL 145591, at *19 (S.D.N.Y. Jan. 10, 2023) ("plaintiffs' counsel has not interacted with the unidentified source—and does not even know the source's name, position, or other attributes tending to bear on the source's credibility"). Here, the facts are supported by witness interviews and internal corporate documents showing evidence of fraud.

### (2) Former employees provide a non-conclusory, consistent picture of fraud

Defendants, like the court below, consider each witness in isolation, ignoring that taken together with the KPMG report, the ICAC resolution, and Spanish court rulings, they provide a consistent, and therefore, adequate basis to plausibly allege Abengoa's accounting fraud.

FE1, as HR director, provided details of an exit interview with an internal auditor who quit rather than participate in falsely inflating the value of certain projects. (JA919-20¶¶114-115) Defendants argue FE1's account should be rejected as hearsay. (Abengoa 28) But "[a]t the pleadings stage, the Court must accept as true

the content of a hearsay statement" and draw reasonable inferences from it. *Groisman v. Feler*, 2017 WL 11690933, at *4 (E.D.N.Y. Sept. 27, 2017) (citing *Gorman v. Consol. Edison Corp.*, 488 F.3d 586, 591-92 (2d Cir. 2007) ("[T]his Court must accept as true all allegations in the complaint and draw all reasonable inferences in favor of the non-moving party.")).

The cases cited by defendants are inapposite, pertaining to vague allegations of second-hand statements from unknown or unidentified sources. *See In re Inv. Tech. Grp., Inc. Sec. Litig.*, 2018 WL 1449206, at *5 (S.D.N.Y. Mar. 23, 2018); *Janbay v. Canadian Solar, Inc.*, 2013 WL 1287326, at *8 (S.D.N.Y. Mar. 28, 2013). Here, FE1 obtained information as HR director that was described with "sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." *Novak v. Kasaks*, 216 F.3d 300, 314 (2d Cir. 2000).

While defendants argue that FE1 should also be discounted because she described events occurring months before the Class Period, as the district court recognized in its earlier order dismissing the second amended complaint ("SAC"), "FE1's statements are not so lacking in specificity as to time-period that they need to be discounted." (SA33 (quoting *Emps.' Ret. Sys. v. Blanford*, 794 F.3d 297, 307 (2d Cir. 2015) ("'allegations concerning activity in one period can support an inference of similar circumstances in a subsequent period'")))

- 7 -

Defendants argue the allegations from the other FEs are too general, but each corroborate FE7's statement that the accounting fraud described at Inabensa was not isolated to one subsidiary. (JA909¶74) This includes FE2 (with broad oversight for accounting and financial reporting at several U.S. subsidiaries (JA900¶40)) and FE3 (Senior Staff Accountant at Abengoa's Missouri corporate office (JA900¶41)), both of whom resigned rather than participate in false financial reporting, a fact that gives their statements an increased indicia of reliability. (JA900¶¶40-41) FE7's statement is also corroborated by, *inter alia*, the factual allegations that: (1) Abengoa falsified its financial statements for 2014 by artificially increasing its profit margin for the A3T project, a cogeneration plant in Mexico, by 14.7%, which resulted in artificially inflating Abengoa's operating profit in the 2014 annual statements by €218 million, causing Abengoa to report a year-end *profit* of €125,300,000 instead of a €92,700,000 *loss* (JA927¶142); (2) Abengoa hid over €2.8 billion in losses from the public in 2014 related to its Abengoa Solar and Abengoa Bioenergia operations, which Abengoa did not reveal until after it imploded in 2015 and 2016 (JA926-27¶¶140-141); and (3) Abengoa concealed its true liabilities in the year-end annual report for 2014 by cancelling a €500 million loan on December 31, 2014 only to renew it two days later on January 2, 2015. (JA927¶¶143-144)

While defendants contend that FE4 and FE5 provide insufficient specificity, the district court acknowledged that they "provide first-hand accounts of allegedly improper accounting, and name specific affected projects." (SA135) Defendants' chief complaint with FE4 and FE5 is that their accounts are limited to one subsidiary, Inabensa, echoing the district court's improper fact-based rejection of their statements as based on "only a handful of projects." (Abengoa 32) But considered with KPMG's report confirming Benjumea's involvement, ICAC findings of accounting fraud, and the findings to date in the Spanish proceedings based upon independent judiciary investigations, there is sufficient specificity and consistency to support the allegations of accounting fraud at several of Abengoa's subsidiaries from which Abengoa's pervasive fraud can be plausibly inferred. This differs from *Davidoff v. Farina*, 2005 WL 2030501, at *13 (S.D.N.Y. Aug. 22, 2005), cited below (SA138) and by defendants (Abengoa 40), where allegations involving improper revenue recognition were dismissed because of the absence of a "'widespread'" or "'pervasive fraudulent scheme.'" (*See* JA892¶3 ("Abengoa's accounting fraud was extensive [and] involved multiple layers of management across dozens of subsidiaries and consumed entire segments within the organization."))

4893-4106-7353.v1

### 2. Defendants minimize the fraud committed at two key Abengoa subsidiaries

Abengoa's fraud was rampant at its two most important subsidiaries, Abeinsa and Inabensa. Abeinsa served as the head of Abengoa's Engineering and Construction segment, while Inabensa led Abeinsa's "Installations" division with the Engineering and Construction group. (JA904¶¶54-55)

Defendants make fact-bound arguments questioning how integral these two subsidiaries were to Abengoa given the parent company had over 500 subsidiaries in more than 70 countries. (Brief for Defendant-Appellee Manuel Sánchez Ortega ("Ortega") 24) But, as alleged, the Engineering and Construction activities, led by Abeinsa and Inabensa, represented approximately 60% of Abengoa's overall revenue. (JA892¶3, JA904-05¶¶54-58) Further, when Abengoa finally imploded and disclosed that it lost €1.2 billion in 2015, the majority of those losses—€900 million—were attributable to Abeinsa. (JA931¶166) The Engineering and Construction segment was also the focus of the ICAC when it sanctioned Deloitte. (JA940-41¶¶192-193)

Defendants argue that the FEs from these subsidiaries should be rejected because they do not work for the parent company, and cannot speak to Abengoa's global operations. (Abengoa 20-21) But allegations of rampant fraud at two key subsidiaries suffice. *City of Pontiac Gen. Emps.' Ret. Sys. v. Lockheed Martin Corp.*, 875 F. Supp. 2d 359, 368-69 (S.D.N.Y. 2012) (court cannot conclude as a matter of

law that statements about key division were immaterial even though Lockheed's overall projected profit decreased just 2.7%); *see also Litwin v. Blackstone Grp., L.P.*, 634 F.3d 706, 720 (2d Cir. 2011) (a misstatement may be material as to "a particularly important segment" of company's business, even if small relative to overall firm); *In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 278-79 (3d Cir. 2006) ("circumstantial evidence" demonstrated senior management had engaged in widespread accounting fraud).

Defendants' authority (Abengoa 20) pertains to whether vague and speculative allegations from witnesses working at subsidiaries who had no contact with senior executives could be imputed to defendants for purposes of scienter. (*See, e.g.*, *Schiro v. Cemex, S.A.B. de C.V.*, 396 F. Supp. 3d 283, 305 (S.D.N.Y. 2019); *Steinberg v. Ericsson LM Tel. Co.*, 2008 WL 5170640, at *13 (S.D.N.Y. Dec. 10, 2008). That is not what is alleged here.

Ultimately, defendants seek to analogize to *In re Wachovia Equity Sec. Litig.*, 753 F. Supp. 2d 326, 358 (S.D.N.Y. 2011), where the testimony of one confidential witness "could describe the anomalies of a rogue fiefdom rather than company-wide practices." But the allegations here (including, *e.g.*, Benjumea's email (JA917¶107)) show the fraud was systemic and not limited to Abeinsa and Inabensa.

4893-4106-7353.v1

### 3. Defendants obfuscate the significance of the fraud prosecutions in Spain

#### a. The acquittals of Ortega and Benjumea in a completely unrelated proceeding are irrelevant

Typical of defendants' misleading arguments is their repeated reference to a third criminal proceeding in which Benjumea and Ortega were acquitted. (Abengoa 11, 36, 45; Ortega 28)  That third case, however, had nothing to do with the accounting fraud charges being pursued in the other two Spanish proceedings.  It pertained to unrelated charges of "disloyal administration" and "aggravated misappropriation," *i.e.*, that Benjumea and Ortega were unduly enriched by payouts when they left Abengoa.  (JA487, JA1120)  Nothing in that case or the fact of acquittal is relevant to accounting fraud in the two other Spanish proceedings and at issue here.  (JA484-729)

Likewise, defendants repeatedly state that the Spanish courts dismissed "all claims" in the proceeding in which FE7 filed the confidential letter. (Abengoa 11, 26-27, 32 n.13)  This is patently false, based on an obvious citation error.  In the cover letter, FE7 notes the "7/2017" proceeding, which is the dismissed misappropriation case against Ortega and Benjumea, but it is absolutely clear from the context of the letter—which has nothing to do with Benjumea's or Ortega's compensation—that FE7's letter refers to the accounting fraud case before the National Court, *i.e.*, the

"10/2016" proceeding: "I hereby send you a document that I have prepared in relation to the complaint filed regarding a possible misrepresentation in Abengoa's accounting, and which I understand corresponds to summary proceeding 7/2017 [sic]." (JA1006) As alleged, the National Court and Seville proceedings relied on FE7's letter. (JA914-15¶98, JA939¶189) Defendants seek to capitalize on what is obviously nothing more than a mistaken citation.

### b. The acceptance of the criminal complaints by investigating judges in the two Spanish proceedings demonstrates the reliability of the accounting fraud allegations

Defendants do not dispute that plaintiffs may rely on factual allegations from other proceedings, as plaintiffs argued in their opening brief. (Plaintiffs-Appellants' Opening Brief ("AOB") 41) Rather, they contend that plaintiffs may not do so here because facts drawn from the investigatory stage of the Spanish proceedings are insufficiently reliable. (Abengoa 37) According to defendants, the existence of the investigation and related allegations cannot support falsity or scienter. (Abengoa 44; Ortega 29-30)

Defendants' reliance on cases involving the commencement and pendency of U.S. government investigations alone is misguided. (Ortega 29-30 (citing, *e.g.*, *In re Gentiva Sec. Litig.*, 932 F. Supp. 2d 352, 380 (E.D.N.Y. 2013) (governmental agencies or regulators had not yet instituted any proceeding alleging wrongdoing);

- 13 -

*City of Brockton Ret. Sys. v. Avon Prods., Inc.*, 2014 WL 4832321, at *1 (S.D.N.Y.

Sept. 29, 2014) (SEC and DOJ opened a formal investigation and issued a subpoena);

*Lipow v. Net1 UEPS Techs., Inc.*, 131 F. Supp. 3d 144, 154-55 (S.D.N.Y. 2015) (SEC,

FBI and DOJ announced investigation into potential criminal misconduct.)))[2]

The investigatory stage of the proceedings in Spain is not analogous to the

launching of U.S. government investigations. In Spain, after the filing of a criminal

complaint, a judge is assigned to investigate the alleged crimes and obtain necessary

facts, including both incriminating and exonerating evidence. (JA932-33¶¶174-176)

The judge reviews testimony of the accused, witnesses testimony, and expert

testimony and reports. (JA933¶176) The judge then admits the complaint if "the

alleged facts, in their concrete formulation, meet the requirements of some type of

criminal offense." (JA1072)

After a criminal complaint was filed against Ortega and Benjumea for criminal

accounting fraud, and following an independent investigation of the proof in support

of the indictments, the investigating judge admitted the complaint, finding the

evidence showed that Abengoa disseminated false financial statements. (JA935¶¶180-

181) After two years of extensive discovery, Abengoa investors expanded the

---

[2] The cases cited by defendants have noted that government investigations can be considered "one piece of the [scienter] puzzle when taking a 'holistic' view of the purported facts." *Gentiva*, 932 F. Supp. 2d at 380.

complaint beyond Ortega and Benjumea to include Abengoa, members of Abengoa's Audit Committee, and Abengoa's auditor Deloitte. (JA935¶182) The prosecutor specifically noted the "exhaustive analysis" of "expert evidence" and stated that there was evidence of "systematic concealment of substantial losses … of assets" and "misrepresentation of the actual economic-financial situation of the entity." (JA935-37¶184) The National Court, in granting the motion, agreed. (JA937-39¶186) This level of "investigation"—one that is part of the judicial process—provides far stronger indicia of reliability than the initial stages of prosecutorial investigation by a U.S. agency.

Defendants note that the National Court's ruling expanding the case was made "'without prejudice to the decisions that may arise from subsequent proceedings'" (Ortega 31 (quoting JA1072)) and that there have been no findings on the merits in the National Court proceedings. (Abengoa 44) But defendants have cited no authority suggesting plaintiffs must await a final merits decision before relying on facts derived from other proceedings. And while defendants point out that the National Court did not determine whether the actions of the newly added defendants "meet the criteria of the crimes that led to these charges" (JA1080), this does not undermine the significance of the charges and supporting facts against the previously charged defendants, Benjumea and Ortega, that plaintiffs included in their Complaint.

In expanding the case to include Deloitte, the National Court relied on the ICAC's resolution, sanctioning Deloitte and its lead audit partner for Abengoa's 2014 financial statements. (JA940-41¶¶192-193) Defendants note that the ICAC did not make specific findings against Abengoa, which is hardly surprising since it was examining the accounting firm's audit. (JA1146) Defendants further assert that the PCAOB concluded that Deloitte's "audits had been properly completed and perfectly recorded." (Abengoa 36, 44) This purported finding—which is not in the record—is Deloitte's bald characterization of a PCAOB audit that it conducted "'on the side.'" (JA1147) But even assuming judicial notice could be taken of Deloitte's self-serving description of PCAOB's audit, this at most creates a factual dispute about the quality of Deloitte's audits. Regardless of Deloitte's culpability, the ICAC resolution, relied on by the National Court and quoted at length in its order, supports accounting malfeasance by Abengoa. (JA937-39¶186, JA940-41¶193)[3]

A separate action against key Abengoa subsidiaries, Abeinsa and Inabensa, was brought in Seville. Importantly, the investigating judge admitted the claims in that

---

[3]    In any event, PCAOB inspections are designed to review portions of selected audits of public companies and an inspection report "is not intended to serve as a balanced report card or overall rating tool" and "should not be interpreted to imply the Board has reached a conclusion about a firm's quality control policies, procedures, or practices."  Public Company Accounting Oversight Board, *Basics of Inspections*, https://pcaobus.org/oversight/inspections/basics-of-inspections

4893-4106-7353.v1

case after considering FE7's letter, testimony from FE4 and FE5, and KPMG's report, all of which confirmed that Abeinsa and Inabensa systematically falsified their business results. (JA939¶189) These proceedings—and the underlying facts—provide ample support for plaintiffs' allegations of accounting fraud.

This case was elevated to the National Court, where it was combined with the accounting case against Benjumea and Ortega, an order that was subsequently reversed. First, Ortega quibbles with the Complaint's allegation that the Seville court agreed that "'the alleged financial accounting fraud pervaded Abengoa in its entirety.'" (Ortega 32 (quoting JA939-40¶190)) But a plain reading of the ruling shows that the court agreed with the prosecutor's request that "the investigation be extended to the entire group Abengoa and holding that the illegal practices that, initially, were filed with relation to the Ave Meca Medina project, could be a generalized practice of the group Abengoa." (ECF 151-24 at 2) The judge indeed held that given the facts raised in these proceedings, as well as proceedings previously brought in the National Court, the case should be transferred to the National Court "to analyze allegedly criminal facts that would impact not only on the executives and supervisors of Abeinsa and Inabensa, but on the whole Abengoa corporate group, for being an alleged widespread and commonly accepted modus operandi." (*Id.* at 5)

The ruling combining the two cases was reversed by the National Court.  (*See* JA877)  But while the two cases are no longer joined, both cases—one in Madrid against Ortega and Benjumea (expanded to include Abengoa, its auditor, and audit committee members) involving falsification of financial statements and information (JA872-73), and one in Seville against Abeinsa and Inabensa involving "statements related to the Meca-Medina project and other subsidiaries of Abengoa not associated with said project" (JA877), continue to proceed through the investigatory stage.

### 4. The Complaint adequately alleges that defendants' dual bookkeeping constitutes accounting fraud

Defendants do not dispute that they routinely kept two sets of books, instead contending that the allegations of dual bookkeeping are insufficient to infer fraud. Plaintiffs, however, allege more than merely keeping two sets of books.  They allege those books contained disparate accounting figures—that the SAP records included inaccurate, inflated margins that were presented to the public, compared with accurate records relied on by project managers.  (JA906-07¶¶65-66, *see also* JA910-11¶¶82-84)  The Complaint alleges that this practice was intended to falsify the strength of Abengoa's operations and recognize revenue prematurely throughout the life of a project (*i.e.*, larger margins allowed for greater pro rata recognition of revenue at earlier points in the projects).  (JA906-07¶¶64-68, *see also* JA910-11¶¶82-84 (dual accounting at Inabensa inflated profit margins).

- 18 -

The Complaint further alleges that it was "widely known" to project managers that the SAP records were inaccurate but nevertheless provided to external auditors, and managers needed to confirm when asked for margin estimates whether the official but inaccurate SAP or actual margin from their own spreadsheets was needed. (JA907¶¶67-68)  The inference, to which plaintiffs are entitled, from this allegation, is that improperly keeping two sets of books (one accurate for internal purposes and one fraudulent for external reporting) was widespread within Abengoa.

Defendants rely on the district court's adoption of an exculpatory inference from this allegation that it could not have been fraudulent since the "'dual system of accounting was commonplace and widely known within Abengoa.'"  (Abengoa 34 (quoting SA139))   Defendants are not entitled to this less culpable—and implausible—inference at the pleading stage.  *Blanford*, 794 F.3d at 307 (defendants' "explanation" for wrongdoing "entitled to little weight at this stage of litigation").

Nor, as the district court found (SA139) and defendants argue here (Abengoa 34), does it help defendants that Abengoa did not attempt to rectify this problem until it created the Controller Department in May 2015.  (JA982¶337)  Instead, it shows that Abengoa (not merely a couple of subsidiaries) had been artificially inflating profit margins by using two sets of books throughout most of the Class Period and, contrary to assurances to investors, it was lacking in financial discipline.

4893-4106-7353.v1

The inference of accounting fraud from the maintenance of two sets of books is bolstered by the ICAC's resolution that Abengoa's financial statements were materially misleading due to inflated profit margins. (JA937-39¶186) And, in particular, Abengoa falsified its financial statements for 2014 by artificially increasing its profit margin for the A3T project, a cogeneration plant in Mexico, by 14.7%, which resulted in artificially inflating Abengoa's operating profit in the 2014 annual statements by €218 million, causing Abengoa to report a year-end profit of €125,300,000, when in reality it should have reported a loss in the amount of €92,700,000. (JA927¶142)

### 5. The Complaint adequately alleges Abengoa's fraudulent invoice triangulation scheme

KPMG's internal audit disclosed that Abengoa's senior management falsified project expenses and manipulated revenue recognized in its financial statements at seven different projects on three different continents. (JA892-93¶5, JA916-17¶¶103-107) While defendants contend that plaintiffs merely "conjure [up] malfeasance" from emails unearthed by KPMG (Abengoa 39), that malfeasance, as alleged, was specifically found by KPMG, which determined that Abengoa manipulated the revenue recognized in its financial statements by altering project margins. (JA915-18¶¶99-108) Indeed, Benjumea's emails show that he, and over a dozen of Abengoa's most senior executives across the conglomerate, knew of and perpetuated the

- 20 -

accounting fraud.  (JA916-17¶¶104-107 (Benjumea writing to department heads that "Everyone that is copied here must comply with my instructions"))

The seven projects identified by KPMG were not even a comprehensive list. Critically, the fact that Benjumea, Abengoa's Executive Chairman (JA899¶33), was directly involved (JA917¶107) provides far more than a plausible inference that the scheme was of greater magnitude.

Abengoa proffers a fact-bound and utterly misleading argument that the invoice triangulation scheme did not impact its publicly-issued consolidated financial statements.  (Abengoa 38)  It contends that the transactions at issue are inter-company transactions, the profits and/or losses of which are eliminated upon consolidation, asserting that "transferring expenses between Abengoa's subsidiaries would not impact Abengoa's consolidated financial statements." (*Id.*)  So, for defendants, "no harm, no foul," since the improper transfers were committed within the subsidiaries themselves.  But the improper accounting occurred on Abengoa's contracts with external third parties.  (JA916-17¶¶105-107)  Those profits and losses were *not* inter-company transactions that were eliminated upon consolidation.  Abengoa, through invoice triangulation, improperly accelerated revenue recognition by fraudulently overstating project completion percentages (*i.e.*, fraudulently overstating incurred costs).

In attempting to downplay the import of this scheme, defendants cite a disputed amount of Abengoa's total revenue implicated by specific instances of triangulation for 2012—0.25%. (Abengoa 41 (citing SA143)) Of course, "'materiality cannot be reduced to a numerical formula.'" *Lockheed*, 875 F. Supp. 2d at 368. More importantly, the figure provided by defendants was disputed, and as the district court recognized, plaintiffs contended that 10% of Abengoa's consolidated operating profit had been affected. (SA143 n.17) Particularly given the Executive Chairman's direct participation in the scheme, attesting to its importance, as well as the inference that such triangulation was more widespread, such a fact-intensive dispute is not appropriate at this stage of the proceedings. *See Altimeo Asset Mgmt. v. Qihoo 360 Tech. Co.*, 19 F.4th 145, 151-52 (2d Cir. 2021) ("'even securities plaintiffs need not prove their entire case within the confines of the complaint'" and "[r]egardless of whether the appellants ultimately prove that there are material misstatements or omissions of fact, they have alleged enough to survive a motion to dismiss on those grounds"); *see also Gebhardt v. ConAgra Foods, Inc*., 335 F.3d 824, 830 (8th Cir. 2003) ("Most investors would consider it significant, no matter what the mix of information available, that a company was not earning as much as it was claiming to earn."). Defendants' argument also disregards that Abengoa hid staggering losses and

recorded millions of euros of fake profit in subsequent years, namely 2014, before

imploding under billions of euros of debt in 2015 and 2016.  (JA923-28¶¶131-145)

## B. Abengoa Misled Investors by Making Materially False and Misleading Statements

### 1. False and misleading statements about Abengoa's use of the percentage-of-completion method are not saved by purported cautionary language

Abengoa repeatedly told investors that "[r]evenue from construction contracts is

recognized using the percentage-of-completion method for contracts whose outcome

can be reliably estimated and it is probable that they will be profitable" and that the

"percentage of completion is determined at the date of every consolidated statement of

financial position based on the actual costs incurred as a percentage of total estimated

costs for the entire contract."  (JA942-43¶197, JA1098)  The fact that investors were

informed that such accounting involves "estimates" did not give Abengoa carte

blanche to recognize revenue prematurely and inflate profit margins.  As alleged,

Abengoa violated the percentage-of-completion rule through false recording of

expenses and transferring expenses between unrelated projects, thereby concealing

project losses and inflating profit margins.  (JA943-44¶¶198-203)  None of these

practices involved reasonable estimates or the good faith failure to "quantif[y]" "all

possible risks."  (JA1098)

4893-4106-7353.v1

For example, the invoice triangulation that FE5 described and KPMG confirmed through Benjumea's emails involved transferring unrelated project expenses to inflate margins and hide losses. (JA894¶9, JA912-16¶¶92-102, *see also* JA940-41¶¶193-195 (ICAC resolution that Abengoa's financial statements were materially misleading due to inflated profit margins)) These maneuvers were not good faith deviations from the percentage-of-completion method after being subject to a "robust project management and control system." (JA942-43¶197, JA1098)

Defendants contend that plaintiffs fail to specify why the estimates were incorrect, but FE7 explained how project managers were prohibited from revising estimates (JA906-07¶¶65-66), and provided a specific example of inflating margins to accelerate project revenue. (JA907¶69) Plaintiffs also alleged that cost provisions were manipulated for projects in Ukraine and Kenya, as well as the AVE Mecca Medina project in Saudi Arabia, in order to prematurely recognize revenue. (JA907-09¶¶70-72) While Defendants question whether the cost provisions shown were false (Abengoa 17 & n.5), plaintiffs' well-pleaded allegations must be accepted as true at this stage, particularly given that they are supported by at least four confidential witnesses with detailed explanations concerning the fraudulent nature of the expenses. (JA918-19¶¶109-112 (explaining fake expenses for AVE Mecca Medina represented disproportionate amount of project and were not included in budget), JA919¶113

(identifying process for generating fake expenses through unnecessary or duplicative work), JA923-24¶¶132-34 (detailing additional fake invoices used to charge expenses to AVE Mecca Medina involving third-party vendors)).

Thus, this case is easily distinguishable from *Svezzese v. Duratek, Inc.*, 67 F. App'x 169, 170 (4th Cir. 2003), cited by defendants (Abengoa 16), where the company providing radioactive waste management services was merely alleged to have "failed to follow procedures necessary to track its waste processing operations and thus maintain an accurate balance sheet." *See Svezzese*, 67 F. App'x at 174 ("Plaintiffs allege little more than accounting failures and breakdowns in the internal procedures necessary to maintain proper accounting practices."). And in *Ind. Elec. Workers' Pension Tr. Fund IBEW v. Shaw Grp., Inc.*, 537 F.3d 527, 532 (5th Cir. 2008), unlike here, the company "endured no liquidity crisis, as might have been expected if massive accounting fraud had occurred." Moreover, "the allegations Plaintiffs quantify are pled as *representative*, not entirely inclusive, of broader misconduct." *City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Techs. Corp.*, 450 F. Supp. 3d 379, 416 (S.D.N.Y. 2020) (emphasis in original).

### 2. Abengoa misled investors by stating it did not need to access capital markets right before doing so

Defendants defend Abengoa's statement on July 31, 2015 with circular reasoning. (JA976-79¶¶320-325) They contend that since an accounting fraud

- 25 -

scheme is not adequately alleged, this statement cannot be evidence of accounting fraud.  (Abengoa 47)

Plaintiffs not only allege that the statement was false, but that it was part of the scheme to hide Abengoa's true liquidity risk.  (AOB64)  While defendants argue that it is not plausible they would have deliberately lied about Abengoa's liquidity needs on a Friday only to disclose the truth on Monday, "this 'argument confuses expected with realized benefits.'"  *Ind. Pub. Ret. Sys. v. SAIC, Inc*., 818 F.3d 85, 97 (2d Cir. 2016) (quoting *Makor Issues & Rights, Ltd. v. Tellabs Inc*., 513 F.3d 702, 710 (7th Cir. 2008)).  Indeed, even the district court found the timing "suggestive."  (SA37)

Defendants further argue that plaintiffs cannot allege reliance since the false statement was made on a Friday but was corrected when the market opened on Monday.  (Abengoa 48)  Defendants cite *Batson v. Rim San Antonio Acquisition, LCC*, 2016 WL 6901312, at *9 (S.D.N.Y. Nov. 22, 2016), where the failure to disclose occurred after plaintiffs invested in the offering.  Here defendants' misleading statement was made before the market closed on Friday.  As alleged, plaintiffs are entitled to the presumption that they purchased ADSs between the time of defendants' misrepresentations and omissions and the disclosure.  (JA989¶368)

4893-4106-7353.v1

### C. Financial Discipline Statements, in Context, Are Not Puffery

Defendants reject the premise that the Complaint alleges company-wide fraud and accordingly argue that statements about maintaining "strict financial discipline" through a "robust project management and control system" are immaterial puffery. Such statements, however, constituted efforts to assure the public of Abengoa's integrity—while failing to disclose its liquidity crisis, which was being masked by fraudulent accounting practices that were the very opposite of "enforc[ing] strict financial discipline to maintain [its] strong liquidity position" through a "robust project management and control system." (JA942-43¶197)

"Whether a representation is 'mere puffery' depends, in part, on the context in which it is made." *In re Petrobras Sec. Litig.*, 116 F. Supp. 3d 368, 381 (S.D.N.Y. 2015). "[W]hen (as here alleged) the statements were made repeatedly in an effort to reassure the investing public about the Company's integrity, a reasonable investor could rely on them as reflective of the true state of affairs at the Company." *Id.*; *see also Ark. Tchr. Ret. Sys. v. Bankrate, Inc.*, 18 F.Supp.3d 482, 485 (S.D.N.Y. 2014) ("while a term like 'high quality' might be mere puffery or insufficiently specific to support liability in some contexts, it is clearly a material misrepresentation when applied to assets that are entirely worthless").

Thus, in *Wash. State Inv. Bd. v. Odebrecht S.A.*, 461 F. Supp. 3d 46, 73-74 (S.D.N.Y. 2020), statements about maintaining a competitive advantage were not puffery because they "were made to reassure investors as to specific risks regarding international competition" and, when combined with the fact that the company omitted information about defendants' involvement in a bribery scheme, the statements were misleading to a reasonable investor. And in *In re Turquoise Hill Res. Ltd. Sec. Litig.* __ F. Supp. 3d __, 2022 WL 4085677, at *35 (S.D.N.Y. Sept. 2, 2022), statements that things were "progressing well" were not puffery because they "reassured investors that construction related to the underground development was not substantially impaired by any delay, a representation that a 'reasonable investor could rely on … as reflective of the true state of affairs at the Company.'" Here, statements about financial discipline—made to reassure investors while omitting Abengoa's fraudulent accounting that was covering up a liquidity crisis—were similarly materially misleading.

Abengoa's statements implicated stated accounting policies and, unlike in the cases cited by defendants (Abengoa 13-14), were not merely vague or general statements about investment or fiscal strategy. *Lasker v. N.Y. State Elec. & Gas Corp.*, 85 F.3d 55, 57, 59 (2d Cir. 1996); *Pehlivanian v. China Gerui Advanced Materials Grp., Ltd.*, 153 F. Supp. 3d 628, 648 (S.D.N.Y. 2015).

- 28 -

**D.    The Complaint Alleges a Compelling Inference of Scienter**

**1.    Rule 9(b) does not add a scienter requirement to Section 11 of the Securities Act**

A Complaint that sounds in fraud does not graft a scienter requirement onto §11, as Ortega argues.[4] In *Rombach v. Chang*, 355 F.3d 164 (2d Cir. 2004), this Court required application of Rule 9(b) to Securities Act claims in certain circumstances, but it did not hold, nor has it ever held, that the application of Rule 9(b) would additionally impose a new substantive element—scienter—onto the claims themselves. Indeed, since its decision in *Rombach*—as well as in *Rombach* itself—this Court has underscored that scienter is not an element of a §11 or §12(a)(2) claim, and it has never articulated an exception for cases "sounding in fraud." *Id.* at 170[5]; *see also In re Sanofi Sec. Litig.*, 87 F. Supp. 3d 510, 528 n.8 (S.D.N.Y. 2015) (While "[c]laims that sound in fraud must satisfy the heightened pleading requirements of Rule 9(b), ... that Rule does not add substantive elements such as scienter to any claim."), *aff'd sub nom. Tongue*, 816 F.3d at 209.

---

[4]    There is no dispute that because underwriter liability is based on negligence the Complaint does not sound in fraud as to the Underwriters and, accordingly, there is no 9(b) requirement as to them.

[5]    *See, e.g.*, *Set Cap. LLC v. Credit Suisse Grp. AG*, 996 F.3d 64, 84 (2d Cir. 2021); *Tongue v. Sanofi*, 816 F.3d 199, 209 (2d Cir. 2016); *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 182-83 (2d Cir. 2014); *Panther Partners Inc. v. Ikanos Commc'ns, Inc.*, 681 F.3d 114, 120 (2d Cir. 2012).

4893-4106-7353.v1

The plain language of Rule 9(b) explicitly disclaims any obligation to plead state of mind with particularity even with respect to a claim of fraud. *See* Fed. R. Civ. P. 9(b). It would be peculiar indeed if a provision that permits the "conditions of a person's mind" to be alleged generally could impose a scienter requirement where none otherwise existed.

What Rule 9(b) does require is "the who, what, when, where and why of each statement alleged to be fraudulent." *In re Merrill Lynch Auction Rate Sec. Litig.*, 851 F. Supp. 2d 512, 533 (S.D.N.Y. 2012), *aff'd sub nom. La. Pac. Corp. v. Merrill Lynch & Co., Inc.*, 571 F. App'x 8 (2d Cir. 2014); *see also Rombach*, 355 F.3d at 170. Those requirements have been amply met.

### 2. Corporate scienter is adequately alleged

Benjumea was Abengoa's Executive Chairman when he engaged in the invoice triangulation scheme. His direct involvement in the fraud is "more than sufficient to impute his scienter to the Company." *Constr. Laborers Pension Tr. for S. Cal. v. CBS Corp.*, 433 F. Supp. 3d 515, 549 (S.D.N.Y. 2020); *see also Plumbers & Pipefitters Loc. Union No. 630 Pension-Annuity Tr. Fund v. Arbitron Inc.*, 741 F. Supp. 2d 474, 491 (S.D.N.Y. 2010) ("Because the plaintiffs have successfully pleaded scienter as to [the company's] then-president, CEO, and chairman, they have also pleaded corporate scienter as to [the company]."); *In re Eletrobras Sec. Litig.*, 245 F. Supp. 3d 450, 469

(S.D.N.Y. 2017) ("because the SAC properly alleges scienter against two key officers of Eletrobras, it necessarily alleges scienter against Eletrobras itself").

Defendants argue that it cannot be inferred from Benjumea's emails that he was "promoting or approving the fabrication of costs." (Abengoa 52) But as alleged, KPMG determined that Benjumea used the invoice triangulation scheme to inflate Inabensa's earnings. (JA916¶103) KPMG identified internal emails showing Benjumea's involvement in manipulating the revenue recognized in Inabensa's financial statements by altering project margins. (JA915-16¶¶100-103) Defendants' argument that Benjumea was merely advocating "for the negotiation and finalization of transactions to allow for the recording of actual costs" (Abengoa 52)—untethered to any facts—is not a more compelling inference.

Next, defendants argue that even if Benjumea directed the scheme, it only involved one subsidiary—Inabensa Turkey—and the alleged "irregularities" were immaterial. (Abengoa 52) Again, Benjumea was Abengoa's Executive Chairman, and his unhesitating authorization to proceed with invoice triangulation at Inabensa Turkey provides a strong inference that this was not a one-off. (JA916-17¶¶103-107) Putting aside that this example alone involved multiple directors and department heads at a number of subsidiaries to inflate project expenses on several projects

4893-4106-7353.v1

(JA892¶3), defendants cite no authority for the proposition that there can be no inference of scienter where the head of a company only commits a little bit of fraud.

Using the same disputed figure of a 0.25% of total revenue impacted by the fraud—in 2012—defendants argue that the misstatements at issue were not sufficiently "'dramatic'" to infer corporate scienter. (Abengoa 55) This mischaracterizes the standard which, in addition, allows for a strong inference of scienter "by ... imputing it from 'other officers or directors who were involved in the dissemination of the fraud.'" *KBC Asset Mgmt. NV v. MetLife, Inc*., 2022 WL 480213, at *2 (2d Cir. Feb. 17, 2022) (quoting *Jackson v. Abernathy*, 960 F.3d 94, 98 (2d Cir. 2020) ("The scienter of the other officers or directors who were involved in the dissemination of the fraud may also be imputed to the corporation, even if they themselves were not the actual speaker.")). Thus, in *Loreley*, 797 F.3d at 178, this Court found plaintiffs plausibly alleged corporate scienter based on an email exchange with the company's principal and owner suggesting he was involved in and thus aware of the activities which rendered the statements misleading.

Defendants also dispute that scienter can be imputed from the ICAC's damning resolution finding Deloitte knowingly certified incorrect and materially misleading financial statements, and that scienter is supported by the expansion of the criminal complaint in Spain to include Deloitte and the responsible audit partner.

(JA941¶¶194-195)  Defendants provide their own self-serving interpretation of the findings of "serious violations of the accounts auditing law" against Deloitte, as well as the findings of other agencies which are not grounded in the Complaint and should be disregarded here.  (JA1146-47)

### 3.    The Complaint adequately alleges Ortega's scienter

Ortega was Abengoa's CEO from March 2010 until his resignation on May 19, 2015.  (JA898¶25)  But scienter is not based solely on his position with the company. Along with Benjumea, Ortega has been charged with misrepresenting Abengoa's financial statements and the investigating judge has admitted the complaint, meaning that the present evidence was sufficient to find him guilty.  (JA935¶181)  Three years later, after thorough investigation, the National Court recognized "there is evidence that can be inferred from the systematic concealment of substantial losses of its assets ... that indicate[s] a visible misrepresentation of the reality of the entity's economic and financial situation."  (JA937-39¶186)

Ortega falls back on the argument that the fraud was limited to just two subsidiaries out of over 500.  (Ortega 24)  This is not true.  As alleged, accounting fraud took place in the U.S. (JA919-20¶¶114-115), Mexico (JA927¶142), and throughout Spain (JA926¶¶140-141).  Further, Abeinsa and Inabensa were key subsidiaries, and the charges against Ortega and Benjumea—as well as the ICAC

resolution and the National Court's expansion of the proceedings to include Abengoa and its auditor (JA937-39¶¶185-186)—support a company-wide accounting scheme with Ortega as CEO.

Ortega claims plaintiffs ignore a third proceeding in which he was acquitted (Ortega 28) but, as discussed above, that case, in which Ortega was absolved of undue compensation when leaving Abengoa, had nothing to do with the accounting fraud allegations at issue in the other Spanish proceedings or here. Relatedly, the fact that Ortega may have held onto Abengoa stock and did not personally profit from the fraud does not undermine allegations supporting Ortega's reckless disregard for Abengoa's dissemination of the false and misleading statements alleged here. (JA983-84¶¶347-349); *see Cosmas v. Hassett*, 886 F.2d 8, 13 (2d Cir. 1989) ("To satisfy the scienter requirement, a plaintiff need not allege facts which show the defendants had a motive for committing fraud, so long as the plaintiff, as [plaintiff] does here, adequately identifies circumstances indicating conscious behavior by the defendants."); *Gruber v. Gilbertson*, 2021 WL 2482109, at *13 (S.D.N.Y. June 17, 2021) (concrete benefit to individual defendant not required to show conscious misbehavior or recklessness).

Ortega's resignation provides support for scienter because it followed a damaging revelation concerning Abengoa's leverage ratios and the creation of a Controller Department to audit past projects margins. (JA981-82¶¶334, 337) Ortega

4893-4106-7353.v1

provides a more benign explanation for his resignation—to lead a quieter life after heart surgery.  (Ortega 37)  But Ortega took a position at BlackRock "where he would be responsible for strategic matters of the largest investment manager worldwide." (JA498)  At most, this creates a fact question.

### E. Control Person Liability for Ortega Is Adequately Alleged

The Complaint adequately alleges control liability for Ortega under §15 and §20(a).  Ortega contends that he cannot be liable under §20(a) without scienter.  This argument fails.  There is "a division of district court authority in [this] Circuit as to whether pleading of culpable participation is an essential element of a legally sufficient Section 20(a) claim." *In re iAnthus Capital Holdings, Inc. Sec. Litig.*, 2022 WL 19037215, at *1 (S.D.N.Y. Dec. 7, 2022).  Although this Court "'has not defined what is meant by the requirement [of] ... a "culpable participant,"'" *Schwab v. E\*TRADE Fin. Corp.*, 258 F. Supp. 3d 418, 436 (S.D.N.Y. 2017), even assuming, without conceding, that culpable participation for §20(a) approximates §10(b) recklessness as the court below held, plaintiffs have amply pled Ortega's scienter.[6]

---

[6]  To the extent this argument is deemed waived (Ortega 44-45), this Court may exercise its discretion to consider it where, as here, the issue "'presents a question of law and there is no need for additional fact-finding.'"  *Jackson*, 960 F.3d at 98.

4893-4106-7353.v1

### F.    Securities Act Claims Were Timely Filed

#### 1.    The Securities Act claims against the Underwriters were timely filed within the one-year limitations period

Abengoa's announcements in November 2014 about its debt classification of the bonds issued by Abengoa Greenfield on or about September 22, 2014 ("the 'Greenfield Bonds'") (JA929¶149) did not trigger the one-year limitations period for plaintiffs' Securities Act claims; indeed, the Greenfield Bonds did not even exist at the time of the Offering, on October 17, 2013.  (JA922¶¶123-126)  Rather, it was Abengoa's August 3, 2015 announcement of a massive €650 million capital increase and asset divestitures of €500 million—one business day after stating it had "no plans" to raise capital (JA896¶14)—that provided plaintiffs with "'sufficient information'" to plead the Securities Act claims "with enough 'detail and particularity to survive a [Rule] 12(b)(6) motion to dismiss.'"  *Fed. Hous. Fin. Agency for Nat'l Mortg. Ass'n v. Nomura Holding Am., Inc.*, 873 F.3d 85, 119 (2d Cir. 2017); *see also Merck & Co. v. Reynolds*, 559 U.S. 633, 653 (2010) ("the limitations period … begins to run once the plaintiff did discover or a reasonably diligent plaintiff would have 'discover[ed] the facts constituting the violation'—whichever comes first") (alteration in original).  Thus, when plaintiffs first asserted Securities Act claims on August 2, 2016, they were timely.  (ECF 31)

4893-4106-7353.v1

The district court correctly held that because plaintiffs had not identified any "alleged misstatements or omissions in" the Registration Statement "that relate[d] either directly or indirectly to Abengoa's debt practices …[,] the November 2014 disclosures about these debt practices did not trigger the beginning of the statute of limitations for Plaintiffs' current Securities Act claims. (SA21) That determination is the law of the case. *See Johnson v. Holder*, 564 F.3d 95, 99 (2d Cir. 2009) ("'when a court has ruled on an issue, that decision should generally be adhered to by that court in subsequent stages in the same case' unless 'cogent and compelling reasons militate otherwise'").

The Securities Act claims in the current Complaint, like those in the SAC, allege that Abengoa's Registration Statement contained inflated financial statements that prematurely recognized revenue, while falsely representing that Abengoa sought "to enforce strict financial discipline to maintain [its] strong liquidity position" (JA38¶52, JA942-43¶197), and that it recognized revenue from construction projects in accordance with the "percentage-of-completion" method. (JA40¶57, JA942-43¶197) Plaintiffs' Securities Act claims contain nothing about the misclassification of the Greenfield Bonds. Thus, the district court erred when it held that the November 2014 disclosures "alone could have alerted the plaintiffs to the alleged misstatements, [and] at the very least, they triggered a duty to inquire." (SA129)

The Underwriters cite the First Amended Complaint ("AC"), which contained allegations regarding debt misclassification, to argue that the November 2014 disclosures "relate directly to 'financial discipline.'" (Brief of Appellees Canaccord Genuity Inc., HSBC Securities (USA) Inc., Merrill Lynch International, and Société Générale ("UW") at 20 (citing Supplemental Appendix of Defendants-Appellees ("SuppA"15¶¶48-50, 50¶146))  But as the court previously explained, plaintiffs "pursue[d] other theories, omitting any mention of Abengoa's debt practices from their Securities Act claims and allegations." (SA21)  And while the November 2014 disclosures that Abengoa had improperly classified the Greenfield Bonds to bolster its leverage ratios alarmed some analysts, they would not have caused a reasonably diligent plaintiff to discover that the Registration Statement's representation of "strict financial discipline" was false *for the reason the current Complaint alleges it was false*—which was not because Abengoa had misclassified debt, but because it was engaged in an accounting fraud aimed at masking its liquidity crisis.  The Underwriters' argument on this point is illogical given that the Greenfield Bonds did not even exist at the time of the Offering.

Likewise, "the November 2014 disclosures" may have generally "led the market to doubt Abengoa's 'credibility'" (UW 21), but they would not have caused a reasonably diligent plaintiff to discover that Abengoa was flouting the "percentage of

completion method" described in the Registration Statement (JA942-43¶197), by artificially inflating profit margins on construction projects and recording fake expenses in order to prematurely recognize revenue in violation of IAS 11. (JA905¶60); *see Nomura*, 873 F.3d at 120 (to trigger the duty to inquire, information must ""relate[] directly to the misrepresentations and omissions the [p]laintiff[] … allege[s] in [its] action against the defendants,"" and must be ""specific enough to provide an ordinary investor with indications of the *probability* (not just the *possibility*) of' a violation") (alterations and emphases in original). Indeed, none of the market reaction the Underwriters cite called into question Abengoa's adherence to the percentage of completion method, or made any connection between its debt misclassification and its revenue recognition. (UW 17, 21, 23)

Even if the November 2014 disclosures about Abengoa's debt misclassification were "'storm warning[s]'" that Abengoa was generally "attempting to deceive the investing public" in some way (UW 21), they did not trigger inquiry notice because they were accompanied by reliable words of comfort from management. (AOB 37) That Abengoa "stood by" its debt classification, and voluntarily "disclosed its leverage ratios with the debt reclassified" in response to analyst concerns suggested an attempt at transparency. (UW 24) And any doubts about Abengoa's credibility when

classifying debt could not have been a storm warning that Abengoa was *separately* committing accounting fraud by recording false percentages of completion.[7]

"[U]nder *Merck*," it is the Underwriters' "burden to prove that a reasonable investor in [plaintiffs'] shoes would have conducted a fulsome investigation" in November 2014 "and uncovered information sufficient to make out a plausible claim for relief" before August 3, 2015. *Nomura*, 873 F.3d at 122. The Underwriters fail to offer any such evidence. Instead, they make the unsupported assertion that an inquiry in November 2014 "would have uncovered sufficient information to plead claims grounded in the accounting improprieties"—by some unspecified point in time— merely because those improprieties were "'widely known within Abengoa.'" (UW 18) The Underwriters' "failure to establish this indispensable piece of the statute of limitations defense dooms their argument on appeal." *Nomura*, 873 F.3d at 122.[8]

---

[7] In *LC Cap. Partners, LP v. Frontier Ins. Grp., Inc.*, 318 F.3d 148, 155 (2d Cir. 2003), "three substantial reserve charges taken within a brief period of time," followed by a news exposé, constituted storm warnings where they directly "'relate[d] to the misrepresentations'" concerning the adequacy of Frontier's reserves. Here, not only was the debt misclassification debacle completely unrelated to Abengoa's accounting fraud, but the concerns raised by analysts in November 2014 were in response to that singular incident, and were not "a series of damaging disclosures" like those in *LC Cap. Partners*, as the Underwriters contend. (UW 22)

[8] The Underwriters—not appellants—inaccurately state the law. (UW 22-23) Their contention that a plaintiff's failure to investigate "remains relevant to determining when the plaintiff should have discovered sufficient information" (UW 23) is contrary to *Merck*'s holding that the limitation period is unaffected by "whether the actual

- 40 -

Finally, while resolution of a statute of limitations defense may sometimes be appropriate at the pleading stage, it cannot be resolved in the Underwriters' favor here. The November 2014 debt misclassification disclosures did not bear any connection—direct or otherwise—to the alleged misrepresentations concerning Abengoa's fraudulent percentage-of-completion accounting and consequent absence of financial discipline. Therefore, those disclosures did not put plaintiffs on notice of the Securities Act claims alleged in the *current* Complaint; nor did they constitute adequate storm warnings triggering a duty to investigate. Even if they did, the Underwriters have not attempted to meet their burden of showing when "a reasonably diligent plaintiff" investigating the claims in November 2014 "would have discovered 'the facts constituting the'" Securities Act violations. *Merck*, 559 U.S. at 653 Accordingly, the Securities Act claims are timely, but at minimum, finding them untimely was premature at the pleading stage.

## 2. The Complaint properly relates back to the AC under Rule 15(c)

Under Rule 15(c), an amendment will relate back if it "asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out—or attempted

---

plaintiff undertook a reasonably diligent investigation." 559 U.S. at 653; (*see also* UW 16, 18 (citing *LC Cap. Partners*, 318 F.2d at 156, which predated *Merck*, to incorrectly argue that a "plaintiff must 'at least … allege that inquiry was made'")).

4893-4106-7353.v1

to be set out—in the original pleading." Fed. R. Civ. P. 15(c)(1)(B). Rule 15(c) provides a "liberal relation back policy." *Villante v. Dep't of Corrs. of City of N.Y.*, 786 F.2d 516, 520 (2d Cir. 1986); *see also Siegel v. Converters Transp., Inc.*, 714 F.2d 213, 216 (2d Cir. 1983) (Rule 15(c) is to be liberally construed, particularly when, as here, an amendment does not allege a new cause of action). Indeed, "[t]he purpose of 'Rule 15 "is to provide maximum opportunity for each claim to be decided on its merits rather than on procedural technicalities,"'" and "the 'central inquiry is whether adequate notice of the matters raised in the amended pleading has been given to the opposing party.'" *Slayton v. Am. Exp. Co.*, 460 F.3d 215, 228 (2d Cir. 2006).

Adequate notice requires only that the Underwriters were aware of " the general fact situation alleged in the original pleading.'" *Stevelman v. Alias Rsch., Inc.*, 174 F.3d 79, 86 (2d Cir. 1999). Here, the Complaint relates back to the timely-filed AC— the first pleading alleging violations of the same sections of the Securities Act against the same Underwriters. (SA19-20 ("It is undisputed that the relevant date for evaluating the timeliness of the Securities Act claims is August 2, 2016, when these claims and the Underwriter Defendants were added to the litigation for the first time."))

- 42 -

### a. The Complaint's allegations concerning Abengoa's lack of "strict financial discipline" relate back to the AC

It is undisputed that the AC, the SAC, and the operative Complaint all allege that the Registration Statement's pronouncement that "[w]e have successfully grown our business while seeking to enforce *strict financial discipline* to maintain our strong liquidity position" was materially false and misleading when made. (SuppA13-14¶46; JA38¶52; JA942-43¶197; UW 35 (referring to the "alleged misrepresentation that the first and third amended complaints *share*")) This is far more than relating back to "'the general fact situation alleged in the original pleading'"—both complaints target the same statement from the Registration Statement. *Stevelman*, 174 F.3d at 86. That the alleged reasons for its falsity have been changed over time via amendment, in view of information that has since come to light, is far from remarkable. *See Siegel*, 714 F.2d at 216 ("'When a suit is filed in a federal court ..., the defendant knows that the whole transaction described in it will be fully sifted, by amendment if need be.'"). This Court acknowledged as much in *Loreley* when discussing how and why leave to amend should be given after receiving the "benefit of a ruling." *See Loreley*, 797 F.3d at 190-91.

4893-4106-7353.v1

### b. The Complaint's allegations concerning the "percentage-of-completion" method relate back to the AC

Plaintiffs filed the AC on August 2, 2016, indisputably within the three-year repose period. (ECF 31) In the AC, plaintiffs alleged that the challenged statements were actionable because they misrepresented and failed to disclose, *inter alia*, that Abengoa "obtained lines of credit utilizing erroneous financial reports that overstated the value of certain projects, *by showing inaccurate percentages of completion on some projects*." (SuppA15-16¶49) Significantly, although the district court failed to conduct a relation back analysis, it expressly—and correctly—held the Complaint's allegations regarding Abengoa's accounting policies (*i.e.*, the "percentage-of-completion" method) have been alleged dating back to the AC. (SA128-29 ("[T]he Court agrees with plaintiffs that the Section 11 claims regarding accounting policies are not new and were alleged, although sparingly, in both the FAC and SAC against the Underwriter defendants.")); *Slayton*, 460 F.3d at 229; *see also id.* at 228 ("where an initial complaint alleges a 'basic scheme' of defrauding investors by misrepresenting earnings and profitability, an allegation of accounts receivable manipulation in an amended complaint will relate back because it is a 'natural offshoot' of that scheme."). Thus, the Underwriters did not have to "speculate" (UW 37) that plaintiffs might one day file another amended complaint challenging the

- 44 -

falsity of the "strict financial discipline" statement in the Registration Statement, or that plaintiffs might make allegations relating to Abengoa's "percentage-of-completion" accounting policy. Plaintiffs did that nearly seven years ago in the AC.

Equally unavailing is the Underwriters' contention that because the FEs' descriptions of accounting improprieties—which included allegations concerning projects with false percentages of completion (SuppA24¶86)—were only alleged in the Exchange Act section of the AC, they could not possibly have been aware that they might face liability for similar claims. (UW 32-33) This is baseless, given that the AC's Securities Act and Exchange Act sections *both* alleged that the same exact statements in the Registration Statement were false. (*Compare* SuppA13-15¶¶46-48 (Securities Act) *with* SuppA26-28¶¶94-96 (Exchange Act)) As such, the Underwriters' assertion that the AC's allegations "were not connected in any way to any alleged misrepresentation in the registration statement" (UW 32-33) is patently false. *See, e.g.*, *CBF Industria de Gusa S/A v. AMCI Holdings, Inc.*, 2020 WL 1673701, at *1-*3 (S.D.N.Y. Apr. 6, 2020) (certain claims asserted against all defendants in amended pleading related back to initial complaint alleging those same claims against only two defendants, when all defendants were otherwise named in both pleadings, because the underlying facts were largely the same).

4893-4106-7353.v1

This Court's decision in *Stevelman* is instructive. There, the original complaint alleged that the company's "internal controls" were inadequate and that the defendants knew or recklessly disregarded the accounts receivable problem when they made false statements involving inflated earnings. 174 F.3d at 86. On amendment, "substantially the same allegations [we]re made, with added specificity: Stevelman allege[d] improper recognition of revenues and failure to establish timely and adequate reserves for doubtful accounts in violation of GAAP and industry standards." *Id*. This Court held that "these are the same transactions and conduct contained in the original allegation of 'inadequate internal controls'" and, therefore, the claims related back under Rule 15(c). *Id*. at 86-87. Similarly, the AC's allegations concerning "inaccurate percentages of completion" on certain projects were alleged in greater detail in the Complaint. (SuppA15-16¶49)

The cases relied on by the Underwriters are inapposite. In *In re Alcatel Securities Litigation*, 382 F. Supp. 2d 513, 528 (S.D.N.Y. 2005) (UW 33), plaintiffs alleged an accounting concept (goodwill) in an amended pleading that was not contemplated by the original complaint. In *Lehman XS Tr., Series 2006-GP2 by U.S. Bank Nat'l Ass'n v. GreenPoint Mortg. Funding, Inc.*, 916 F.3d 116, 129 (2d Cir. 2019) (UW 3, 28-29, 31), this Court noted the many differences between the original and second amended complaint, including that they "invoke separate contracts; the

signatories to the [agreements] are different; and the nature of the claims and the remedies they seek are not the same." That is entirely unlike the situation here, where the Complaint alleges the same Securities Act claims, arising from the same Offering, against the same defendants, alleging identical misstatements, that were false, in part, for failing to adhere to the same percentage of completion method explicitly referenced in the AC. *See also Peifa Xu v. Gridsum Holding Inc*., 2021 WL 773002, at *8 (S.D.N.Y. Feb. 23, 2021) (the concepts of "'sub-optimal' offshore capital structure, the impact this structure would have on Gridsum's tax liability … or Gridsum's obligation to disclose these facts" were introduced for the first time in the third amended complaint)). (UW 34) *Caldwell v. Berlind*, 543 F. App'x 37 (2d Cir. 2013) is also distinguishable. *See id.* ("[n]either this accounting treatment nor any other accounting practice allegedly causing a misstatement as to the leverage ratio [was] to be found in the original complaints"). Here, the percentage-of-completion method has been a focus of plaintiffs' allegations since the AC. (SuppA15-16¶49)

Moreover, *Slayton* helps *plaintiffs*, not defendants. (UW 28, 30-31, 36) This Court held that claims in an original pleading alleging undisclosed risks and exposure gave adequate notice to the defendants of an amended complaint's allegations of valuation misstatements and non-compliance with GAAP, and thus related back under

Rule 15(c). *Slayton*, 460 F.3d at 228-29. The AC gave the Underwriters adequate notice of the Complaint's Securities Act claims and they relate back to the AC.[9]

Finally, because "the timeliness analysis differs from the relation-back analysis" (UW 36)—with the former requiring a direct connection between the misrepresentation and the disclosure triggering notice, and the latter merely requiring a claim to arise out of the conduct set out in the original pleading—the Underwriters' argument that plaintiffs' positions on inquiry notice and relation back cannot coexist is meritless. (UW 35-38) The November 2014 disclosures about Abengoa's debt misclassification did not relate directly to the misrepresentations about its strict financial discipline or its use of the percentage-of-completion method—as they must have to commence the one-year limitations period. But because both categories of misrepresentations alleged in the current Complaint were alleged in the AC, the Complaint's Securities Act claims do relate back to the AC. It is of no moment that

---

[9] Permitting relation back here would not "frustrate the purposes of the statutes of limitation and repose in the Securities Act," as the Underwriters contend. (UW 34-35) *See, e.g.*, *Se. Pa. Transp. Auth. v. Orrstown Fin. Servs. Inc.*, 12 F. 4th 337, 353 (3d Cir. 2021) (finding claims in third amended complaint related back nine years after offering, in an action brought under the Securities Act and Exchange Act before the Acts' deadlines, holding "the right to repose cannot bar the courthouse doors if a defendant never had it"). *See also Krupski v. Costa Crociere S. p. A.*, 560 U.S. 538, 550 (2010) ("[T]he purpose of relation back [is] to balance the interests of the defendant protected by the statute of limitations with the preference expressed in the Federal Rules of Civil Procedure in general, and Rule 15 in particular, for resolving disputes on their merits.").

4893-4106-7353.v1

the AC *also* included allegations about Abengoa's debt misclassification that are no longer part of the Complaint's Securities Act claims.

## II.     CONCLUSION

The dismissal of plaintiffs' claims with prejudice should be reversed.

DATED:  April 3, 2023                Respectfully submitted,

ROBBINS GELLER RUDMAN
  & DOWD LLP
ANDREW S. LOVE

                                     *s/Andrew S. Love*
                                     ANDREW S. LOVE

Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA  94104
Telephone:  415/288-4545
415/288-4534 (fax)
alove@rgrdlaw.com

ROBBINS GELLER RUDMAN
  & DOWD LLP
ROBERT M. ROTHMAN
ERIN W. BOARDMAN
ROBERT D. GERSON
58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)
rrothman@rgrdlaw.com
eboardman@rgrdlaw.com
rgerson@rgrdlaw.com

LEVI & KORSINSKY, LLP
NICHOLAS I. PORRITT
ADAM M. APTON
55 Broadway, 4th Floor
New York, NY 10006
Telephone: 212/363-7500
212/363-7171 (fax)
nporritt@zlk.com
aapton@zlk.com

*Counsel for Lead Plaintiffs-Appellants and Movant-Appellant*

4893-4106-7353.v1

## RULE 32(g) CERTIFICATE

The undersigned counsel certified that PLAINTIFF-APPELLANTS' REPLY BRIEF uses a proportionally spaced Times New Roman typeface, 14-point, and that the text of the brief comprises 10,490 words according to the word count provided by Microsoft Word 2016 word processing software.

*s/Andrew S. Love*
ANDREW S. LOVE

## DECLARATION OF SERVICE

I, the undersigned, declare:

1.     That declarant is and was, at all times herein mentioned, a citizen of the United States and employed in the City and County of San Francisco, over the age of 18 years, and not a party to or interested party in the within action; that declarant's business address is Post Montgomery Center, One Montgomery Street, Suite 1800, San Francisco, California 94104.

2.     I hereby certify that on April 3, 2023, I electronically filed the foregoing document: **PLAINTIFFS-APPELLANTS' REPLY BRIEF** with the Clerk of the Court for the United States Court of Appeals for the Second Circuit by using the appellate CM/ECF system.

3.     I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

I declare under penalty of perjury that the foregoing is true and correct. Executed on April 3, 2023, at San Francisco, California.

*s/Andrew S. Love*
ANDREW S. LOVE